Darren G. Reid (11163)
Brandon T. Christensen (16420)
HOLLAND & HART LLP
222 South Main Street, Suite 2200
Salt Lake City, Utah  84101
Telephone:  (801) 799-5800
Facsimile:  (801) 799-5700
dgreid@hollandhart.com
btchristensen@hollandhart.com

*Attorneys for Plaintiffs*

## IN THE FOURTH JUDICIAL DISTRICT COURT
## IN AND FOR UTAH COUNTY, STATE OF UTAH

| | |
|---|---|
| SMASH TECHNOLOGY, LLC, a Nevada limited liability company; and MICHAEL ALEXANDER, an individual; <br><br>     Plaintiffs, <br><br> vs. <br><br> SMASH SOLUTIONS, LLC, a Delaware limited liability company; JERRY "J.J." ULRICH, an individual; and JOHN DOES 1-3; <br><br>     Defendants. | **MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** <br><br> Case No. 190400159 <br><br> Judge Lynn W. Davis |

Plaintiffs Smash Technology, LLC ("**Technology**") and Michael Alexander

("**Alexander**"), by and through their undersigned counsel, respectfully requests that pursuant to

Utah R. Civ. P. 65(a)(e) the Court enter a Temporary Restraining Order and Preliminary

Injunction against Defendants Jerry "J.J." Ulrich ("**Ulrich**") and John Does 1-3 (collectively,

"**Innovations**") as follows:

I.      **CONCISE STATEMENT OF RELIEF REQUESTED & GROUNDS THEREFORE**

Smash Technology has developed "customer relationship management" (CRM) technology that enhances businesses' ability to connect, develop, interact, and communicate with, and market to their customers and prospective contacts in a wide variety of ways, including by creating highly-detailed contact profiles and dashboard aggregating and updating data via public sources and databases to maximize communication, sales, marketing, social media, and various other activities.  Technology's intellectual property and proprietary technology (the "**CRM Platform**") is wholly-owned by Technology.

Michael Alexander is the sole member and manager of Technology.  In forming Technology, Alexander partnered with J.J. Ulrich to develop the company into a CRM technology powerhouse.  To date, Alexander has funded Technology with approximately $900,000.  As Technology's primary operator, Ulrich was tasked with a simple mandate: hire a Chief Technology Officer (Sam Potter) to run point with the outsourced development team, Feracode LLC, the Utah company developing the CRM Platform for Technology.  Once this important task was completed, Technology would invest in hosting and server costs for the CRM Platform and other necessary operating expenses once ready to deploy the Alpha testing phase and become partially operational.

Upon information and belief, Alexander has recently discovered that Ulrich formed a new entity or entities—John Does 1-3 and referred to herein as Smash *Innovations*—for the purpose of misappropriating Technology's CRM Platform, hi-jacking Technology's development relationship with Feracode, and soliciting new investors and customers outside of Technology.  Ulrich's current actions are causing immediate and irreparable harm to Technology

and the CRM Platform by diluting the brand, creating confusion in the marketplace, and interfering with Technology's current and long-term business value proposition to investors and customers.

For the reasons detailed below, Plaintiffs request that this Court enter a Temporary Restraining Order ordering Ulrich and Innovations to:

a.      refrain from misappropriating Technology's intellectual property and CRM Platform;

b.      refrain from interfering with Technology's Feracode contract and prospective customers;

c.      refrain from  misrepresenting their ownership of Technology's intellectual property, CRM Platform, business tool suite, and database to investors, customers, or other third parties; and

d.      refrain from taking any other action that would impair Plaintiffs' rights and cause them additional harm.

