Darren G. Reid (11163)
Brandon T. Christensen (16420)
HOLLAND & HART LLP
222 South Main Street, Suite 2200
Salt Lake City, Utah  84101
Telephone:  (801) 799-5800
Facsimile:  (801) 799-5700
dgreid@hollandhart.com
btchristensen@hollandhart.com
*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICTCOURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SMASH TECHNOLOGY, LLC, a Nevada limited liability company; and MICHAEL ALEXANDER, an individual; | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| Plaintiffs, | |
| vs. | |
| SMASH SOLUTIONS, LLC, a Delaware limited liability company; JERRY "J.J." ULRICH, an individual; and JOHN DOES 1-3; | Case No. 2:19-cv-00105-TC |
| Defendants. | Judge Tena Campbell |
| SMASH SOLUTIONS, LLC, a Delaware limited liability company; JERRY "J.J." ULRICH, an individual; and JOHN DOES 1-3; | |
| Counterclaim Plaintiffs, | |
| vs. | |
| SMASH TECHNOLOGY, LLC, a Nevada limited liability company; and MICHAEL ALEXANDER, an individual; | |
| Counterclaim Defendants. | |

# TABLE OF CONTENTS

**Page No(s).**

TABLE OF CONTENTS......................................................................................................... i

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ................................................................................................................1

RESPONSE TO DEFENDANTS' STATEMENT OF FACTS ......................................................3

STANDARD......................................................................................................................27

ARGUMENT.....................................................................................................................28

    I.      GENUINE DISPUTES OF MATERIAL FACT REGARDING THE
PARTIES' RIGHTS, INTERESTS, AND OWNERSHIP OF THE
INTELLECTUAL PROPERTY PRECLUDE SUMMARY
JUDGMENT .........................................................................................29

    II.     DEFENDANTS' MOTION SHOULD BE DENIED PURSUANT TO
RULE 56(d) .........................................................................................34

CONCLUSION.................................................................................................................35

## <u>TABLE OF AUTHORITIES</u>

<u>Page No(s).</u>

### <u>CASES</u>

*Bodum USA, Inc. v. Lifetime Brands, Inc.*,
    No. 14-CV-3365, 2015 WL 3932107 (N.D. Ill. June 24, 2015)............................................33

*Bridgman v. Winsness*,
    98 P. 186 (Utah 1908)..................................................................................................................33

*Dieleman v. Sendlein*,
    670 P.2d 578 (Nev. 1983)............................................................................................................33

*Ellsworth Paulsen Const. Co. v. 51-SPR-L.L.C.*,
    2008 UT 28, 183 P.3d 248............................................................................................................33

*Lints v. Graco Fluid Handling (A) Inc.*,
    347 F. Supp. 3d 990 (D. Utah 2018).......................................................................................27, 28

*Luckette v. F.M. Howell & Co.*,
    942 F. Supp. 2d 374 (W.D.N.Y. 2013)........................................................................................33

*Posner v. Tassely*,
    No. 63326, 2015 WL 149102 (Nev. Jan. 9, 2015)......................................................................33

### <u>OTHER AUTHORITIES</u>

59A Am. Jur. 2d Partnership § 180..................................................................................................34

Fed. R. Civ. P. 56(a) ........................................................................................................................27

Fed. R. Civ. P. 56(d) ...............................................................................................................3, 34-35

Local Rule 56(c)(3)..............................................................................................................................3

Plaintiffs Smash Technology, LLC ("***Technology***") and Michael Alexander (collectively, "Plaintiffs") respectfully submit this Opposition to Defendants Smash Solutions, LLC's ("***Solutions***") and Jerry "J.J." Ulrich's Partial Motion for Summary Judgment (collectively, "Defendants") (Dkt. No. 32) (the "***Motion***").

## INTRODUCTION

Defendants' Motion is without merit and its lack of candor is stunning.  Michael Alexander—through his investments in Smash Technology—funded and paid for the development of the intellectual property, software technology, and CRM Platform (collectively, the "***CRM Platform***") at issue in this case.[1]  Accordingly, Plaintiffs have rights, interests, and ownership in, and/or control of, the CRM Platform, which was specifically developed for Smash Technology pursuant to its agreement with Feracode.  The facts surrounding the formation, funding, and operation of Smash Technology are disputed, and the facts regarding the development and ownership of the CRM Platform are hotly contested.

Defendants seek a ruling as a matter of law that "[Smash] Solutions owns the Intellectual Property at issue in this case, and that Technology has no ownership interest."  Motion at 18.  The numerous genuine disputes of material fact supporting Plaintiffs' rights, interest, and ownership in the CRM Platform preclude summary judgment.  Given the narrow focus of Defendants' Motion, Plaintiffs only address here material facts directly related to Plaintiffs' rights, interest, and ownership in the CRM Platform.  Plaintiffs' Opposition, Appendix of

---

[1]  Plaintiffs' references to the CRM Platform includes the intellectual property at issue in this case, including but not limited to the software technology, code, features, functionalities, and items bundled up and associated with Feracode's development of the CRM Platform.

Evidence, and Declaration of Michael Alexander all demonstrate that the present Motion merits denial.

In addition to Alexander's declaration, his numerous email and text communications with J.J. Ulrich demonstrate, overwhelmingly, that Ulrich understood, agreed upon, and participated in Smash Technology's development of the CRM Platform pursuant to its agreement with Feracode.  Moreover, Ulrich understood, agreed upon, accepted, and used Alexander's resources to pay Feracode to develop the CRM Platform for Smash Technology, including using Alexander's cash and cryptocurrency.  These facts demonstrate, at the least, there is a genuine issue of material fact.

Incredibly, Defendants' Motion fails to mention Alexander's and Ulrich's communications and course of performance pursuant to their partnership in Smash Technology.  In one email from Ulrich to Alexander, for example, he acknowledges Alexander's payments to Feracode for the purpose of developing the CRM Platform: "***When we paid the invoice to Feracode $50,000 was used from the $60k you sent.  The difference was used by pulling all cash and commissions out of our accounts to cover the $26k difference***."  (Alex. Decl. ¶ 36.)  This single communication defeats Defendants' motion for summary judgment.  As demonstrated by Plaintiffs' Appendix of Evidence, there are literally dozens of additional communications and documents that support Plaintiffs' claims, including Alexander's and Ulrich's partnership efforts in Smash Technology and Alexander's funding of Feracode's development of the CRM Platform.  Consequently, the Court should deny Defendants' misguided and premature Motion.

If Plaintiffs must develop additional genuine disputes of material facts, Plaintiffs move the Court for Rule 56(d) relief. Though the Court can deny now Defendants' Motion on the basis of disputed facts, the parties have not yet engaged in any discovery. Indeed, the parties just propounded their first sets of written discovery requests. Thus, after document production, responses to written discovery requests, and depositions, Plaintiffs will be in a better position to develop the record and identify additional facts to support their claims and opposition to this Motion, including their rights and interests in the CRM Platform. For example, Plaintiffs' document requests seek critical documentary evidence that has not been produced by Defendants, including, among other things, Ulrich's personal and business financial records, Ulrich's use of Alexander's cash and Bitcoin, Ulrich's communications with Feracode, and Ulrich's transactions with Feracode. Plaintiffs dispute the following facts:

## <u>RESPONSE TO DEFENDANTS' STATEMENT OF FACTS</u>

Defendants do not concede Statement of Facts Nos. 1-4, 6, 9-10, 17, 19-20, and 23-26, but they are immaterial for purposes of Plaintiffs' response to the very narrow issue before the Court, *i.e.*, the genuine disputes of material fact relating to the parties' rights, interests, ownership in, and/or control of, the intellectual property, software technology, and CRM Platform under development by Feracode. Accordingly, Defendants do not respond to them pursuant to local Rule 56(c)(3) ("The nonmoving party should not restate all of the moving party's statement of facts and should only respond to those facts for which there is a genuine dispute of material fact.").