## II.      STATEMENT OF FACTS

### A.      The Formation of Smash Technology (Technology)

Smash Technology has developed "customer relationship management" (CRM) technology that enhances businesses' ability to connect, develop, interact, and communicate with, and market to their customers and prospective contacts in a wide variety of ways, including by creating highly-detailed contact profiles and dashboard aggregating and updating data via public sources and databases to maximize communication, sales, marketing, social media, and various other activities.  *See* Declaration of Michael Alexander ("Decl.") ¶ 3, attached as

Exhibit A.  Technology's intellectual property and proprietary technology—the CRM Platform, business tool suite, and data base—is wholly-owned by Technology.  *Id.*

Michael Alexander is the sole member and manager of Technology.  Decl. ¶ 4.  In forming Technology, Alexander partnered with J.J. Ulrich, who was previously the majority shareholder in Smash Solutions or Solutions.  *Id.*  Alexander was also a shareholder in Solutions. Solutions dissolved its business by executing dissolution papers and sending notice to all interested parties.  *Id.*

Alexander's and Ulrich's Technology partnership intended to work as follows:  first, Ulrich agreed to transfer clear title to Solutions' infant intellectual property to Technology, and second, Alexander agreed to fund Technology.  Decl. ¶ 5.  Ulrich agreed to dissolve Smash Solutions and indemnify Alexander and Technology from any liability from Smash Solutions creditors, investors, and employees.  *Id.*  Ulrich was unable to provide any of the initial funding. *Id.*  Pursuant to this same agreement, Ulrich agreed to build his Bitclub Network business to produce adequate sales and production volume to maximize daily earnings from Tatiana Alexander's Uberfund and Centurion Bitclub Network.  Ulrich has defaulted on his obligations relating to the Bitclub Network.

Based upon his representations, Ulrich transferred Solutions' intellectual property to Technology.  To date, Alexander has funded Technology with approximately $900,000.  *Id.*

Alexander and Ulrich intended to develop Technology into a CRM technology powerhouse by developing the sophisticated CRM Platform that would outpace all competitors in the marketplace.  Decl. ¶ 6.

As Technology's primary operator, Ulrich was tasked with a simple mandate: hire a Chief Technology Officer (Sam Potter) to run point with the outsourced development team building out the CRM Platform.  Decl. ¶ 7.  Once this important task was completed, Technology would invest in hosting and server costs for the CRM Platform and other necessary operating expenses once ready to deploy the Alpha testing phase and become partially operational.  *Id.*

### B.    The Feracode Agreement

In March 2018, Technology entered into a Master Services Agreement with Feracode, LLC, a Utah limited liability company, whereby Feracode agreed to develop the CRM Platform in exchange for $1.7 million.  Decl. ¶ 8.  The parties agreed that Feracode would develop the CRM Platform during 12 discrete time periods or milestones.  *Id.*  After each accomplished milestone, the parties would agree upon the completed work, exchange payment, and authorize the next milestone to be performed.  *Id.*  To date, Feracode has completed seven milestones, readying the CRM Platform for its Alpha testing phase.  *Id.*

Though Solutions never fully developed CRM technology, Solutions developed limited templates and technical documents that could be used as a spring-board for Technology (with Feracode's expertise and services) to develop more sophisticated and superior CRM technology that was viable to market and was sustainable and scalable, including the use of current updated language and superior software code, among other things.  Decl. ¶ 9.

Technology has developed the CRM Platform at great expense and implemented protocols to keep information and processes related to the CRM Platform confidential and proprietary.  Decl. ¶ 10.  Technology's intellectual property and CRM Platform is its most

valuable asset.  *Id.*  Technology intends to develop significant goodwill and a quality business reputation in the marketplace with its CRM Platform.  *Id.*

### C.     Ulrich's Financial Misconduct

Upon information and belief, Ulrich has engaged in numerous unauthorized transactions for Technology without Alexander's knowledge or authorization, including but not limited to entering into unauthorized vendor agreements, commingling Technology funds with Solutions and personal accounts, and using Technology funds for personal expenses.  Decl. ¶ 11.  For example, Ulrich has used funds for personal expenses such as moving expenses, travel and food expenses, investments, computers, and internet and cable services for his home and other businesses.  *Id.*

Upon information and belief, Ulrich has failed to account for substantial funds Alexander invested into Technology, including two wires in the amount of approximately $90,000 and earnings provided from Alexander's other business interests in the amount of approximately $900,000.  Decl. ¶ 12.