5.      Ulrich invented the technology and infrastructure for the business software suite. His experience working with big data aggregation and data collection created the initial system that Solutions is developing, with the intent to market it commercially.  (Ulrich Decl., ¶ 5.)

**RESPONSE:**  Disputed.  Contrary to Defendants' assertion, Technology has rights, interests, and ownership in, and/or control of, the new intellectual property, new code, new software technology, new features, new functionality, and new CRM Platform at issue in this case.  (*See* Appendix of Evidence, Declaration of Michael Alexander ("Alex Decl."), ¶¶ 2-4, 6-9, 11-12, 16-18, 20-24, 30-37, 42, 45-48, 51, 53-54, 59, 61, 63-66, 69-70, 73-77, 79, and 80; and Documents, Exhibits 1-5.)

Though Ulrich and/or Solutions never fully developed or completed a CRM technology, Solutions developed a limited beta model with limited templates and technical documents that could be used as a possible shortcut and springboard for Technology (with Feracode's expertise and services) to develop more advanced, refined, sophisticated, and superior CRM technology that was viable to market and was sustainable and scalable, including the use of the most advanced and current updated language, superior software code, and new and expanded features, among other things.  (Alex Decl. ¶ 11.)  Based upon Ulrich's representations, Alexander understood that Ulrich transferred Solutions' infant intellectual property to Technology and dissolved Solutions.  (Alex Decl. ¶ 7.)  In reliance on that transfer, and at Ulrich's insistence, on or about March 13, 2018, Alexander executed Technology's Master Services Agreement with Feracode, LLC for the express purpose of developing the new intellectual property and CRM Platform for Technology's benefit.  (Alex Decl. ¶ 7; Exhibit A (Feracode-Smash Technology Agreement)).

4

Pursuant to its Master Services Agreement with Smash Technology, Feracode agreed to develop the new intellectual property and CRM Platform in exchange for $1.7 million.  (Alex Decl. ¶ 8; Exhibit A.)  The parties agreed that Feracode would develop the CRM Platform during 12 discrete time periods or milestones.  (*Id.*)  After each accomplished milestone, the parties would agree upon the completed work, exchange payment, and authorize the next milestone to be performed.  (*Id.*)  To date, Feracode has completed multiple milestones that Alexander has paid for with his Technology investments of cash, cryptocurrency, and other resources, readying the CRM Platform for its Alpha deployment and testing phase.  (*Id.*)  In other words, Technology paid Feracode to develop the new intellectual property and CRM Platform for Technology's benefit.  (*Id.*)  Through Alexander's personal investments of cash, Bitcoin withdrawals, and other resources, which he often provided directly to Ulrich as his business partner in Technology, Feracode was then paid by Ulrich/Technology to develop the new intellectual property and CRM Platform for Technology's benefit pursuant to its agreement with Feracode.  (*Id.*)

Feracode sent invoices to Smash Technology for the development of the intellectual property, software technology, and CRM Platform.  (Appendix of Evidence, Documents, Ex. 4.) Sam Potter, Smash Technology's CTO, also sent invoices to Smash Technology.  (*Id.* at Ex. 5.) As described by Alexander, his investments in Smash Technology actually paid for the Feracode and Potter invoices.  (Alex Decl. ¶¶ 12, 66.)

7.     Solutions owns all intellectual property rights to the software.  (Ulrich Decl., ¶ 7.)

**RESPONSE:** Disputed.  Contrary to Defendants' assertion, Technology has rights, interests, and ownership in, and/or control of, the new intellectual property, new code, new software technology, new features, new functionality, and new CRM Platform at issue in this

case.  *See* Alex Decl. ¶¶ 2-4, 6-9, 11-12, 16-18, 20-24, 30-37, 42, 45-48, 51, 53-54, 59, 61, 63-66, 69-70, 73-77, 79, and 80; Documents, Exhibits 1-5.

    **(1) *<u>Alexander and Ulrich Engaged in a Smash Technology Partnership</u>***.  In forming, funding, and operating Smash Technology, Alexander partnered with Ulrich, and Ulrich performed as a partner in Smash Technology.  Alex Decl. ¶¶ 4-7 ("I partnered with J.J. Ulrich;" "My technology partnership with Ulrich;" "Ulrich and I understood and agreed we would be equal partners in Technology and share in its ultimate proceeds and success, and we initially performed accordingly"); Alex Decl. ¶ 16 ("My emails with Ulrich also support our Smash Technology partnership"); Alex Decl. ¶¶ 18-20 ("I know with your business experience and connections combined with the plan that we have developed;" "the timing is right that we can come together to make this happen;" "I am willing to work into a full partnership with you. Meaning you would on [sic] same equity as I own;" "[I] want you as a partner as I already consider you to be one;" Ulrich noting "what you've done for me already with the effort you put forth in making this a reality;" "You and I combined, can find the funding"); Alex Decl. ¶¶ 23-24 ("I want to lock arms in a partnership and go to work building the software.  The only thing is I would like to make sure we are both financially invested as we move forward;" "In return I would receive an equal interest to you in Smash and an equal interest in the new entity with both you and Sterling;"); Alex Decl. ¶ 27 ("I sent you the email about partnership"); Alex Decl. ¶¶ 38-41 ("I want to share with you my gratitude for everything you have done and I really look forward to the success we will enjoy in the future;" "my desire to work together with you;" "the starting point to our agreement was initially outlined on November 6th 2017;" "[m]y priority objectives for the agreement was the need to establish a skilled partner;" "Michael I knew that if

we locked arms and committed to making this happen we would succeed;" "I did request support for the several issues that I needed your support to resolve; "created the new plan;" "and deploying this to our organization;" "so we can move forward synergistically"); Alex Decl. ¶¶ 47-48 ("The Smash Technology Team;" "You and I are funding this"); Alex Decl. ¶ 53 ("I want to be able to maintain an equal agreement between you and I Sam and Sterling"); Alex Decl. ¶ 55 ("Setting Up A Working Weekly Meeting With Us;" "I just want to make sure our relationship is strong and your [sic] feeling confident with items happening in the company"); Alex Decl. ¶ 57 ("As a partner and a friend I want to make sure you have what you need"); Alex Decl. ¶ 59 ("I know the massive potential of what we have built and I still believe what we create in Smash will be bigger than what [Bitcoin] has created"); Alex Decl. ¶ 62 ("I value your friendship and I value our partnership;" "your advice, experience and guidance is the reason I wanted you as a partner"); Alex Decl. ¶¶ 64-66 ("I offered the partnership with you because I feel that we can create a multi-billion dollar exit in Smash;" "my pure intent to be a solid partner, friend and leader with your group. . . . I continue to be grateful for your partnership and friendship;" "Once we came to an Agreement and set upon the Smash Technology project"); Alex Decl. ¶¶ 72-73 ("As your equal Partner, I want and need all the "original hard tangible" financial records;" "Partners would and should provide this upon request especially partners that are supposed to be equal and especially when one is providing the source of funding;" "We have an agreement for the Intellectual Property since all this began even before you finally made the decision to dissolve Smash Solutions.  You contributed the Intellectual Property.  I contributed the funding"); Alex Decl. ¶¶ 77-78 ("We agreed, and you transferred the Intellectual Property from Smash Solutions to Smash Technology.  Later we gave Feracode access to this IP to start

the development and build of Smash Technology;" "Maybe you want to buy me out or have one

of your new investors buy me out?  You don't appear to want a partner that hold you responsible

and accountable and you don't appreciate what I have done for you and this project;" "Partners

must have 100% transparency between them and are responsible and accountable to one

another").