Despite repeated requests from Alexander, Ulrich has only provided limited (and troubling) financial information related to Technology's expenses.  Decl. ¶ 13.  Significantly, Ulrich has failed to provide any original documentation of Technology's transactions like bank and credit card statements, digital exchanges conversion transaction reports (when Ulrich converted crypto currencies into U.S. dollars), invoices, and vendor contracts.  *Id.*  Upon information and belief, Ulrich has also fraudulently invoiced Solutions and/or himself for various Technology purchases.  *Id.*  In either instance, Ulrich is enriching himself to the detriment of Technology and Alexander.  *Id.*

### D.      Innovations: Ulrich's Misappropriation and Deceit

Upon information and belief, Alexander recently discovered that Ulrich has formed a new entity or entities—John Does 1-3 and referred to herein as Innovations—for the purpose of misappropriating Technology's CRM Platform and intellectual property, hi-jacking Technology's development relationship with Feracode, and soliciting new investors and customers outside of Technology.  Decl. ¶ 14.

Ulrich recently locked Alexander out of chatroom discussions with Feracode, presumably to supplant Technology with his newly-formed enterprise Innovations and to redirect Feracode's development efforts to support his misappropriation of the CRM Platform.  Decl. ¶ 15.  Upon information and belief, Ulrich is working with and/or directing Feracode to circumvent its contractual obligations with Technology and to divert the CRM Platform and related intellectual property to Innovations.  *Id.*  Upon information and belief, and without authorization, Ulrich has dusted off Solutions' old private placement memorandum (PPM) to solicit funds from investors while misrepresenting his ownership of Technology's CRM platform and intellectual property.  *Id.*  Upon information and belief, Ulrich has removed access to Technology's website and is directing investors or customers to the old Solutions website or new Innovations websites.  *Id.*

Ulrich's current actions are causing immediate and irreparable harm to Technology and the CRM Platform by diluting the brand and technology, creating confusion in the marketplace, and interfering with Technology's current and long-term business value proposition to investors and customers.  Decl. ¶ 16.  Given Ulrich's and Innovations' utter disregard for the law and their unwillingness to respect Technology's rights, they will likely continue their actions.  Thus, Plaintiffs are at risk of losing their entire investment and business.  These damages are

irreparable and are difficult to calculate.  At this point, it appears the only way Ulrich and

Innovations will cease their wrongful conduct is through judicial intervention.  Consequently,

Plaintiffs' motion should be granted.

## III.   ARGUMENT

A district court may issue a TRO and/or preliminary injunction upon a showing that: (1)

"The applicant will suffer irreparable harm unless the order or injunction issues"; (2) "The

threatened injury to the applicant outweighs whatever damage the proposed order or injunction

may cause to the party restrained or enjoined"; (3) "The order or injunction, if issued, would not

be adverse to the public interest"; and (4) "There is a substantial likelihood that the applicant will

prevail on the merits of the underlying claim, or the case presents serious issues on the merits

which should be the subject of further litigation."  Utah R. Civ. P. 65A(e).

As shown below, Plaintiffs satisfy each of these four prerequisites, and the Court should

grant this motion.

### A.   Absent An Injunction, Plaintiffs Will Suffer Irreparable Harm

Injunctive relief is fundamentally preventive in nature, and an injunction serves to

"preserve the status quo pending the outcome of the case."  *Zagg, Inc. v. Harmer*, 2015 UT App

52, ¶ 8, 345 P.3d 1273, 1275, *citing Hunsaker v. Kersh*, 1999 UT 106, ¶ 8, 991 P.2d 67, 69

("Injunctive relief is not purely limited to cases where no other possible remedy will be

available.  Its broader purpose is preventive in nature.").  Consequently, the "irreparable harm"

justifying an injunction includes wrongs (i) "of a repeated and continuing character" *or* (ii)

"which occasion damages that are estimated only by conjecture, and not by any accurate

standard." *Hunsaker*, 1999 UT 106, ¶ 9, 991 P.2d at 69, *citing System Concepts, Inc. v. Dixon*, 669 P.2d 421, 427-28 (Utah 1983).