### (2) *Alexander and Ulrich Invested Cash, Cryptocurrency, and Other Resources— Including Infant Intellectual Property—Into Their Smash Technology Partnership.*

Alexander and Ulrich invested cash, cryptocurrency, and other resources—including infant

intellectual property—into their Smash Technology partnership.  Alex Decl. ¶ 4 ("I agreed to

fund Technology"); Alex Decl. ¶ 6 (Uberfund and Centurion positions with Bitclub Network

would be used to fund Technology); Alex Decl. ¶¶ 7-9 ("Ulrich transferred Solutions' infant

intellectual property to Technology;" "Feracode has completed multiple milestones that I have

paid for with my Technology investments of cash, cryptocurrency, and other resources;"

"Through my personal investments of cash, Bitcoin withdrawals, and other resources, which I

often provided directly to Ulrich as my business partner in Technology;" "Technology, through

my personal investments, has developed the new intellectual property and CRM Platform at great

expense"); Alex Decl. ¶ 12 ("I invested substantial personal resources into Technology, which I

often provided directly to Ulrich solely for the purposes of developing Technology's new

intellectual property and CRM Platform"); Alex Decl. ¶ 14 ("my investments in Technology;"

"my Bitcoin contributions, their conversion into U.S. dollars, and their related transactions");

Alex Decl. ¶¶ 16-17 ("My email communications with Ulrich detail my investments in

Feracode's development of the intellectual property and CRM Platform at issue in this case;"

"my own investments of cash, Bitcoin, and other resources that directly paid for Feracode's development of the intellectual property, software technology, and CRM Platform at issue in this case" "my investments in Smash Technology" "my investments in Feracode's development of the intellectual property and CRM Platform;" "I know you've assisted in raising funds for the development and I know you would do that to support me"); Alex Decl. ¶¶ 20-24 ("You and I combined, can find the funding;" "The only other obligation is getting the software under development that would take approximately 300k a month commitment, however the first month would probably be 150k;" "The first I was hoping that we could get started with using some of the growth in bitclub network;" "maybe you would be willing to let me keep the Uberfund account and use it to assist in funding the monthly commitments;" "The only thing is I would like to make sure we are both financially invested as we move forward;" "you proposed we combine our 50/50 income from Uberfund going forward to fund costs for Smash and the new corporate structure"); Alex Decl. ¶¶ 30-34 ("I wired Ulrich $60,000 for purposes of investing in Smash Technology and paying for the development of the intellectual property, software technology, and CRM Platform;" "we should have a new agreement with the $10,000 amount to get started;" "I ultimately paid this $10,000 amount to get Smash Technology up and running;" "discussed how we would fund Smash Technology's operating expenses through my Bitclub Network positions;" "we can create the money to cover expenses from several sources;" "we need to engage a plan to make sure it is covered until the company can be funding the project plan using internal subscriptions;" "we can use the trading and bitmax to cover the expenses;" "The goal would be to achieve minimum funding level to not draw from internal resources any longer than we need to complete the product"); Alex Decl. ¶¶ 36-37 ("I hereby authorize per our

verbal agreement and you have my permission to use up to $50,000 I wired to you to buy bitcoin

for me to pay the first payment to the Development Team together with our shared funds from

Uberfund to cover the $76,000 first installment;" "When we paid the invoice to Feracode

$50,000 was used from the $60k you sent.  The difference was used by pulling all cash and

commissions out of our accounts to cover the $26k difference"); Alex Decl. ¶ 40 ("I did request

support for the several issues that I needed your support to resolve"); Alex Decl. ¶ 42 ("we have

not spent that much thus far with the exception of Feracode"); Alex Decl. ¶¶ 45-46 ("we

immediately met with Feracode to arrange a payment arrangement to allow us a little time to get

the cashflow from the loan, PPM or the [Bitcoin] mining;" "all the technology specific

accounting documents he has used to setup, manage and deploy the new software systems");

Alex Decl. ¶ 48 ("You and I are funding this;" "I have had to put in even more money and it

looks like even more is necessary"); Alex Decl. ¶¶ 52-53 ("I know that the accounting needs to

be completed so you know where you are at financially with Smash;" "we have already invested

far more than an equal share into Smash Technology;" "You have had access and the use of my

share from Uberfund and my additional contribution from Centurion earnings"; "I know the

massive potential of what we have built and I still believe what we create in Smash will be

bigger than what [Bitcoin] has created"); Alex Decl. ¶ 61 ("We are coming up far short with

Uberfund and Centurion earnings;" "it has adversely affected the funding piece for Smash

Technology;" "I am just thinking of ways to support all costs through the launch of Smash");

Alex Decl. ¶ 63 ("Going forward the earnings from both of my Bitclub positions have been

funding the new company.  In addition, I have sent two money wires"); Alex Decl. ¶ 66 ("so I

had to find a way to supplement the funding for Smash Technology;" "I expected from both

positions I pledged that I could at least cover Feracode, Sam, and the server until we got to the

Alpha stage and could generate funds from Smash Technology subscriptions.  I never expected

or wanted to dip into personal funds and liquidate coins especially this year as the price has

dropped significantly to fund Smash Technology separate from earnings from Uberfund and

Centurion.  Liquidating coins for cash to fund Smash Technology has been a very expensive

contribution based upon the loss to us when coin prices run up soon in 2019"); Alex Decl. ¶¶ 69-

70 ("Jerry asked me to send you the PDF report for the bookkeeping records now that all the

expenses and invoices are included.  We also wanted to make sure that you both have access to

the QuickBooks Online account;" "where deposits from Michael and JJ were recorded;" "I have

totaled the expenses and what Michael and JJ have deposited as seen below;" "Total Paid

Expenses" as $532,553.70 with "Michael's Deposits" as $122,350.00 in "CASH," "Jerry's

Deposits" as $275,695.00 "TOTAL"); Alex Decl. ¶¶ 73-79 ("You contributed the Intellectual

Property.  I contributed the funding;" "My first obligation was to pay half of Sterling's retainer;"

"your obligation was to transfer the Smash Solutions Intellectual Property and all rights in it to

Smash Technology.  This cleared the path for us to enter into new agreements to launch a new

company that we would both contribute to.  In exchange for what I was bringing, you were

bringing and providing the Smash IP;" "I have provided the funding to get us here, I have stated

verbally and in written communication I am ready, willing and able to continue to fund ST even

if you cannot meet your obligations;" "What have you spent the money and coins I committed

and provided to fund Smash Technology?;" "I was to provide the financial vehicle, which

became vehicle(s) plus sponsoring my leaders under these [Bitclub] positions, which was never

part of the deal.  I have also made additional cash payments, which was never part of the deal

either.  I have done all this and more during this genesis development stage of Smash

Technology;" "We agreed to hire Sam and I paid him to do the same;" "I have incurred

tremendous hard costs and invested significant time traveling back to the USA (10) times already

this year to meet and reach resolution with you, the team and Sterling;" "When you add up all

the trips, hotels and other related travel expenses just this year alone; I have out of pocket

expenses of roughly $100,000;" "We agreed, I was to provide the financial vehicle, which

became vehicles.  I even went further sponsoring my leaders under these positions; I have also

made additional cash payments; which was never part of the deal;" "We agreed, and you

transferred the Intellectual Property from Smash Solutions to Smash Technology.  Later we gave

Feracode access to this IP to start the development and build of Smash Technology;" "Maybe

you want to buy me out or have one of your new investors buy me out?;" "[a]s of today

December 18, 2018 we have paid Feracode a total of $462,000 which takes us up to the Alpha

launch.  For the record and on the record, I am responsible for the majority of the funding for

Smash Technology up to this point;" "my (2) [Bitcoin] positions have contributed a total of

$258,736.80.  In addition. I have sent you two separate money wires;" "We agreed I would

contract with and pay Feracode to develop and build the new technology for Smash Technology.