Here, monetary damages are difficult to calculate. Ulrich and Innovations are misappropriating Technology's CRM Platform, hi-jacking Technology's development relationship with Feracode, and soliciting new investors to fund the CRM Platform outside of Technology. Among other things, Ulrich's and Innovations' actions are diluting Technology's brand and technology, creating confusion in the marketplace, and interfering with Technology's current and long-term business value proposition to investors and customers—immediate harms which are all egregious and ongoing. The harm is even more troubling because Ulrich and Innovations are, upon information and belief, using an old private placement memorandum to solicit investor funds and potentially implicate Technology in various types of fraud, demonstrating a maliciousness that blatantly flouts their obligations to Plaintiffs. Absent an injunction, Plaintiffs will continue to face irreparable harm.

**B.      An Injunction In Plaintiffs' Favor Outweighs Any Potential Damage The Injunction May Cause Defendants**

Plaintiffs will suffer far greater harm in the absence of the requested injunction than Ulrich and Innnovations will suffer if the requested injunction issues. Ulrich and Innovations are misappropriating Technology's most valuable asset, the CRM Platform, and misrepresenting its true ownership and control to investors and customers. By diluting Technology's brand and technology, creating confusion in the marketplace, and interfering with Technology's current and long-term value, Ulrich and Innovations are violating the laws designed to protect businesses from such conduct.

In contrast, the requested injunction would cause no cognizable harm to Ulrich and Innovations, who have no legitimate right to misappropriate the CRM Platform, to interfere with Technology's contract with Feracode, and to solicit funds from investors and customers through false and misleading means. Ulrich and Innovations will only be prevented from doing that which they cannot do legally, which is not a harm. *See Novell Inc. v. Timpanogos Research Group Inc.,* No. 970400339, 1998 WL 177721, at *1 (Utah Dist. Ct., 4th Dist., Jan. 30, 1998). The narrowly-tailored restrictions on their conduct during the pendency of this litigation is appropriate given their egregious conduct and the immediate and ongoing harm to Plaintiffs. Thus, the TRO that Plaintiffs seek will not cause any legitimate harm to Ulrich and Innovations, let alone a harm that is outweighed to the harm facing Plaintiffs, and therefore, the motion should be granted.

### C.    Public Interest Favors Injunctive Relief

The Court must balance the interest in protecting the right for Plaintiffs to protect their investments and intellectual property against Ulrich's and Innovations right to conduct legitimate business in the marketplace. However, the balancing in this case overwhelmingly favors Plaintiffs. Public interest favors granting an injunction because Ulrich's and Innovations' conduct constitutes misappropriation, deceit, and other intolerable conduct, causing immediate and irreparable harm to Plaintiffs. The scales of justice tip in favor of Plaintiffs, as a temporary injunction would preserve the status quo during the pendency of this litigation as the underlying claims are adjudicated, including ownership and control of the CRM Platform. Ulrich and Innovations would not be precluded from conducting legitimate business so long as it did not

involve the Technology's intellectual property, the CRM Platform, interference with Feracode, and the deceptive practices with investors and customers.

**D.      Plaintiffs A Substantial Likelihood of Success on The Merits**

Pursuant to Utah R. Civ. P. Rule 65A, an injunction may be entered where a plaintiff shows a substantial likelihood of success on the merits, or that "the case presents serious issues on the merits which should be the subject of further litigation."  Utah R. Civ. P. 65A(e)(4).  Here, Plaintiffs satisfy both standards, and for purposes of this motion, focuses only on three of their claims against Defendants.

As a starting point, this case presents serious issues on the merits, which should be subject to further litigation.  The facts demonstrate that Ulrich and Innovations are currently misappropriating Technology's CRM Platform by attempting to diver Feracode's development efforts and to solicit investors and customers outside the scope of Technology, the sole owner and developer of the CRM Platform.  At a fundamental level, this issue must be subject to further litigation.