That is an authorized expense and I signed the contract with Feracode.  We agreed, I would

contract with and pay Sam to communicate with the Feracode development team to lead, direct,

supervise them, review the code and also test the Feracode development teams work and monitor

progress and keep the development team on track, etc.  That is an authorized expense for ST");

Alex Decl. ¶ 80 ("I have exchanged numerous text message communications with Ulrich

regarding our Smash Technology partnership, our Smash Technology course of performance,

and our Smash Technology investments, including my own investments of cash, Bitcoin, and other resources that directly paid for Feracode's development of the intellectual property, software technology, and CRM Platform") (*see* related text communications).

**(3)** ***Smash Technology Entered Into An Agreement With Feracode for the Development of the Intellectual Property, Software Technology, and CRM Platform At Issue***. In March 2018, Smash Technology entered into an agreement with Feracode for the development of the intellectual property, Software Technology, and CRM Platform at issue.  (Alex Decl. ¶ 7; Exhibit A.)

Though Ulrich and/or Solutions never fully developed or completed a CRM technology, Solutions developed a limited beta model with limited templates and technical documents that could be used as a possible shortcut and springboard for Technology (with Feracode's expertise and services) to develop more advanced, refined, sophisticated, and superior CRM technology that was viable to market and was sustainable and scalable, including the use of the most advanced and current updated language, superior software code, and new and expanded features, among other things.  (Alex Decl. ¶ 11.)  Based upon Ulrich's representations, Alexander understood that Ulrich transferred Solutions' infant intellectual property to Technology and dissolved Solutions.  (Alex Decl. ¶ 7.)  In reliance on that transfer, and at Ulrich's insistence, on March 12, 2018, Alexander executed Technology's Master Services Agreement with Feracode, LLC for the express purpose of developing the new intellectual property and CRM Platform for Technology's benefit.  (Alex Decl. ¶ 7, Exhibit A.)

Pursuant to its Master Services Agreement with Smash Technology, Feracode agreed to develop the new intellectual property and CRM Platform in exchange for $1.7 million.  (Alex

Decl. ¶ 8.)  The parties agreed that Feracode would develop the CRM Platform during 12 discrete time periods or milestones.  (*Id.*)  After each accomplished milestone, the parties would agree upon the completed work, exchange payment, and authorize the next milestone to be performed.  (*Id.*)  To date, Feracode has completed multiple milestones that Alexander has paid for with his Technology investments of cash, cryptocurrency, and other resources, readying the CRM Platform for its Alpha deployment and testing phase.  (*Id.*)  In other words, Technology paid Feracode to develop the new intellectual property and CRM Platform for Technology's benefit.  (*Id.*)  Through Alexander's personal investments of cash, Bitcoin withdrawals, and other resources, which he often provided directly to Ulrich as his business partner in Technology, Feracode was then paid by Ulrich/Technology to develop the new intellectual property and CRM Platform for Technology's benefit pursuant to its agreement with Feracode.  (*Id.*)

Feracode sent invoices to Smash Technology for the development of the intellectual property, software technology, and CRM Platform.  (*See* Appendix of Evidence, Documents, Ex. 4.)  Sam Potter, Smash Technology's CTO, also sent invoices to Smash Technology.  (*Id.* at Ex. 5.)  As described by Alexander, his investments in Smash Technology actually paid for the Feracode and Potter invoices.  (Alex Decl. ¶¶ 12, 66.)

**(4) *Alexander's Investments into Technology Actually Paid for Feracode's Development of the Intellectual Property, Software Technology, and CRM Platform for Technology's Benefit.***  Alexander's investments into Technology paid for Feracode's development of the intellectual property, software technology, and CRM Platform, establishing Plaintiffs' rights, interests, and ownership in, and/or control of, the developed CRM Platform. Alex Decl.  ¶ 4 ("I agreed to fund Technology"); Alex Decl. ¶ 6 (Uberfund and Centurion

positions with Bitclub Network would be used to fund Technology and pay for the development

of the new intellectual property and CRM Platform); Alex Decl. ¶¶ 7-9 ("Ulrich transferred

Solutions' infant intellectual property to Technology;" "Feracode has completed multiple

milestones that I have paid for with my Technology investments of cash, cryptocurrency, and

other resources;" "Through my personal investments of cash, Bitcoin withdrawals, and other

resources, which I often provided directly to Ulrich as my business partner in Technology,

Feracode was then paid by Ulrich/Technology to develop the new intellectual property and CRM

Platform for Technology's benefit pursuant to its agreement with Feracode;" "Technology,

through my personal investments, has developed the new intellectual property and CRM

Platform at great expense"); Alex Decl. ¶ 12 ("I invested substantial personal resources into

Technology, which I often provided directly to Ulrich solely for the purposes of developing

Technology's new intellectual property and CRM Platform"); Alex Decl. ¶¶ 16-17 ("My email

communications with Ulrich detail my investments in Feracode's development of the intellectual

property and CRM Platform at issue in this case;" "my own investments of cash, Bitcoin, and

other resources that directly paid for Feracode's development of the intellectual property,

software technology, and CRM Platform at issue in this case" "my investments in Feracode's

development of the intellectual property and CRM Platform"); Alex Decl. ¶¶ 20-24 ("The only

other obligation is getting the software under development that would take approximately 300k a

month commitment, however the first month would probably be 150k;" "maybe you would be

willing to let me keep the Uberfund account and use it to assist in funding the monthly

commitments;" "you proposed we combine our 50/50 income from Uberfund going forward to

fund costs for Smash and the new corporate structure"); Alex Decl. ¶¶ 30-34 ("I wired Ulrich

$60,000 for purposes of investing in Smash Technology and paying for the development of the intellectual property, software technology, and CRM Platform;" "we should have a new agreement with the $10,000 amount to get started;" "I ultimately paid this $10,000 amount to get Smash Technology up and running;" "discussed how we would fund Smash Technology's operating expenses through my Bitclub Network positions;" "we can create the money to cover expenses from several sources;" "we need to engage a plan to make sure it is covered until the company can be funding the project plan using internal subscriptions;" "we can use the trading and bitmax to cover the expenses;" "The goal would be to achieve minimum funding level to not draw from internal resources any longer than we need to complete the product"); Alex Decl. ¶¶ 36-37 ("I hereby authorize per our verbal agreement and you have my permission to use up to $50,000 I wired to you to buy bitcoin for me to pay the first payment to the Development Team together with our shared funds from Uberfund to cover the $76,000 first installment;" "When we paid the invoice to Feracode $50,000 was used from the $60k you sent. The difference was used by pulling all cash and commissions out of our accounts to cover the $26k difference"); Alex Decl. ¶ 42 ("we have not spent that much thus far with the exception of Feracode"); Alex Decl. ¶¶ 45-46 ("we immediately met with Feracode to arrange a payment arrangement to allow us a little time to get the cashflow from the loan, PPM or the [Bitcoin] mining;" "all the technology specific accounting documents he has used to setup, manage and deploy the new software systems"); Alex Decl. ¶ 48 ("You and I are funding this;" "I have had to put in even more money and it looks like even more is necessary"); Alex Decl. ¶¶ 52-53 ("I know that the accounting needs to be completed so you know where you are at financially with Smash;" "we have already invested far more than an equal share into Smash Technology;" "You have had access and the