**i.      Plaintiffs are likely to succeed on their intentional interference claim.**

To prevail on the merits of a tortious interference claim, a plaintiff must prove "(1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) . . . by improper means, (3) causing injury to the plaintiff."  *Eldredge v. Johndrow*, 2015 UT 21, ¶ 70, 345 P.3d 553.

Ulrich's and Innovations conduct was and is intentional.  Ulrich recently locked Alexander out of chatroom discussions with Feracode, presumably to supplant Technology and to redirect Feracode's development efforts to support Innovations' misappropriation of the CRM

Platform.  Upon information and belief, Ulrich is working with and/or directing Feracode to circumvent its contractual obligations with Technology and to divert the CRM Platform to Innovations.

To establish improper means, a plaintiff must show "that the defendant's means of interference were contrary to statutory, regulatory, or common law or violated an established standard of a trade or profession." *Anderson Dev. Co. v. Tobias*, 2005 UT 36, ¶ 70 116 P.3d 323 (citation omitted).  Improper means include "violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood."  *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 201 (Utah 1991).  Here, Ulrich's and Innovations conduct includes deceit and misrepresentation, as described above.

Because Ulrich's and Innovations conduct also has caused injury to Plaintiffs, Plaintiffs are likely to succeed on the merits of their intentional interference claim.

>            **ii.       Plaintiffs are likely to succeed on their deceptive trade practices claim.**

To prevail on the merits of a deceptive trade practices claim under Utah Code Ann. § 13-11a-3(1)(b), (c) and (e), a plaintiff must establish that "in the course of a person's business," the defendant "(b) causes likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services; (c) causes likelihood of confusion or of misunderstanding as to affiliation, connection, association with, or certification by another; . . . [and] (e) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have or that person has sponsorship, approval, status, affiliation, or connection that the person does not have."

Here, Ulrich and Innovations are representing to Feracode, investors, and customers that Innovations owns and operates the CRM Platform and intellectual property, which "causes likelihood of confusion or misunderstanding" as to the "source" of the CRM Platform and Technology's implicit "approval" of Ulrich's and Innovations' marketing and/or use of the CRM Platform and intellectual property.  Ulrich's and Innovations' representations also "causes likelihood of confusion or misunderstanding" as to their "affiliation, connection, [and] association with" Technology and its CRM Platform.

Moreover, Ulrich and Innovations are representing that the CRM Platform and intellectual property has "sponsorship, approval, status, affiliation, or connection" with Solutions and/or Technology.  Indeed, upon information and belief, Ulrich is currently using Solutions' old private placement memorandum (PPM) to solicit funds from investors while misrepresenting his ownership of the Technology's CRM platform.

Based on the facts before the Court, Plaintiffs are likely to succeed on their deceptive trade practices claim against Ulrich and Innovations.

### iii.    Plaintiffs are likely to succeed on their unjust enrichment claim.

Upon information and belief, Ulrich has fraudulently invoiced Solutions and/or himself for various Technology "expenses."  Moreover, Ulrich has used Technology funds for personal expenses such as moving expenses, among other things.  Thus, Technology has conferred significant benefits on Ulrich and/or Solutions, which they knowingly accepted.  If Ulrich and/or Solutions retain these benefits, they will be unjustly enriched to the detriment of Technology and Alexander.

"Unjust enrichment of a person occurs when he has and retains money or benefits which in justice and equity belong to another." *Commercial Fixtures & Furnishings, Inc. v. Adams*, 564 P.2d 773, 776 (Utah 1977).  There must be a benefit conferred, an appreciation or knowledge of the benefit, and the retention of the benefit so as to make it inequitable to retain the benefit without payment of its value.  *See Concrete Prods. Co. v. Salt Lake County*, 734 P.2d 910, 911 (Utah 1987).  As described above, Plaintiffs meet these elements and are likely to succeed on their claim against Ulrich and Solutions.

### CONCLUSION

WHEREFORE, Plaintiffs respectfully request that this Court:

1.      grant their Motion for a Temporary Restraining Order ordering Ulrich and Innovations to:

      a.      refrain from misappropriating Technology's intellectual property and CRM Platform;

      b.      refrain from interfering with Technology's Feracode contract and prospective customers;

      c.      refrain from  misrepresenting their ownership of Technology's intellectual property and CRM Platform to investors, customers, or other third parties; and

      d.      refrain from taking any other action that would impair Plaintiffs' rights and cause them additional harm.