use of my share from Uberfund and my additional contribution from Centurion earnings;" "I
know the massive potential of what we have built and I still believe what we create in Smash will
be bigger than what [Bitcoin] has created"); Alex Decl. ¶ 61 ("We are coming up far short with
Uberfund and Centurion earnings;" "it has adversely affected the funding piece for Smash
Technology;" "I am just thinking of ways to support all costs through the launch of Smash");
Alex Decl. ¶ 63 ("Going forward the earnings from both of my Bitclub positions have been
funding the new company.  In addition, I have sent two money wires"); Alex Decl. ¶ 63 ("so I
had to find a way to supplement the funding for Smash Technology;" "I expected from both
positions I pledged that I could at least cover Feracode, Sam, and the server until we got to the
Alpha stage and could generate funds from Smash Technology subscriptions.  I never expected
or wanted to dip into personal funds and liquidate coins especially this year as the price has
dropped significantly to fund Smash Technology separate from earnings from Uberfund and
Centurion.  Liquidating coins for cash to fund Smash Technology has been a very expensive
contribution based upon the loss to us when coin prices run up soon in 2019"); Alex Decl. ¶¶ 69-
70 ("Jerry asked me to send you the PDF report for the bookkeeping records now that all the
expenses and invoices are included.  We also wanted to make sure that you both have access to
the QuickBooks Online account;" "where deposits from Michael and JJ were recorded;" "I have
totaled the expenses and what Michael and JJ have deposited as seen below;" "Total Paid
Expenses" as 532,553.70 with "Michael's Deposits" as $122,350.00 in "CASH," "Jerry's
Deposits" as $275,695.00 "TOTAL"); Alex Decl. ¶¶ 73-79 ("You contributed the Intellectual
Property.  I contributed the funding;" "My first obligation was to pay half of Sterling's retainer;"
"your obligation was to transfer the Smash Solutions Intellectual Property and all rights in it to

Smash Technology.  This cleared the path for us to enter into new agreements to launch a new company that we would both contribute to.  In exchange for what I was bringing, you were bringing and providing the Smash IP;" "I have provided the funding to get us here, I have stated verbally and in written communication I am ready, willing and able to continue to fund ST even if you cannot meet your obligations;" "What have you spent the money and coins I committed and provided to fund Smash Technology?;" "I was to provide the financial vehicle, which became vehicle(s) plus sponsoring my leaders under these [Bitclub] positions, which was never part of the deal.  I have also made additional cash payments, which was never part of the deal either.  I have done all this and more during this genesis development stage of Smash Technology;" "We agreed to hire Sam and I paid him to do the same;" "I have incurred tremendous hard costs and invested significant time traveling back to the USA (10) times already this year to meet and reach resolution with you, the team and Sterling;" "When you add up all the trips, hotels and other related travel expenses just this year alone; I have out of pocket expenses of roughly $100,000;" "We agreed, I was to provide the financial vehicle, which became vehicles.  I even went further sponsoring my leaders under these positions; I have also made additional cash payments; which was never part of the deal;" "We agreed, and you transferred the Intellectual Property from Smash Solutions to Smash Technology.  Later we gave Feracode access to this IP to start the development and build of Smash Technology;" "[a]s of today December 18, 2018 we have paid Feracode a total of $462,000 which takes us up to the Alpha launch.  For the record and on the record, I am responsible for the majority of the funding for Smash Technology up to this point;" "my (2) [Bitcoin] positions have contributed a total of $258,736.80.  In addition. I have sent you two separate money wires;" "We agreed I would

contract with and pay Feracode to develop and build the new technology for Smash Technology. That is an authorized expense and I signed the contract with Feracode.  We agreed, I would contract with and pay Sam to communicate with the Feracode development team to lead, direct, supervise them, review the code and also test the Feracode development teams work and monitor progress and keep the development team on track, etc.  That is an authorized expense for ST"); Alex Decl. ¶ 80 ("I have exchanged numerous text message communications with Ulrich regarding our Smash Technology partnership, our Smash Technology course of performance, and our Smash Technology investments, including my own investments of cash, Bitcoin, and other resources that directly paid for Feracode's development of the intellectual property, software technology, and CRM Platform") (see related text communications).

Ulrich received invoices for Smash Technology expenses, he received wire transfers from Alexander, and he wired Smash Technology payments to Feracode.  (*See* Appendix of Evidence, Documents, Exhibits 1-3.)  Moreover, Feracode sent invoices to Smash Technology for the development of the intellectual property, software technology, and CRM Platform.  (*Id.* at Ex. 4.) Sam Potter, Smash Technology's CTO, also sent invoices to Smash Technology.  (*Id.* at Ex. 5.) As described by Alexander, his investments in Smash Technology actually paid for the Feracode and Potter invoices.  (Alex Decl. ¶¶ 12, 66.)

8.      Solutions began developing this software in 2012 in Salt Lake City, and later in India and Brazil, long before Alexander became affiliated with Solutions.  (Ulrich Decl., ¶ 8.)

**RESPONSE:** Disputed.  Contrary to Defendants' assertion, Technology has rights, interests, and ownership in, and/or control of, the new intellectual property, new code, new software technology, new features, new functionality, and new CRM Platform at issue in this

case.  *See* Alex Decl. ¶¶ 2-4, 6-9, 11-12, 16-18, 20-24, 30-37, 42, 45-48, 51, 53-54, 59, 61, 63-66, 69-70, 73-77, 79, and 80; Documents, Exhibits 1-5.

Though Ulrich and/or Solutions never fully developed or completed a CRM technology, Solutions developed a limited beta model with limited templates and technical documents that could be used as a possible shortcut and springboard for Technology (with Feracode's expertise and services) to develop more advanced, refined, sophisticated, and superior CRM technology that was viable to market and was sustainable and scalable, including the use of the most advanced and current updated language, superior software code, and new and expanded features, among other things.  (Alex Decl. ¶ 11.)  Based upon Ulrich's representations, Alexander understood that Ulrich transferred Solutions' infant intellectual property to Technology and dissolved Solutions.  (Alex Decl. ¶ 7.)  In reliance on that transfer, and at Ulrich's insistence, on March 12, 2018, Alexander executed Technology's Master Services Agreement with Feracode, LLC for the express purpose of developing the new intellectual property and CRM Platform for Technology's benefit.  (Alex Decl. ¶ 7, Exhibit A.)

Pursuant to its Master Services Agreement with Smash Technology, Feracode agreed to develop the new intellectual property and CRM Platform in exchange for $1.7 million.  (Alex Decl. ¶ 8.)  The parties agreed that Feracode would develop the CRM Platform during 12 discrete time periods or milestones.  (*Id.*)  After each accomplished milestone, the parties would agree upon the completed work, exchange payment, and authorize the next milestone to be performed.  (*Id.*)  To date, Feracode has completed multiple milestones that Alexander has paid for with his Technology investments of cash, cryptocurrency, and other resources, readying the CRM Platform for its Alpha deployment and testing phase.  (*Id*)  In other words, Technology

paid Feracode to develop the new intellectual property and CRM Platform for Technology's

benefit.  (*Id.*) Through Alexander's personal investments of cash, Bitcoin withdrawals, and other

resources, which he often provided directly to Ulrich as his business partner in Technology,

Feracode was then paid by Ulrich/Technology to develop the new intellectual property and CRM

Platform for Technology's benefit pursuant to its agreement with Feracode.  (*Id.*)

Feracode sent invoices to Smash Technology for the development of the intellectual

property, software technology, and CRM Platform.  (*See* Appendix of Evidence, Documents, Ex.

4.)  Sam Potter, Smash Technology's CTO, also sent invoices to Smash Technology.  (*Id.* at Ex.

5.)  As described by Alexander, his investments in Smash Technology actually paid for the

Feracode and Potter invoices.  (Alex Decl. ¶¶ 12, 66.)

11.     To develop the Intellectual Property into a finished software product that can be

marketed commercially, Solutions signed a contract with Feracode USA ("**Feracode**") on

January 29, 2018 (the "**Feracode-Solutions Agreement**").  (*Ex. 2.*)

12.     This Agreement provided that Feracode would write the code for the Software.

(*See Ex. 2.*)

13.     This Agreement has never been canceled and remains in force.  (Ulrich Decl.,

¶ 11.)