2.      grant their Motion for Temporary Restraining Order without the necessity of requiring Plaintiffs to prove actual damages or posting a bond or other security.

3.      convert the Temporary Restraining Order to a preliminary injunction at a hearing to be set for the Court's earliest convenience pursuant to Utah R. Civ. P. 65A(b)(3); and

4.      such other relief as the Court deems just and proper.

DATED this 28th day of January, 2018.

HOLLAND & HART, LLP


/s/ Darren G. Reid
Darren G. Reid
Brandon Christensen
*Attorneys for Plaintiff*

11903754_1

Darren G. Reid (11163)
Brandon T. Christensen (16420)
HOLLAND & HART LLP
222 South Main Street, Suite 2200
Salt Lake City, Utah  84101
Telephone:  (801) 799-5800
Facsimile:  (801) 799-5700
dgreid@hollandhart.com
btchristensen@hollandhart.com

*Attorneys for Plaintiffs*

_____

## IN THE FOURTH JUDICIAL DISTRICT COURT
## IN AND FOR UTAH COUNTY, STATE OF UTAH

| | |
|---|---|
| SMASH TECHNOLOGY, LLC, a Nevada limited liability company; and MICHAEL ALEXANDER, an individual;<br><br>    Plaintiffs,<br><br>vs.<br><br>SMASH SOLUTIONS, LLC, a Delaware limited liability company; JERRY "J.J." ULRICH, an individual; and JOHN DOES 1-3;<br><br>    Defendants. | **DECLARATION OF MICHAEL ALEXANDER**<br><br><br>Case No. 190400159<br><br>Judge Lynn W. Davis |

I, Michael Alexander, pursuant to Utah Code § 78B-5-705, hereby declare under penalty

of perjury the following to be true to the best of my knowledge:

1.      I am over the age of 21 and am the sole member and manager of Smash

Technology.



2.    The facts set forth in this declaration are within my personal knowledge and are true and correct to the best of my knowledge, information, and belief.

**The Formation of Smash Technology (Technology)**

3.    Smash Technology has developed "customer relationship management" (CRM) technology that enhances businesses' ability to connect, develop, interact, and communicate with, and market to their customers and prospective contacts in a wide variety of ways, including by creating highly-detailed contact profiles and dashboard aggregating and updating data via public sources and databases to maximize communication, sales, marketing, social media, and various other activities.  Technology's intellectual property and proprietary technology—the CRM Platform, business tool suite, and data base—is wholly-owned by Technology.

4.    I am the sole member and manager of Technology.  In forming Technology, I partnered with J.J. Ulrich, who was previously the majority shareholder in Smash Solutions or Solutions.  I was also a shareholder in Smash Solutions.  Solutions dissolved its business by executing dissolution papers and sending notice to all interested parties.

5.    My partnership with Ulrich intended to work as follows:  first, Ulrich agreed to transfer clear title to Solutions' infant intellectual property to Technology, and second, I agreed to fund Technology.  Ulrich agreed to dissolve Smash Solutions and indemnify me and Technology from any liability from Smash Solutions' creditors, investors, and employees. Ulrich was unable to provide any of the initial funding.  Pursuant to this same agreement, Ulrich agreed to build his Bitclub Network business to produce adequate sales and production volume to maximize daily earnings from Tatiana Alexander's Uberfund and Centurion Bitclub Network.

Ulrich has defaulted on his obligations relating to the Bitclub Network.  Based upon his representations, Ulrich transferred Solutions' intellectual property to Technology and dissolved Smash Solutions.  To date, I have funded Technology with approximately $900,000.

6.     We intended to develop Technology into a CRM technology powerhouse by developing the most advanced and sophisticated CRM Platform that would outperform and outpace all competitors in the marketplace.