14.     Solutions provided its Build Plan to Feracode when it was complete, and

Feracode has been executing it.  (Ulrich Decl., ¶ 12.)

15.     Solutions and Ulrich continue to make payments according to the Agreement.

(Ulrich Decl., ¶ 14.)

21.     Solutions continues to perform under the Feracode-Solutions Agreement, which

predated the Feracode-Technology Agreement.  (Ulrich Decl., ¶ 15.)

**RESPONSE:**  Plaintiffs dispute Statement of Facts Nos. 11-15 and 21, which essentially

allege that Feracode has developed the intellectual property, software technology, and CRM

Platform at issue in this case pursuant to its agreement with Smash Solutions, and that

Ulrich/Solutions—independent of Alexander/Smash Technology—has paid Feracode for such

development.  As demonstrated above, these facts are hotly contested with genuine disputes of

material fact.

Contrary to Defendants' assertion, Technology has rights, interests, and ownership in,

and/or control of, the new intellectual property, new code, new software technology, new

features, new functionality, and new CRM Platform at issue in this case.  *See* Alex Decl. ¶¶ 2-4,

6-9, 11-12, 16-18, 20-24, 30-37, 42, 45-48, 51, 53-54, 59, 61, 63-66, 69-70, 73-77, 79, and 80;

Documents, Exhibits 1-5.

Though Ulrich and/or Solutions never fully developed or completed a CRM technology,

Solutions developed a limited beta model with limited templates and technical documents that

could be used as a possible shortcut and springboard for Technology (with Feracode's expertise

and services) to develop more advanced, refined, sophisticated, and superior CRM technology

that was viable to market and was sustainable and scalable, including the use of the most

advanced and current updated language, superior software code, and new and expanded features,

among other things.  (Alex Decl. ¶ 11.)  Based upon Ulrich's representations, Alexander

understood that Ulrich transferred Solutions' infant intellectual property to Technology and

dissolved Solutions.  (Alex Decl. ¶ 7.)  In reliance on that transfer, and at Ulrich's insistence, on

March 12, 2018, Alexander executed Technology's Master Services Agreement with Feracode, LLC for the express purpose of developing the new intellectual property and CRM Platform for Technology's benefit.  (Alex Decl. ¶ 7, Exhibit A.)

Pursuant to its Master Services Agreement with Smash Technology, Feracode agreed to develop the new intellectual property and CRM Platform in exchange for $1.7 million.  (Alex Decl. ¶ 8.)  The parties agreed that Feracode would develop the CRM Platform during 12 discrete time periods or milestones.  (*Id.*)  After each accomplished milestone, the parties would agree upon the completed work, exchange payment, and authorize the next milestone to be performed.  (*Id.*)  To date, Feracode has completed multiple milestones that Alexander has paid for with his Technology investments of cash, cryptocurrency, and other resources, readying the CRM Platform for its Alpha deployment and testing phase.  (*Id.*)  In other words, Technology paid Feracode to develop the new intellectual property and CRM Platform for Technology's benefit.  (*Id.*)  Through Alexander's personal investments of cash, Bitcoin withdrawals, and other resources, which he often provided directly to Ulrich as his business partner in Technology, Feracode was then paid by Ulrich/Technology to develop the new intellectual property and CRM Platform for Technology's benefit pursuant to its agreement with Feracode.  (*Id.*)

Feracode sent invoices to Smash Technology for the development of the intellectual property, software technology, and CRM Platform.  (*See* Appendix of Evidence, Documents, Ex. 4.)  Sam Potter, Smash Technology's CTO, also sent invoices to Smash Technology.  (*Id.* at Ex. 5.)  As described by Alexander, his investments in Smash Technology actually paid for the Feracode and Potter invoices.  (Alex Decl. ¶¶ 12, 66.)

23

18.     Alexander was the organizer, the sole manager, and the only member.  (*See* Ex. 3.)  In fact, the Operating Agreement for Technology states the company is a "Single Member limited liability company."  (Ex. 4 at 1.)

**RESPONSE:** Disputed.  Defendants allege and imply that Ulrich was not an investing and performing partner in Smash Technology.  As demonstrated above, these facts are hotly contested with genuine disputes of material fact.  Alex Decl. ¶¶ 4-7 ("I partnered with J.J. Ulrich;" "My technology partnership with Ulrich;" "Ulrich and I understood and agreed we would be equal partners in Technology and share in its ultimate proceeds and success, and we initially performed accordingly"); Alex Decl. ¶ 16 ("My emails with Ulrich also support our Smash Technology partnership"); Alex Decl. ¶¶ 18-20 ("I know with your business experience and connections combined with the plan that we have developed;" "the timing is right that we can come together to make this happen;" "I am willing to work into a full partnership with you. Meaning you would on [sic] the same equity as I own;" "[I] want you as a partner as I already consider you to be one;" Ulrich noting "what you've done for me already with the effort you put forth in making this a reality;" "You and I combined, can find the funding"); Alex Decl. ¶¶ 23-24 ("I want to lock arms in a partnership and go to work building the software.  The only thing is I would like to make sure we are both financially invested as we move forward;" "In return I would receive an equal interest to you in Smash and an equal interest in the new entity with both you and Sterling;"); Alex Decl. ¶ 27 ("I sent you the email about partnership"); Alex Decl. ¶¶ 38-41 ("I want to share with you my gratitude for everything you have done and I really look forward to the success we will enjoy in the future;" "my desire to work together with you;" "the starting point to our agreement was initially outlined on November 6th 2017;" "[m]y priority

objectives for the agreement was the need to establish a skilled partner;" "Michael I knew that if

we locked arms and committed to making this happen we would succeed;" "I did request support

for the several issues that I needed your support to resolve; "created the new plan;" "and

deploying this to our organization;" "so we can move forward synergistically");  Alex Decl.

¶¶ 47-48 ("The Smash Technology Team;" "You and I are funding this"); Alex Decl. ¶ 53 ("I

want to be able to maintain an equal agreement between you and I Sam and Sterling"); Alex

Decl. ¶ 55 ("Setting Up A Working Weekly Meeting With Us;" "I just want to make sure our

relationship is strong and your [sic] feeling confident with items happening in the company");

Alex Decl. ¶ 57 ("As a partner and a friend I want to make sure you have what you need"); Alex

Decl. ¶ 59 ("I know the massive potential of what we have built and I still believe what we create

in Smash will be bigger than what [Bitcoin] has created"); Alex Decl. ¶ 62 ("I value your

friendship and I value our partnership;" "your advice, experience and guidance is the reason I

wanted you as a partner"); Alex Decl. ¶¶ 64-66 ("I offered the partnership with you because I

feel that we can create a multi-billion dollar exit in Smash;" "my pure intent to be a solid partner,

friend and leader with your group. . . . I continue to be grateful for your partnership and

friendship;" "Once we came to an Agreement and set upon the Smash Technology project");

Alex Decl. ¶¶ 72-73 ("As your equal Partner, I want and need all the "original hard tangible"

financial records;" "Partners would and should provide this upon request especially partners that

are supposed to be equal and especially when one is providing the source of funding;" "We have

an agreement for the Intellectual Property since all this began even before you finally made the

decision to dissolve Smash Solutions.  You contributed the Intellectual Property.  I contributed

the funding"); Alex Decl. ¶¶ 77-78 ("We agreed, and you transferred the Intellectual Property

25

from Smash Solutions to Smash Technology.  Later we gave Feracode access to this IP to start

the development and build of Smash Technology;" "Maybe you want to buy me out or have one

of your new investors buy me out?  You don't appear to want a partner to hold you responsible

and accountable and you don't appreciate what I have done for you and this project;" "Partners

must have 100% transparency between them and are responsible and accountable to one

another").