7.     As Technology's primary operator, Ulrich was tasked with a simple mandate: hire a Chief Technology Officer (Sam Potter) to run point with the outsourced development team building out the CRM Platform.  Once this important task was completed, Technology would invest in hosting and server costs for the CRM Platform and other necessary operating expenses once ready to deploy the Alpha testing phase and become partially operational.

**The Feracode Agreement**

8.     In March 2018, Technology entered into a Master Services Agreement with Feracode, LLC, a Utah limited liability company, whereby Feracode agreed to develop the CRM Platform in exchange for $1.7 million.  The parties agreed that Feracode would develop the CRM Platform during 12 discrete time periods or milestones.  After each accomplished milestone, the parties would agree upon the completed work, exchange payment, and authorize the next milestone to be performed.  To date, Feracode has completed seven milestones, readying the CRM Platform for its Alpha deployment and testing phase.

9.     Though Solutions never fully developed CRM technology, Solutions developed limited templates and technical documents that could be used as a spring-board for Technology

(with Feracode's expertise and services) to develop more sophisticated and superior CRM technology that was viable to market and was sustainable and scalable, including the use of current updated language and superior software code, among other things.

10.     Technology has developed the CRM Platform at great expense and implemented protocols to keep information and processes related to the CRM Platform confidential and proprietary.  Technology's intellectual property and CRM Platform is its most valuable asset. Technology intends to develop significant goodwill and a quality business reputation in the marketplace with its CRM Platform.

**Ulrich's Financial Misconduct**

11.     Upon information and belief, Ulrich has engaged in numerous unauthorized transactions for Technology without Alexander's knowledge or authorization, including but not limited to entering into unauthorized vendor agreements, commingling Technology funds with Smash Solutions and personal accounts, and using Technology funds for personal expenses.  For example, I reviewed some transactions, it appears Ulrich has used funds for personal expenses such as moving expenses, travel and food expenses, investments, computers, and internet and cable services for his home and other businesses.

12.     Upon information and belief, Ulrich has failed to account for substantial funds I invested into Technology, including two wires in the amount of approximately $90,000 and earnings provided from my other business interests in the amount of approximately $900,000.

13.     Despite my repeated requests, Ulrich has only provided limited (and troubling) financial information to me related to Technology's expenses.  Ulrich has failed to provide any

original documentation of Technology's transactions like bank and credit card statements, digital exchanges conversion transaction reports (when Ulrich converted crypto currencies into U.S. dollars), invoices, and vendor contracts.  Upon information and belief, Ulrich has also fraudulently invoiced Solutions and/or himself for various Technology purchases.  In either instance, I believe Ulrich is enriching himself to the detriment of Technology and Alexander.

**Innovations: Ulrich's Misappropriation and Deceit**

14.     Upon information and belief, I recently discovered information that Ulrich has possibly formed a new entity or entities—referred to herein as Innovations—for the purpose of misappropriating Technology's intellectual property and CRM Platform, hi-jacking Technology's development relationship with Feracode, and soliciting new investors and customers outside of Technology.

15.     Ulrich recently locked me out of chatroom discussions with Feracode, presumably to supplant Technology with his newly-formed enterprise Innovations and to redirect Feracode's development efforts to support his misappropriation of the CRM Platform.  Upon information and belief, Ulrich is working with and/or directing Feracode to circumvent its contractual obligations with Technology and to divert the CRM Platform and related intellectual property to Innovations.  Upon information and belief, and without authorization, Ulrich has dusted off Solutions' old private placement memorandum (PPM) to solicit funds from investors while misrepresenting his ownership of Technology's CRM platform, intellectual property, and business.  Upon information and belief, Ulrich has removed access to Technology's website and is directing investors or customers to the old Solutions website or new Innovations websites.

5

16.     I believe Ulrich's and Innovations current actions are causing immediate and irreparable harm to Technology and the CRM Platform by diluting the brand and technology, creating confusion in the marketplace, and interfering with Technology's current and long-term business value proposition to investors and customers.

DATED this 28th day of January, 2018.


*/s/ Michael Alexander*

Michael Alexander

11939168_1