20.     On January 25, 2019, Feracode gave notice to Technology that the Feracode-

Technology Agreement was terminated pursuant to its terms.  (*See Ex. 6.*)  Feracode's stated

reasons were the "serious delinquency of the payments and final transfer of the Intellectual

Property not being completed from Jerry Ulrich and Smash Solutions …." (*Id.*)

**RESPONSE:**  Disputed.  Neither Alexander nor Smash Technology received notice of

Feracode's purported termination of its agreement with Smash Technology in January 2019 and

disputes any alleged reasons for such termination, especially given the fact Technology had paid

Feracode substantial sums to develop the new intellectual property and CRM Platform for

Technology's benefit.  (Alex Decl. ¶ 8.)  Furthermore, as a legal matter, such a purported

termination has no bearing on Technology's rights, interests, and ownership in, and/or control in,

the intellectual property, software technology, and CRM Platform that it paid Feracode to

develop.

22.     Solutions remains in possession of the Intellectual Property, and it has never

transferred it to Technology.  (Ulrich Decl., ¶ 16.)

**RESPONSE:**  Disputed.  Contrary to Defendants' assertion, Technology has rights,

interests, and ownership in, and/or control of, the new intellectual property, new code, new

software technology, new features, new functionality, and new CRM Platform at issue in this case. *See* Alex Decl. ¶¶ 2-4, 6-9, 11-12, 16-18, 20-24, 30-37, 42, 45-48, 51, 53-54, 59, 61, 63-66, 69-70, 73-77, 79, and 80; Documents, Exhibits 1-5.

This Statement of Fact is essentially duplicative of Statement of Fact No. 7, wherein Defendants allege "Solutions owns all intellectual property rights to the software." Plaintiffs vigorously dispute that Solutions owns the intellectual property, that Solutions remains in possession of the property, and that it has never transferred the intellectual property to Technology. Accordingly, Plaintiffs incorporate by reference herein their particularized response to Statement of Fact No. 7, which applies with equal force to this Statement of Fact. Because Plaintiffs' particularized response to this Statement of Fact includes the same 14 pages of detailed response, Defendants seek to avoid redundancy for the sake of efficiency and clarity.

## **STANDARD**

Summary judgment is proper only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A factual dispute is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way. In applying this standard, the court must view the factual record and draw all reasonable inferences therefrom most favorably to the non-movant." *Lints v. Graco Fluid Handling (A) Inc*., 347 F. Supp. 3d 990, 1002 (D. Utah 2018) (citation and internal quotation marks omitted).

"When the movant chooses to show that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial, it must make more than simple conclusory assertions to that effect, otherwise summary judgment would be converted into a tool for

27

harassment.  The movant must affirmatively demonstrate that there is no evidence in the record to prevail on his motion."  *Id.* at 1006.

## ARGUMENT

Ulrich's own admissions defeat his premature and disingenuous summary judgment attempt.  As demonstrated in the Appendix of Evidence, which primarily consists of Ulrich's own email and text communications to Alexander, it is clear that genuine disputes of material fact exist regarding the parties' rights, interests, and ownership in, and/or control of, the intellectual property, software technology, and CRM Platform at issue in this case.  For example, from the outset of Smash Technology's development agreement with Feracode, Ulrich emailed Alexander and confirmed Alexander's direct payment to Feracode to develop the CRM Platform. "***When we paid the invoice to Feracode $50,000 was used from the $60k you sent.  The difference was used by pulling all cash and commissions out of our accounts to cover the $26k difference***."  (Alex Decl. ¶ 36.)  Significantly, Ulrich's conformation was in response to Alexander's express authorization to use his cash to pay Feracode: "I hereby authorize per our verbal agreement and you have my permission to use up to $50,000 I wired to you to buy bitcoin for me to pay the first payment to the Development Team together with our shared funds from Uberfund to cover the $76,000 first installment."  (Alex Decl. ¶ 37.)  Accordingly, Smash Technology—via Alexander's direct investments—actually paid Feracode to develop the intellectual property, software technology, and CRM Platform at issue from this case—and the payments continued throughout 2018.

I.  **GENUINE DISPUTES OF MATERIAL FACT REGARDING THE PARTIES' RIGHTS, INTERESTS, AND OWNERSHIP OF THE INTELLECTUAL PROPERTY PRECLUDE SUMMARY JUDGMENT**

In his email and text communications directly to Alexander, Ulrich repeatedly acknowledged and discussed Alexander's and Smash Technology's payments to Feracode for purposes of developing the CRM Platform:

- "The only other obligation is getting the software under development that would take approximately 300k a month commitment, however the first month would probably be 150k" (Alex Decl. ¶ 21);

- "maybe you would be willing to let me keep the Uberfund account and use it to assist in funding the monthly commitments" (*Id.*);

- "we can use the trading and bitmax to cover the expenses" (Alex Decl. ¶ 33);

- "The goal would be to achieve minimum funding level to not draw from internal resources any longer than we need to complete the product" (Alex Decl. ¶ 33);

- "we have not spent that much thus far with the exception of Feracode" (Alex Decl. ¶ 42);

- "we immediately met with Feracode to arrange a payment arrangement to allow us a little time to get the cashflow from the loan, PPM or the [Bitcoin] mining" (Alex Decl. ¶ 45);

- "I know that the accounting needs to be completed so you know where you are at financially with Smash" (Alex Decl. ¶ 52);

- "I know the massive potential of what we have built and I still believe what we create in Smash will be bigger than what [Bitcoin] has created;" (Alex Decl. ¶ 59);

- "Here is the information for the WIRE TRANSFER," providing Alexander with Feracode wire information (Alex Decl. ¶ 80; Ex. W SS000211);

- "Michael this is what we sold in cash.  I will send you the coin.  I told you I had not done the transfers until Kevin could show me the accounting.  This is what we had already done before you gave me that information.  Feracode has been 20k a week We sold coin to avoid the cash having to go through all the exchange process and used what was in the accounts to fund packages" (Alex Decl. ¶ 80; Ex. W SS000214);

- "This audit was from a series of transactions that we sold the coin that was in our account and Uberfund and Centurion when we use cash they came in for new transfers to pay Feracode" (Alex Decl. ¶ 80; Ex. W SS000215);

- "I also let him know I have a payment that will soon need to be sent down to Feracode so we can get them paid" (Alex Decl. ¶ 80; Ex. W SS000222-23);

- "I know you did not want to use crypto for payments any longer but that is the only way I can pay for my side of these costs . . . The withdrawls made from them are accounted for and yes you need the reports from those but I am not going to have you sent inaccurate or not complete data" (Alex Decl. ¶ 80; Ex. W SS000225);

- "So as of right now are we still splitting the funds that come into Centurion and Uberfund, because that is why we did the withdrawls out of them for Feracode payments and the operating expenses" (*Id.*);

- "Smash has been very expensive to build and we would not be where we are at today without all the ip and that we had to get to this point. All these packages and systems we have created will also create a huge financial windfall for everyone because of the size of packages coming and because of the systems we created" (Alex Decl. ¶ 80; Ex. W SS000226);

- "While we have been going through this I have put off Feracode for as long as I can.  I need to sell some of the coin in our accounts to pay them" (Alex Decl. ¶ 80; Ex. W SS000231); and

- "Michael are you in a position to support on the final payment to Feracode?" (Alex Decl. ¶ 80; Ex. W SS000241

Ulrich texted the following summary to Alexander on December 8, 2018[2], regarding their investments in Smash Technology and their payments to Feracode.  Though Alexander immediately disputed the inaccurate and confusing accounting, Ulrich's text is telling:

> "Just so you have a summary of the accounting items.  Here they are.  I don't know when sterling will be able to go over them with you in detail however the final payment to Feracode on December 18th for $188,000 they will not be able to continue programming. So I figure you should have the general amounts and I can send

---

[2]  Ulrich's text regarding Plaintiffs' partnership in Smash Technology and their related investments was just a month before Plaintiffs filed this action.

over the reports to you as well or you can wait for sterling to
review."

   o   Total Expenses: -$581,553.70
   o   Michael Deposits: $122,350.00
   o   Jerry's Deposits: $270,395.00
   o   Total Deposits: $392,745.00
   o   Additional Expenses – deposits: $188,8070 (Total By Jerry $459,203.70)
   o   Michael difference after accounting review: $336,853.70"

(Alex Decl. ¶ 80; Ex. W SS000240).

Plaintiffs' claims are not a fever dream.  They are not ginned up out of thin air.
Alexander's and Ulrich's partnership in Smash Technology *actually* happened.  Their
investments into Smash Technology *actually* happened.  Alexander's substantial payments to
Feracode to develop the intellectual property, software technology, and CRM Platform for
Technology's benefit *actually* happened.  Indeed, in his declaration and email/text
communications to Ulrich, Alexander repeatedly affirms his substantial investments into Smash
Technology—and related payments to Feracode—for the express purpose of developing
Technology's new intellectual property, new software technology, and new CRM Platform.
(Alex. ¶ 12; Plaintiffs' Response to Statement of Fact No. 7.)  Though Alexander invested cash,
cryptocurrencies, and other resources into Smash Technology that were to be utilized in
developing the intellectual property and CRM Platform pursuant to the Feracode agreement,
Ulrich has failed to account for his investments into Technology, including two cash wires in the
amount of $100,000 and earnings provided from Alexander's Bitcoin positions and other
business interests in the amount of approximately more than $2 million.  (*Id.*)

Incredibly, Defendants' Motion ignores all the evidence regarding Plaintiffs' rights and
interests in the intellectual property, software technology, and CRM Platform developed by

31

Feracode pursuant to its agreement with Smash Technology.  To be clear, the genuine disputes of material fact regarding this issue are overwhelming, acute, and relevant.  Even without the benefit of discovery given Defendants' premature motion, Plaintiffs have established the following facts with supporting testimony, email and text communications, and documents:

> (1) Alexander and Ulrich engaged in a Smash Technology partnership;
> (2) Alexander and Ulrich invested cash, cryptocurrency, and other resources—including infant intellectual property—into their Smash Technology partnership;
> (3) Smash Technology entered into an agreement with Feracode for the development of the intellectual property, software technology, and CRM Platform; and
> (4) Alexander's investments into Smash Technology actually paid for Feracode's development of the intellectual property, software technology, and CRM Platform for technology's benefit.

(*See* Plaintiffs' Response to Statements of Fact Nos. 7 and 22.)

Though the parties have not engaged in discovery and Defendants have not produced relevant and critical transactional documents, Plaintiffs do have some in their possession, which, again, support Ulrich's participation in the Smash Technology partnership and Alexander's substantial investments into Smash Technology.  For example, Ulrich received invoices for Smash Technology expenses, he received wire transfers from Alexander, and he wired Smash Technology payments to Feracode.  (*See* Appendix of Evidence, Documents, Exhibits 1-3.) Moreover, for many months, Feracode sent invoices directly to Smash Technology for the development of the intellectual property, software technology, and CRM Platform.  (*Id.* at Ex. 4.) Sam Potter, Smash Technology's CTO, also sent invoices to Smash Technology.  (*Id.* at Ex. 5.) As described by Alexander, his investments in Smash Technology actually paid for the Feracode and Potter invoices.  (Alex Decl. ¶¶ 12, 66.)

Consequently, there are genuine disputes of material fact regarding the parties' rights, interests, and ownership in, and/or control of, the CRM Platform under development by Feracode, which precludes summary judgment.  *See Luckette v. F.M. Howell & Co.*, 942 F. Supp. 2d 374, 379 (W.D.N.Y. 2013) (stating that "which party owned the intellectual property" was a material question of fact precluding summary judgment); *Bodum USA, Inc. v. Lifetime Brands, Inc.*, No. 14-CV-3365, 2015 WL 3932107, at *6 (N.D. Ill. June 24, 2015) ("[W]hether intellectual property rights were validly assigned" was question of fact that precluded summary judgment).

The existence of Ulrich's and Alexander's Smash Technology partnership, or, as the facts may ultimately establish, a joint venture—which Plaintiffs' have demonstrated with overwhelming testimonial and documentary evidence—is also a question of fact that precludes summary judgment.  *See Dieleman v. Sendlein*, 670 P.2d 578, 579 (Nev. 1983) ("Whether an oral partnership has been entered is a question of fact."); *Posner v. Tassely*, No. 63326, 2015 WL 149102, at *3 (Nev. Jan. 9, 2015) ("Whether a partnership or joint venture arises out of a written agreement is a question of fact."); *Ellsworth Paulsen Const. Co. v. 51-SPR-L.L.C.*, 2008 UT 28, ¶ 24, 183 P.3d 248 (explaining that whether a joint venture exists is ordinarily a question of fact, and setting forth the essential elements of a joint venture as (1) a community of interest in the performance of the common purpose; (2) a joint proprietary interest in the subject matter; (3) a mutual right to control; (4) a right to share in the profits; and (5) unless there is an agreement to the contrary, a duty to share in any losses which may be sustained); *Bridgman v. Winsness*, 98 P. 186, 189 (Utah 1908) (citation and internal quotation marks omitted) ("The existence of a partnership is to be proved, like any other fact, by competent evidence and subject to the usual

rules of evidence."); 59A Am. Jur. 2d Partnership § 180 (stating "the existence of the facts necessary to bring the relation within the tests of partnership, or the determination whether a partnership exists under the evidence and the inferences reasonably drawn from the evidence, is a question of fact for the jury.").

## II.     DEFENDANTS' MOTION SHOULD BE DENIED PURSUANT TO RULE 56(d)

Because Defendants filed their summary judgment motion at the outset of this case— before any discovery has been conducted—Plaintiffs do not have additional relevant documentary evidence supporting their claims and facts in opposition to Defendants' Motion. Pursuant to Rule 56(d), the Court may defer considering Defendants' motion, deny it, or allow time for the parties to engage in discovery.  On June 12, 2019, Plaintiffs' served their first sets of document requests on Ulrich and Smash Solutions, seeking critical documentary evidence that has not been produced by Defendants, including, among other things, Ulrich's personal and business financial records, Ulrich's use of Alexander's cash and Bitcoin, Ulrich's communications with Feracode, and Ulrich's transactions with Feracode.  (*See* Appendix of Evidence, Declaration of Darren Reid in Support of Rule 56(d) Relief, which is attached for the purpose of supporting Plaintiff's Rule 56(d) Motion.)  Plaintiffs expect this additional evidence will dispute Defendants' contentions that Smash Solutions (or Ulrich) is the exclusive owner of the intellectual property, software technology, and CRM Platform developed by Feracode.  It will also dispute Defendants' contentions that Plaintiffs have no rights or interests in the same, whether as a result of the parties' partnership, joint venture, or other legal relationship.

## <u>CONCLUSION</u>

Based on the foregoing, Plaintiffs' respectfully request the Court deny Defendants' narrowly-focused, misguided, and premature Motion.  In the alternative, and to the extent additional discovery is necessary to fully respond to Defendants' motion, Plaintiffs move for Rule 56(d) relief and respectfully request the Court deny Defendants' Motion or, at a minimum, defer considering Defendants' Motion until the parties have completed fact discovery, which closes in December 2019.

DATED this 21st day of June, 2019.

HOLLAND & HART LLP


/s/  Darren G. Reid
Darren G. Reid
Brandon T. Christensen
*Attorneys for Plaintiffs*

13125429_v1