# EXHIBIT 7

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS .................................................................................................. 1

ARTICLE II THE LIMITED LIABILITY COMPANY ...................................................... 7

    2.1    Formation ......................................................................................................... 7
    2.2    Conversion. ...................................................................................................... 7
    2.3    Name ................................................................................................................ 8
    2.4    Business Purpose............................................................................................. 8
    2.5    Registered Office and Agent ........................................................................... 8
    2.6    Term ................................................................................................................. 8
    2.7    Company Powers .............................................................................................. 8
    2.8    Business Transactions of a Member or Director with the Company ............... 9
    2.9    Principal Place of Business.............................................................................. 9
    2.10   Title to Company Property .............................................................................. 9

ARTICLE III THE MEMBERS ........................................................................................... 9

    3.1    The Members ................................................................................................... 9
    3.2    Member Meetings. ......................................................................................... 10
    3.3    Liability of Members .................................................................................... 10
    3.4    Power to Bind the Company .......................................................................... 10

ARTICLE IV THE BOARD AND OFFICERS ................................................................. 11

    4.1    Management by the Board of Directors. ....................................................... 11
    4.2    Meetings of the Board. .................................................................................. 11
    4.3    Actions Requiring Member Approval ........................................................... 12
    4.4    Payments to Managers .................................................................................. 13
    4.5    Officers and Related Persons ........................................................................ 14
    4.6    Reliance by Third Parties .............................................................................. 15
    4.7    Corporate Opportunities................................................................................ 15

ARTICLE V CAPITAL STRUCTURE AND CONTRIBUTIONS.................................... 17

    5.1    Capital Structure. .......................................................................................... 17
    5.2    Initial Capital Contributions.......................................................................... 19
    5.3    Management Equity Incentives...................................................................... 19
    5.4    Preemptive Rights. ........................................................................................ 19
    5.5    No Withdrawal of Capital Contributions ...................................................... 20
    5.6    No Other Capital Contributions .................................................................... 20
    5.7    Maintenance of Capital Accounts. ................................................................ 20

ARTICLE VI ALLOCATIONS AND DISTRIBUTIONS ............................................................ 21

    6.1    Allocations of Net Profits and Net Losses ............................................................ 21
    6.2    Regulatory and Special Allocations. ..................................................................... 21
    6.3    No Right to Distributions ...................................................................................... 22
    6.4    Distributions .......................................................................................................... 22
    6.5    Withholding .......................................................................................................... 23

ARTICLE VII ACCOUNTS .................................................................................................... 23

    7.1    Books and Records ................................................................................................ 23
    7.2    Form K-1 ............................................................................................................... 23
    7.3    Tax Allocations .................................................................................................... 23
    7.4    Tax Matters Partner .............................................................................................. 23

ARTICLE VIII TRANSFER OF UNITS ................................................................................. 24

    8.1    Limitation on Transfer ......................................................................................... 24
    8.2    Permitted Transfers .............................................................................................. 24
    8.3    Conditions to Transfers ........................................................................................ 24
    8.4    Buyout Rights. ...................................................................................................... 25
    8.5    Drag-Along Rights. ............................................................................................... 26
    8.6    Cessation of Employment. .................................................................................... 27
    8.7    Death ..................................................................................................................... 28
    8.8    Divorce ................................................................................................................. 29

ARTICLE IX EVENTS OF DISSOLUTION ........................................................................... 29

    9.1    Event of Dissolution ............................................................................................. 29

ARTICLE X TERMINATION .................................................................................................. 29

    10.1    Liquidation ........................................................................................................... 29
    10.2    Final Accounting .................................................................................................. 30
    10.3    Cancellation of Certificate ................................................................................... 30

ARTICLE XI EXCULPATION AND INDEMNIFICATION .................................................... 30

    11.1    Exculpation ........................................................................................................... 30
    11.2    Indemnification ..................................................................................................... 30
    11.3    Amendments ......................................................................................................... 31

ARTICLE XII AMENDMENT TO AGREEMENT ................................................................. 31

    12.1    Amendment to Agreement. .................................................................................. 31

ARTICLE XIII GENERAL PROVISIONS ................................................................. 31

13.1    Notices ........................................................................................................ 31
13.2    Entire Agreement, Etc ................................................................................ 32
13.3    Construction Principles .............................................................................. 32
13.4    Counterparts ............................................................................................... 32
13.5    Severability ................................................................................................ 32
13.6    Governing Law; Venue .............................................................................. 32
13.7    Submission to Jurisdiction; Consent to Service of Process. ................. 32
13.8    Waiver of Right to Trial by Jury ............................................................... 33
13.9    Binding Effect ............................................................................................ 33
13.10   Further Agreements .................................................................................... 33
13.11   No Third-Party Beneficiary ....................................................................... 33
13.12   Limited Liability Company ........................................................................ 33

## LIMITED LIABILITY COMPANY AGREEMENT

This LIMITED LIABILITY COMPANY AGREEMENT (this "Agreement") of Smash Solutions, LLC (the "Company") is made and entered into as of this 3rd day of April, 2014 (the "Effective Date"), by and among the Company, the entities and individuals listed as signatories hereto, and each Person who may subsequently be admitted as a member of the Company in accordance with the terms hereof (each, a "Member" and, collectively, the "Members").

## RECITALS

WHEREAS, on September 5, 2012, Smash Solutions, LLC was duly formed and organized in accordance with the provisions of the Utah Revised Limited Liability Company Act, Utah Code Annotated Section 48-2c-101 et seq, and any successor statute, and was subsequently converted to a Delaware limited liability company under the Act (as defined below) on January 2, 2013;

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members agree as follows:

## ARTICLE I

## DEFINITIONS

As used herein, the following terms have the meanings set forth below:

1.1    "Act" means the Delaware Limited Liability Company Act, codified in Title 6 of the Delaware Code, Section 18-101 et seq., as now adopted or as may be hereafter amended.

1.2    "Adjusted Capital Account Deficit" shall mean, with respect to any Member, the deficit balance, if any, in such Member's Capital Account, as of the end of the relevant Taxable Year, after giving effect to the following adjustments:

(a)    Crediting to such Capital Account any amount which such Member is obligated to restore or is deemed to be obligated to restore pursuant to Treasury Regulation Section 1.704-1(b)(2)(ii)(c), 1.704-2(g)(1), and 1.704-2(i); and

(b)    Debiting to such Capital Account the items described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5), and (6).

1.3    "Affiliate" shall have the meaning set forth in Rule 405 promulgated under the Securities Act.

1.4    "Agreement" shall have the meaning set forth in the Preamble hereto.

Initials: _____

1.5    "Board" shall have the meaning set forth in Section 5.1(a) hereof.

1.6    "Business Day" shall mean any day except Saturday, Sunday or any other day on which commercial banks located in Salt Lake City, Utah are authorized or required by law to be closed for business.

1.7    "Capital Account" shall have the meaning set forth in Section 5.7(a) hereof.

1.8    "Capital Contribution" shall mean any contribution of cash or property to the Company made by or on behalf of a Member, as set forth from time to time on Schedule 1 hereto.

1.9    Termination for "Cause" shall mean a Cessation of Employment of an Employee Member which occurs for reason of or relating to: (i) the Employee's conviction of or plea of guilty or *nolo contendere* to, a felony or any other crime involving dishonesty or moral turpitude; (ii) the Employee's willfully engaging in misconduct in the performance of his duties for the Company (including theft, fraud, embezzlement, etc.) that is injurious to the Company, (iii) the Employee's willfully engaging in misconduct *other than in the performance of his duties* for the Company (including theft, fraud, embezzlement, etc.) that is materially injurious to the Company, monetarily or otherwise; (iv) Employee's engaging or in any manner participating in any activity which is competitive with or intentionally injurious to Company; or (v) Employee's failure to follow the Company's material policies and procedures or the lawful directions of the Board or the Company's senior executive employees, as determined in the judgment of the Board.

1.10    "Certificate of Cancellation" shall mean the certificate required to be filed with the Secretary of State of the State of Delaware pursuant to the Act in connection with a dissolution of the Company.

1.11    "Certificates" shall have the meaning set forth in Section 2.2 hereof.

1.12    "Cessation of Employment" means the occurrence of any of the following (i) the voluntary cessation of the performance of all services for the Company by an Employee Member, (ii) termination by the Company of an Employee Member of the performance of all services for the Company for any reason, (iii) death of the Employee Member, or (iv) Disability of the Employee Member.

1.13    "Claims" shall have the meaning set forth in Section 11.2.

1.14    "Code" shall mean the Internal Revenue Code of 1986, as amended.

1.15    "Company" shall have the meaning set forth in the Preamble hereto.

Initials: 

1.16    "Company Minimum Gain" shall have the meaning set forth for "partnership minimum gain" in Treasury Regulation Section 1.704-2(d).

1.17    "Covered Person" or "Covered Persons" shall have the meaning set forth in Section 11.1 hereof.

1.18    "Depreciation" shall mean, for each Fiscal Year, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such Fiscal Year for federal income tax purposes, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Board.

1.19    "Director" shall have the meaning set forth in Section 5.1(a) hereof.

1.20    "Disability" shall mean: (i) a long-term disability, as defined in the Company's long-term disability plan or policy as then in effect; or (ii) if the Company does not maintain or participate in a disability plan or policy for the benefit of the Company's executives, then the applicable Person's inability reasonably to perform his duties because of any medically determinable physical or mental impairment that (A) can reasonably be expected to result in death or (B) has lasted or can reasonably be expected to last for at least 90 consecutive days or for at least 90 days in any 120-consecutive-day period, as determined by the Board, in its sole and absolute discretion, upon receipt of competent medical advice from a qualified physician selected by or acceptable to the Board; provided, that conditions existing and previously diagnosed with respect to any Member as of the date hereof shall be excluded from this definition and shall in no event qualify as a "Disability".

1.21    "Effective Date" shall have the meaning set forth in the preambles.

1.22    "Employee Member" shall mean any Member of the Company who serves, or who has served within the past calendar year, as an employee or consultant of the Company.

1.23    "Event of Dissolution" shall have the meaning set forth in Section 9.1 hereof.

1.24    "Exchange Act" shall mean the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

1.25    "Fair Market Value" shall, as of any date, mean the fair market value of Units or other securities or assets of the Company as of such date, as determined

in good faith by the Board using such methods or procedures as shall be established from time to time by the Board (it being understood and agreed that Fair Market Value shall be determined valuing the Company as a private company and as a going concern, but valuing any Units without regard to any minority discounts or transfer restrictions, or discounts arising from lack of liquidity).

1.26    "Fiscal Year" shall have the meaning set forth in Section 8.2 hereof.

1.27    "Governmental Authority" shall mean any federal, state, municipal or other governmental authority, department, commission, board, agency or other instrumentality.

1.28    "Gross Asset Value" shall mean, with respect to any asset, the adjusted basis of the asset for federal income tax purposes, except as follows:

(a)    with the exception of contributions in the form of cash, the initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross Fair Market Value of such asset, as reasonably determined by the Board;

(b)    the Gross Asset Value of all Company assets shall be adjusted to equal their respective gross Fair Market Values, as determined by the Board, immediately prior to the following times:  (i) the acquisition of additional Units or other interests in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (ii) the distribution by the Company to a Member of more than a de minimis amount of Company property as consideration for Units or other interests in the Company; (iii) the grant of Units in the Company (other than a de minimis number of Units) as consideration for the provision of services to or for the benefit of the Company by an existing Member acting in a Member capacity, or by a new Member acting in a Member capacity or in anticipation of becoming a Member; and (iv) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); provided, however, that adjustments pursuant to subsections (i), (ii) and (iii) of this subclause (b) shall be made only if the Board reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interest of the Members in the Company;

(c)    the Gross Asset Value of any Company asset distributed to any Member will be adjusted to equal the gross Fair Market Value of such asset on the date of distribution as reasonably determined by the Board; and

(d)    the Gross Asset Values of the Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(m) and subclause (c) of the definition of "Net Profits and Net Losses" or Section 6.2(e) hereof; provided, however, that such Gross Asset Values shall not be adjusted pursuant to this subclause (d) to the extent that the Board determines that an

adjustment pursuant to subclause (b) above is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this subclause (d).

1.29    "Majority Interest" shall mean, as of any date, a number of issued and outstanding Units equal to more than 50% of the aggregate number of issued and outstanding Units on such date.

1.30    "Member" or "Members" shall have the meaning set forth in the preamble hereto.

1.31    "Membership Interest" shall mean, as of any date, a Member's entire interest in the Company, including such Member's right to distributions, vote on or consent to matters hereunder, and such other rights and privileges that the Member may enjoy by being a Member.

1.32    "Member Nonrecourse Debt" shall have the meaning set forth in Treasury Regulation Section 1.704-2(b)(4), substituting the term "Company" for the term "partnership" and the term "Member" for the term "partner" as the context requires.

1.33    "Net Profits and Net Losses" shall mean, for each Fiscal Year or portion thereof, an amount equal to the Company's taxable income or loss for such period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss and deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a)    any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profits and Net Losses pursuant hereto shall be taken into account in computing such taxable income or losses as if it were taxable income;

(b)    any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Profits or Net Losses pursuant hereto shall be taken into account in computing such taxable income or losses as if they were deductible items;

(c)    to the extent an adjustment to the adjusted tax basis of any asset pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution (other than in liquidation of a Member's interest in the Company), the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Net Profits or Net Losses;

(d)    in the event the Gross Asset Value of any Company asset is adjusted pursuant to subclause (a) or (b) of the definition of Gross Asset Value above, the

amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Net Profits and Net Losses;

(e)     gain or loss resulting from the disposition of property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value; and

(f)     in lieu of depreciation, amortization or other cost recovery deductions taken into account in computing taxable income or loss, there shall be taken into account Depreciation for such period.

1.34    "Nonrecourse Deductions" shall have the meaning set forth in Treasury Regulation Section 1.704-2(b) substituting the term "Company" for the term "partnership" as the context requires.

1.35    "Permitted Transfer" shall have the meaning set forth in Section 8.2 hereof.

1.36    "Permitted Transferee" shall mean a transferee by testamentary or intestate disposition.

1.37    "Person" shall mean any individual, firm, corporation, partnership, limited liability company or other entity, and shall include any successor (by merger or otherwise) of such entity.

1.38    "Preemptive Right" shall have the meaning set forth in Section 5.4(a) hereof.

1.39    "Preemptive Rights Notice" shall have the meaning set forth in Section 5.4(a) hereof.

1.40    "Preemptive Rights Offer" shall have the meaning set forth in Section 5.4(a) hereof.

1.41    "Regulations" shall mean the U.S. Treasury Regulations, as amended.

1.42    "Related Party Agreement" shall have the meaning set forth in Section 4.3.1(e) hereof.

1.43    Equity that is "Reserved" for issuance shall not be deemed issued and outstanding for any purpose, and shall not be entitled to voting rights or other economic rights until such equity is issued.

1.44    "Securities Act" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

1.45    "Taxable Year" shall mean the Company's taxable year ending on or about December 31 (or part thereof in the case of the Company's first and last taxable year), or such other year as is (i) required by Section 706 of the Code or (ii) determined by the Board (if no year is so required by Section 706 of the Code).

1.46    "Tax Matters Partner" shall have the meaning ascribed to the term "tax matters partner" in Code Section 6231.

1.47    "Transfer" shall mean any voluntary or involuntary attempt to, directly or indirectly, offer, sell, assign, transfer, grant a participation in, pledge, mortgage, encumber or otherwise dispose of any Units, or the consummation of any such transactions, or the soliciting of any offers to purchase or otherwise acquire, or take pledge of, any Units; provided, however, that the transfer of an interest in any of the Members that is not a natural person shall not be deemed to be a Transfer of the Units held by such Member, except to the extent that the transfer of such interest in the Member constitutes a change in control of the Member; and provided further, that pledges of Units to banks and financial institutions in connection with obtaining or amending credit facilities or similar forms of debt from such financial institutions in the ordinary course of the Company's business shall not be deemed to be a "Transfer" for purposes of this Agreement.

1.48    "Units" shall have the meaning set forth in Section 5.1(a) hereof.

1.49    "Unit Percentage" shall mean, with respect to any Member holding Units as of a specified date, the percentage determined by dividing (i) the aggregate number of Units held by such Member as of such date, by (ii) the aggregate number of issued and outstanding Units as of such date.

1.50    "Voting Interest" shall mean, as of any date, a Member's entire interest in the Company that is eligible to vote on or consent to a particular matter hereunder.

1.51    "Working Capital Plan" shall have the meaning set forth in Section 4.3(b) hereof.

## ARTICLE II

## THE LIMITED LIABILITY COMPANY

2.1    Formation.  Smash Solution, LLC was originally organized as a Utah limited liability company pursuant to the provisions of the Act.  Articles of Organization for the Company (the "Articles") were filed in the Office of the Secretary of State of Utah on September 5, 2012.

2.2    Conversion.  Smash Solution, LLC was converted to a Delaware limited liability company under the Act on or around January 2, 2013 pursuant to a Certificate of Conversion and a Certificate of Formation filed with the Office of the

Secretary of State of Delaware (the "Certificates"), and in connection with the conversion, was renamed as "Smash Solutions, LLC."

2.3     Name.  The name of the Company shall be "Smash Solutions, LLC", and its business shall be carried on in such name with such variations and changes as the Board shall determine or deem necessary to comply with requirements of the jurisdictions in which the Company's operations are conducted.

2.4     Business Purpose.  The Company is formed for the purpose of engaging in any business or activity for which limited liability companies may be formed under the Act.   The Company shall possess and may exercise all the powers and privileges granted by the Act or by any other law or by this Agreement, together with any powers incidental thereto, insofar as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the business purposes or activities of the Company.

2.5     Registered Office and Agent.   The Company shall maintain a registered office in the State of Utah at, and the name and address of the Company's registered agent in the State of Utah is: J.J. Ulrich, Address: 10757, South River Front Parkway, Suite 275, South Jordan, UT 84095. The Company shall also maintain a registered agent and office in the State of Delaware, which shall initially be: 160 Greentree Drive, Suite 101, Dover, Delaware, 19904.  The Board may, from time to time, change the Company's registered office and/or registered agent and shall forthwith amend the Certificate of Formation to reflect such change(s).

2.6     Term.  The term of the Company commenced on the date of filing of the Certificates in the Office of the Secretary of State of the State of Utah and shall continue until the Company is dissolved pursuant to Article IX below.

2.7     Company Powers.  In furtherance of the business purpose specified in Section 2.4 hereof and without limiting the generality of Section 4.1 hereof, the Company and the Board, acting on behalf of the Company, shall be empowered through simple majority vote to do or cause to be done any and all acts, deemed by the Board to be necessary or advisable in furtherance of the business purpose of the Company, including, without limitation, the power and authority:

(a)     to acquire, hold, manage, own, sell, transfer, convey, assign, exchange, pledge or otherwise dispose of the Company's interest in securities or any other investments made or other property held by the Company, including without limitation investments in capital stock, bonds, notes, debentures and other obligations, investment contracts, partnership shares, limited liability company shares, options, warrants, other securities;

(b)     to borrow funds, in the name and on behalf of the Company, to enter into agreements and other instruments evidencing the Company's obligations in connection therewith and to pledge the Company's assets as collateral to secure the Company's obligations thereunder;

(c) to establish, have, maintain or close one or more offices within or without the State of Delaware and in connection therewith to rent or acquire office space and to engage personnel;

(d) to open, maintain and close bank and brokerage accounts, including the power to draw checks or other orders for the payment of moneys, and to invest such funds as are temporarily not otherwise required for Company purposes;

(e) to bring and defend actions and proceedings at law or in equity or before any Governmental Authority;

(f) to hire consultants, custodians, attorneys, accountants and such other agents, officers and employees of the Company as it may deem necessary or advisable, and to authorize each such agent and employee to act for and on behalf of the Company;

(g) to make all elections, investigations, evaluations and decisions, binding the Company thereby, that may, in the judgment of the Board, be necessary or appropriate for the accomplishment of the Company's business purposes;

(h) to enter into, perform and carry out contracts and agreements of every kind necessary or incidental to the accomplishment of the Company's business purpose, and to take or omit to take such other action in connection with the business of the Company as may be necessary or desirable to further the business purpose of the Company; and

(i) to carry on any other activities necessary to, in connection with, or incidental to any of the foregoing or the Company's business.

2.8     Business Transactions of a Member or Director with the Company. A Member or Director may transact business with the Company and, subject to applicable law, shall have the same rights and obligations with respect to any such matter as a person who is not a Member or Director.

2.9     Principal Place of Business.  The principal place of business of the Company shall be at such location as the Board may, from time to time, select.

2.10     Title to Company Property.  Legal title to all property of the Company shall be held and vested and conveyed in the name of the Company, and no real or other property of the Company shall be deemed to be owned by any Member individually unless otherwise agreed by the Members or as the actual situation requires.

ARTICLE III

THE MEMBERS

3.1     The Members.  The name, address and Unit Percentage of each of the Members are set forth on Schedule 1 hereto, which shall be amended from time to

time to reflect the admission of new Members, additional capital contributions of Members or the Transfer of Units by any Member, each, to the extent permitted by the terms of this Agreement.

        3.2     <u>Member Meetings.</u>

        (a)     Actions by the Members' Meetings. The Members may vote, approve a matter or take any action by the vote of Members' holding Units entitled to vote at a meeting, in person or by proxy, or without a meeting by the written consent of Members pursuant to subparagraph (b) below. Meetings of the Members shall be held upon not less than two (2) nor more than sixty (60) days' prior written notice of the time and place of such meeting delivered to each holder of Units in the manner provided in <u>Section 13.1</u> hereof. Notice of any meeting may be waived by any Member before or after any meeting. Meetings of the Members may be conducted in person or by conference telephone, videoconference or webcast facilities.

        (b)     Action by Written Consent. Any action may be taken by the Members without a meeting if authorized by the written consent of the Members holding Units sufficient to approve such action pursuant to the terms of this Agreement or the Act. In no instance where action is authorized by written consent will a meeting of Members be required to be called or notice be required to be given; <u>however</u>, a copy of the action taken by written consent must be promptly sent to all Members, with the original filed with the records of the Company which are to be kept at the registered office of the Company.

        (c)     Quorum; Voting. For any meeting of Members, the presence in person or by proxy of Members owning Units representing at least a Majority Interest shall constitute a quorum for the transaction of any business. Except as otherwise provided in this Agreement, the affirmative vote of Members owning Units representing at least a Majority Interest shall constitute approval of any action.

        3.3     <u>Liability of Members.</u> All debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member.

        3.4     <u>Power to Bind the Company.</u> No Member (acting in his or her capacity as such) shall have any authority to bind the Company to any third party with respect to any matter except pursuant to a resolution expressly authorizing such action which resolution is duly adopted by the Board and, as applicable, by the Members, by the affirmative vote required for such matter pursuant to this Agreement or the Act.

## ARTICLE IV

## THE BOARD AND OFFICERS

4.1    Management by the Board of Directors.

(a)    Subject to such matters which are expressly reserved hereunder or under the Act to the Members (including a certain percentage interest of the Members) for decision, the Company shall be managed by managers, which collectively shall be known as the board of directors (the "Board").  The Board shall be responsible for policy setting, approving the overall direction of the Company, and making daily business decisions affecting the daily business and ordinary course affairs of the Company.  It is the intent of the Members that each director ("Director") of the Company shall be deemed to be a "Manager" of the Company (as defined in the Act) for all purposes under the Act. The Board shall consist of five (5) Directors.  The Board shall initially be comprised of J.J. Ulrich, as Chairman, and such other members as a Majority Voting Interest may appoint from time to time.

(b)    Each Director shall serve until his or her resignation, removal, death or disability. A Manager may resign at any time upon written notice to the Board.

(c)    Removal.  Any Director may be removed with or without cause only by (i) the affirmative vote of Members owning Units representing at least seventy percent of the Membership Interests.

(d)    Vacancies.  Any vacancy occurring on the Board as a result of the resignation, removal, death or Disability of a Director shall be filled by the Member who appointed such Director.  A Director chosen to fill a vacancy resulting from the resignation, removal, death or Disability of a Director shall serve until such Director's resignation, removal, death or Disability.

4.2    Meetings of the Board.

(a)    The Board shall meet at such times as may be necessary for the Company's business on at least twenty four (24) hours' prior written notice of the time and place of such meeting, which notice may be waived by those Board Directors participating in the meeting.

(b)    The presence of a majority of the Directors then in office shall constitute a quorum at any meeting of the Board.

(c)    Except as otherwise provided in this Agreement, all actions of the Board shall require the affirmative vote of a majority of the Directors present at a duly organized meeting at which a quorum is present.

(d)      Meetings of the Board may be conducted in person or by conference telephone or videoconference facilities and each Director shall be entitled to participate in any meeting of the Board by telephone.

(e)      Any action required or permitted to be taken at any meeting of the Board may be taken without a meeting if, following two (2) Business Days' prior written notice to all Directors (unless such notice is waived), such number of Directors sufficient to approve such action pursuant to the terms of this Agreement consent thereto in writing, and the writing or writings are filed with the minutes of proceedings of the Board.

4.3      Actions Requiring Member Approval.

4.3.1    No action by the Company shall be taken with respect to any of the following matters, and the Members shall, through their respective Board representatives, cause the Company not to take any such action, without the prior approval of a Majority Voting Interest of the Members:

(a)      any amendment to the Certificate of Formation;

(b)      adoption of the annual working capital plan and budget of the Company (the "Working Capital Plan") or the taking of any action inconsistent with the Working Capital Plan;

(c)      selection or replacement of the Company's accountants or a material change in accounting policies;

(d)      approval of audited financial statements;

(e)      any transaction or agreement between (i) the Company and (ii) any Member or such Member's Affiliates (a "Related Party Agreement"), other than any transaction pursuant to or expressly provided for in this Agreement, or any amendment to a Related Party Agreement;

(f)      the declaration, making or payment of dividends or distributions to the Members (whether in cash, securities or other property);

(g)      issuing Common Units or other equity securities of the Company, or any derivative security underlying such Common Units or other equity securities.

(h)      entering into or amending any agreement providing for indebtedness;

(i)      dissolution or liquidation of the Company, in whole or in part, consolidation or merger of the Company with or into any other entity or conveying or transferring its properties and assets substantially as an entirety to any Person, except for dissolution pursuant to Section 9.1; and

(j)      instituting proceedings to be adjudicated bankrupt or insolvent, or consenting to the institution of bankruptcy or insolvency proceedings against it or filing a petition seeking, or consenting to, reorganization or relief under any applicable federal or state law relating to bankruptcy, or consenting to the appointment of a receiver, liquidator, assignee, trustee, sequestrator or other similar official of the Company or a substantial part of its property, or making any assignment for the benefit of creditors, or admitting in writing its inability to pay its debts generally as they become due, or taking corporate action in furtherance of any such action;

4.3.2    Limitations on Power of Managers.  Notwithstanding any other provisions of this Agreement, the Board / Managers shall not have authority hereunder to cause the Company to engage in the following out of the ordinary transactions without first obtaining the affirmative vote or written consent of sixty-one percent (61%) of the Membership Voting Interests:

(1)      The sale, exchange or other disposition of all, or substantially all, of the Company's assets occurring as part of a single transaction or plan, or in multiple transactions over a six month period, except in the orderly liquidation and winding up of the business of the Company upon its duly authorized dissolution;

(2)      The conversion of the Company into, or the merger of the Company with, another limited liability company or limited partnership, provided in no event shall a Member be required to become a general partner in a merger with a limited partnership without his express written consent or unless the agreement of merger provides each Member with the dissenter's rights described in the Act;

(3)      The merger of the Company with, or conversion into, a corporation or a general partnership or other Person;

(4)      The establishment of additional classes of Members beyond holders of Common Units;

(5)      The lending of money by the Company to any Manager, Member, or officer;

(6)      Any act which would make it impossible to carry on the ordinary business of the Company; and

(7)      The filing of a bankruptcy petition on behalf of the Company.

4.4      Payments to Managers.  Except as specified in this Agreement, no Manager or Affiliate of a Manager is entitled to remuneration for services rendered or goods provided to the Company.   The Managers and their Affiliates shall receive only the following payments:

(a) Services Performed by Managers or Affiliates.  The Company shall pay the Managers or Affiliates of the Managers for services rendered or goods

provided to the Company to the extent that the Managers are not required to render such services or goods themselves without charge to the Company, and to the extent that the fees paid to such Managers or Affiliates do not exceed the fees that would be payable to an independent responsible third party that is willing to perform such services or provide such goods.

(b)     Expenses.  The Company shall pay or reimburse the Managers for all reasonable and necessary business expenses incurred or paid by the Managers in connection with the Managers' performance of services on the Company's behalf, upon presentation to the Company of invoices or other acceptable documentation substantiating such expenses; provided, however, that approval by a majority of the Directors shall be required for the reimbursement of any individual expense in excess of $1,000 or expenses in the aggregate exceeding $3,000 in any quarter.  Additionally, the Company shall also pay or reimburse the Managers or their Affiliates for organizational expenses (including, without limitation, legal and accounting fees and costs) incurred to form the Company and prepare and file the Articles and this Agreement.

4.5     Officers and Related Persons.  The Board shall have the authority to appoint and terminate officers of the Company and retain and terminate employees, agents and consultants of the Company and to delegate such duties to any such officers, employees, agents and consultants as the Board deems appropriate, including the power, acting individually or jointly, to represent and bind the Company in all matters, in accordance with the scope of their respective duties.  Any loans between officers and related persons, on one hand, and the Company or a Company affiliate, on the other hand, will have the interest rate capped at a rate no higher than the prevailing London Interbank Offered Rate (LIBOR) plus three (3) percent.

(a)     General.  The Board may, as it deems appropriate, choose a Chairman, a Chief Executive Officer, a President, a Chief Technology Officer, a Chief Marketing Officer, a Treasurer / Chief Financial Officer, a Secretary, and one or more Vice Presidents (and, in the case of each Vice President, with such descriptive title, if any, as the Board shall determine), Assistant Secretaries, Assistant Treasurers and other officers.  Any number of offices may be held by the same person, unless otherwise prohibited by law.  The officers of the Company need not be Directors of the Company nor, except in the case of the Chairman of the Board, need such officers be Directors of the Company.

(b)     Initial Officer Appointments.  As of the date hereof, the officers of the Company are set forth below.

| Title | Individual |
| --- | --- |
| Chief Executive Officer | J.J. Ulrich |
| President and Chief Financial Officer | Carl Doane |

| Title | Individual |
|---|---|
| Chief Technology Officer | Samuel Potter |
| Chief Business Officer | Vivienne Russell |

(c)     Further Officer Elections.  From and after the date hereof, the Board may elect such other officers of the Company, upon such terms including salary and equity incentives, as it deems advisable.

(d)     The officers of the Company shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Board; and all officers of the Company shall hold office until their successors are chosen, or until their earlier death, Disability, resignation or removal. Any officer elected by the Board may be removed at any time, with or without Cause, by the affirmative vote of the Board that includes the vote of the Chairman.

(e)     Voting Securities Owned by the Company.  Powers of attorney, proxies, waivers of notice of meeting, consents and other instruments relating to securities owned by the Company may be executed in the name of and on behalf of the Company by the Chairman, Chief Executive Officer, any President, the CFO or any other officer authorized to do so by the Board and any such officer may, in the name of and on behalf of the Company, take all such action as any such officer may deem advisable to vote in person or by proxy at any meeting of security holders of any entity in which the Company may own securities and at any such meeting shall possess and may exercise any and all rights and power incident to the ownership of such securities and which, as the owner thereof, the Company might have exercised and possessed if present.  The Board may, by resolution, from time to time confer like powers upon any other person or persons.

4.6     Reliance by Third Parties.  Persons dealing with the Company are entitled to rely conclusively upon the power and authority of the Board.

4.7     Corporate Opportunities.

(a)     The Directors and their Affiliates may engage or invest in, independently or with others, any business activity of any type or description, including without limitation those that might be the same as or similar to the Company's business and that might be in direct or indirect competition with the Company.  Neither the Company nor any Member shall have any right in or to such other ventures or activities or to the income or proceeds derived therefrom.  The Directors shall not be obligated to present any investment opportunity or prospective economic advantage to the Company, even if the opportunity is of the character that, if presented to the Company, could be taken by the Company.  The Directors shall have the right to hold any investment opportunity or prospective economic advantage for their own account or to recommend such opportunity to Persons other than the Company.  Each Member acknowledges that

the Directors own and/or manage other businesses, including businesses that may compete with the Company and for the Directors' time.  Each Member hereby waives any and all rights and claims which they may otherwise have against the Directors and their officers, directors, shareholders, partners, members, managers, agents, employees, and Affiliates as a result of any of such activities.

(b)      Certain Matters Deemed Not Corporate Opportunities.  In addition to and notwithstanding the foregoing provisions of this Section 4.7, a corporate opportunity shall not be deemed to belong to the Company if it is a business opportunity that the Company is not financially able or contractually permitted or legally able to undertake, or that is, from its nature, not in the line of the Company's business or is of no practical advantage to it or is one in which the Company has no interest or reasonable expectancy. Notwithstanding any other provision of this Section 4.7, no provision contained in this Agreement is intended to be construed, or shall be interpreted, as a contractual waiver of any fiduciary duty owing to an officer or director of the Company.

(c)      Deemed Notice.  Any person or entity purchasing or otherwise acquiring any interest in any Units shall be deemed to have notice of and to have consented to the provisions of this Section 4.7.

(d)      Confidentiality.  Notwithstanding anything to the contrary in this Agreement, each Member hereby covenants with the Company and each other Member that while a Member and upon the Transfer of the Units or interest of such Member in the Company, whether voluntary, involuntary, by operation of law, or by reason of any provision of this Agreement, the Member will not, directly or indirectly, through an Affiliate or otherwise, use or disclose in any manner any Confidential Information.  "Confidential Information" as used herein means all Intellectual Property, trade secrets, "know-how," customer lists, pricing policies, operational methods, programs, computer software and other business information of the Company created, developed, produced, or otherwise arising before the date of the Transfer.  Each Member hereby stipulates that a breach of the provisions of this Subsection will result in irreparable damage and injury to the Company for which no money damages could adequately compensate it.  If the Member breaches the provisions of this Agreement, in addition to all other remedies to which the Company may be entitled, and notwithstanding the provisions of Section 13.7, the Company shall be entitled to an injunction to enforce the provisions of this Agreement, to be issued by any court of competent jurisdiction, to enjoin and restrain the Member and each and every Person concerned or acting in concert with the Member from the continuance of such breach. Each Member expressly waives any claim or defense that an adequate remedy at law might exist for any such breach.

ARTICLE V

CAPITAL STRUCTURE AND CONTRIBUTIONS

5.1     Capital Structure.

(a)     The Company shall be authorized to issue two classes of membership units ("Units"), designated as "Common Units" and "Preferred Units." Initially, Fifty Million (50,000,000) Common Units shall be authorized for issuance; and Five Million (5,000,000) Preferred Units shall be authorized for issuance.

(b)     Common Units.  Each Common Unit shall entitle the holder thereof to one vote on all matters submitted to a vote of the Members of the Company.  The Common Unit holders shall be entitled to distributions as provided in Article VIII, and shall have such other the rights as may be specifically set forth in this Agreement, or an amendment to this Agreement duly adopted and approved by the Managers.

(c)     Preferred Units.  The Preferred Units shall have the following rights and privileges:

(1)     Dividend Policy.  The Preferred Membership Units will carry an annual 6% (Six Percent) cumulative dividend compounded annually, payable upon a liquidation or redemption, or on a annual basis only in the discretion of the Company's Managers.  Holders of shares of Preferred Units are entitled to dividends when, as and if declared by the Board of Directors, out of funds legally available therefor.  The Company has not yet paid any dividends and does not expect to do so in the near future.  The Company intends to use all retained earnings for working capital and to finance the anticipated growth and expansion of the business.  The dividends of the Preferred Units that are not paid annually will accrue to the following dividend period(s), and shall accumulate until such time as the Preferred Unit dividends are paid in full.

(2)     Liquidation Preference.  In the event of any liquidation, dissolution or winding up of the Company, the proceeds shall be paid as follows:  First pay one times the Original Purchase Price plus accrued dividends plus declared and unpaid dividends on each Preferred Membership Unit. The balance of any proceeds shall be distributed to holders of Common Membership Units.

A merger or consolidation (other than one in which Unit holders of the Company own a majority by voting power of the outstanding equity of the surviving or acquiring corporation) and a sale, lease, transfer or other disposition of all or substantially all of the assets or equity of the Company (each, a "Change in Control Transaction") will be treated as a liquidation event (a "Deemed Liquidation Event"), thereby triggering payment of the liquidation preferences

described above to the extent Preferred Membership Units are not converted to Common Units prior to the completion of the Change in Control Transaction.

(3)  Redemption.  The Preferred Membership Units shall be redeemable from funds legally available for distribution at the option of the Company commencing any time after the fifth anniversary of the Closing at a price equal to the Original Purchase Price plus all accrued but unpaid dividends.

(4)  Conversion.  The Preferred Membership Units shall have conversion rights as follows:

(a) Automatic Conversion.  Each Preferred Membership Unit shall automatically be converted into Common Membership Units (or common stock, as may be then applicable) at the then effective Conversion Price upon the closing of a firm commitment underwritten public offering pursuant to an effective registration statement under the Securities Act of 1933, as amended, covering the offer and sale of a class of equity to the public involving gross proceeds to the Company of not less than $10,000,000 (a "Qualified Initial Public Offering").

(b) Right to Convert.  Each Preferred Membership Unit shall be given written notice at least twenty calendar days before the completion of a Change in Control Transaction, which notice shall include the material terms of such anticipated transaction, including the anticipated consideration pursuant to contemplated transaction.  Each Preferred Membership Unit holder shall then have a period of fifteen calendar days in which to convert the Preferred Membership Units to Common Units on the following terms: each Preferred Unit would be convertible into such number of fully paid and non-assessable Common Units (or common stock, as may then be applicable) as is determined by dividing the applicable Original Issue Price of such Preferred Unit by the Conversion Price (the "Conversion Price") at the time in effect for a Preferred Membership Unit. The Conversion price per Preferred Unit shall initially be $1.00, subject to adjustment from time to time as specified below.

(c) Adjustments.  The Conversion Price shall be subject to adjustment as follows.  In the event the outstanding Common Units shall be subdivided by split, dividend or otherwise, into a greater number of Units, the Conversion Price then in effect shall, concurrently with such subdivision, be proportionately decreased. In the event the outstanding Common Units shall be combined or consolidated into a smaller number of Units, the Conversion Price then in effect shall, concurrently with such subdivision, be proportionately increased.  If the Common Units shall be changed into the same or a different number of Units or shares of any other class or classes of equity or other securities or property, whether by capital reorganization, reclassification or otherwise, then each Preferred Membership Unit shall thereafter be convertible into the number of membership units, or shares of stock to which a holder of the number of Common Units of the Company deliverable upon conversion of such

Preferred Units shall have been entitled upon such reorganization, classification or other event.

(d)     Further Series of Preferred Units.  Subject to any vote expressly required by applicable law or this Agreement, authority is hereby expressly granted to the Managers from time to time to issue Preferred Units in one or more additional series, and in connection with the creation of any such series, by resolution or resolutions providing for the issue of the Preferred Units thereof, to determine and fix such voting powers, full or limited, or no voting powers, and such designations, preferences and relative participating, optional or other special rights, and qualifications, limitations or restrictions thereof, as shall be stated and expressed in such resolutions, all to the full extent now or hereafter permitted by applicable law. Without limiting the generality of the foregoing, and subject to the rights of any series of Preferred Stock then outstanding, the resolutions providing for issuance of any series of Preferred Units may provide that such series shall be superior or rank equally or be junior to the Preferred Units of any other series to the extent permitted by applicable law.

(5)     Voting.  Holders of Preferred Units have no voting, preemptive, subscription, or right of redemption.

5.2     Initial Capital Contributions.  Immediately prior to the Effective Date, the Company shall be capitalized as set forth on Schedule 1.  In exchange for the Capital Contributions and awards associated with certain employment agreements, each Member is herewith receiving Units in the Company in proportion to the Unit Percentage set forth opposite the name of such Member on Schedule 1 hereto.

5.3     Management Equity Incentives.  The Company may establish an equity incentive plan (the "EIP") for executives, directors, officers and consultants of the Company.  The total amount of equity set aside for issuance under the EIP may be up to ten percent (10%) of the Fully Diluted Equity as of the Effective Date.  The Board, with a Majority Voting Interest including the affirmative vote of the Chairman, may alter the percentage of Fully Diluted Equity set aside for issuance under the EIP in its discretion from time to time, and the vesting and other terms for awards made thereunder.

5.4     Preemptive Rights.

(a)     Each Member initially listed on Schedule 1 shall have a right of first refusal to purchase (the "Preemptive Right"), (i) with respect to the issuance by the Company of additional Units, a number of such additional Units as may be necessary in order to permit such Member to maintain its then current Fully Diluted Unit Percentage as of immediately prior to such issuance and (ii) with respect to any other equity securities issued by the Company, a number of such securities as is equal to the aggregate number of such securities to be issued, multiplied by such Member's Fully Diluted Unit Percentage as of immediately prior to such issuance; provided, however, that no Member shall have a Preemptive Right with respect to (x) the compensatory grants of Company securities to officers or employees of the Company or any Company Subsidiaries, in respect of services rendered to the Company or any Company Subsidiary

or as incentive compensation, or (y) the issuance by the Company of Units as consideration in any merger, consolidation or recapitalization involving the Company or a Company Subsidiary or as consideration for the acquisition by the Company or any Company Subsidiary of the assets or capital stock of any Person.  Such Preemptive Right will be offered to each Member holding Units (such offer, the "Preemptive Rights Offer") pursuant to a written notice from the Company offering such Member the Units or other equity securities, on the same terms and conditions as offered to the other offeree(s) (such written notice, the "Preemptive Rights Notice").  The Preemptive Rights Notice will specify the material terms and conditions of the offering, including (i) the aggregate offering amount and offering price per Unit or other equity securities, (ii) the identity of each proposed purchaser in the offering, (iii) the number of Units or other equity securities, proposed to be acquired by each proposed purchaser, and (iv) all written financial information and other disclosures provided by the Company to any other proposed investor in the offering.  Each Member holding Units will have thirty (30) days from the date of the Preemptive Rights Notice to notify the Company in writing of its binding acceptance of such Preemptive Rights Offer with respect to all or any portion of the Units or other equity securities which are offered to such Member pursuant to the Preemptive Rights Offer.

(b)     In the event that any Member elects to purchase Units or other equity securities pursuant to this Section 5.4, the closing of the applicable Preemptive Rights Offer shall be consummated concurrently with the respective issuance of additional Units or other equity securities to the other investors in such offering.

(c)     In the event that any Member does not accept any Preemptive Rights Offer within the applicable thirty (30) day period, the Company shall have the right to issue the Units or other equity securities on terms and conditions not more favorable to the other offerees than those set forth in the Preemptive Rights Notice, pursuant to a definitive agreement to be entered into no later than 90 days after such date.

(d)     Notwithstanding anything to the contrary contained herein, no rights shall be granted pursuant to this Section 5.3 to subscribe for Units or other equity securities to be issued pursuant to an underwritten initial (and any subsequent) public offering of Units (or any other equity securities of the Company).

5.5     No Withdrawal of Capital Contributions.  Except upon a dissolution and liquidation of the Company effected in accordance with Articles IX and X hereof, no Member shall have the right to withdraw its Capital Contributions from the Company.

5.6     No Other Capital Contributions.  Except as provided in Section 5.2 hereof, no Member shall be obligated to make any cash or non-cash contribution to the Company's capital without the unanimous consent of all Members.

5.7     Maintenance of Capital Accounts.

Initials: _____

(a)      The Company shall establish and maintain a capital account ("Capital Account") for each Member in accordance with the following provisions:

(1)    to each Member's Capital Account there shall be credited (x) such Member's contributions of cash and the Gross Asset Value of other properties and assets contributed to the Company, (y) such Member's distributive share of net profits and other items of income or gain which are specifically allocated to such Member and other items of expense or loss which are specifically allocated to such Member and (z) the amount of any Company liabilities assumed by such Member or which are secured by any property distributed to such Member, in each case, with such Member's prior written consent; and

(2)    to each Member's Capital Account there shall be debited (x) the amount of money and the Gross Asset Value of any property distributed to such Member pursuant to any provision of this Agreement, (y) such Member's distributive share of net losses and (z) the amount of any liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company.

(b)      This Section 5.7 and other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Regulations.  Notwithstanding that a particular adjustment is not set forth in this Section 5.7, the Capital Accounts of the Members shall be adjusted as required by, and in accordance with, the Capital Account maintenance rules of Regulations Section 1.704-1(b).

## ARTICLE VI

## ALLOCATIONS AND DISTRIBUTIONS

6.1    Allocations of Net Profits and Net Losses.

(a)      Net Losses shall be allocated among the Members ratably in proportion to their respective Unit Percentages.

(b)      Net Profits shall be allocated among the Members ratably in proportion to their respective Unit Percentages, subject to the provisions of Section 6.4. Notwithstanding the foregoing, allocation of net profits and net losses shall comply with the provisions of Section 704 and the Treasury Regulations promulgated thereunder.

6.2    Regulatory and Special Allocations.

(a)      If any Member has a deficit balance in his, her or its Capital Account, such Member shall have no obligation to restore such negative balance

or to make any Capital Contributions to the Company by reason thereof, and such negative balance shall not be considered an asset of the Company or of any Member.

        (b)     In the event any Member unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulation Section 1.704(b)(2)(ii)(d)(4), (5) or (6), profits shall be specially allocated to such Member in an amount and manner sufficient to eliminate the Adjusted Capital Account Deficit created by such adjustments, allocations or distributions as quickly as possible. This paragraph is intended to comply with the qualified income offset requirement in Treasury Regulation Section 1.704(b)(ii)(d) and shall be interpreted consistent therewith.

        (c)     Each Nonrecourse Deduction of the Company shall be specially allocated among the Members in accordance with their Unit Percentage.

        (d)     If there is a net decrease in Company Minimum Gain (determined according to Treasury Regulation Section 1.704-2(d)(I)) during any Taxable Year, each Member shall be specially allocated profits for such Taxable Year (and, if necessary, subsequent Taxable Years) in an amount equal to each Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulation Section 1.704-2(g). The items to be so allocated shall be determined in accordance with Treasury Regulation Section 1.704-2(f)(6) and 1.704-2(j)(2). This paragraph is intended to comply with the minimum gain chargeback requirement in Treasury Regulation Section 1.704-2(f) and shall be interpreted consistent therewith.

        (e)     To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or 743(b) is required to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated, as provided in Treasury Regulation Section 1.704-1(b)(2)(iv)(m), as an item of profit (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such profit or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Treasury Regulations.

        (f)     Any item of Company loss or expense that is attributable to Member Nonrecourse Debt shall be specially allocated to the Members in the manner which they share the economic risk of loss (as defined in Treasury Regulations Section 1.752-2) for such Member Nonrecourse Debt.

        6.3     <u>No Right to Distributions</u>. No Member shall have the right to demand or receive distributions of any amount, except as expressly provided in this <u>Article VI</u>.

        6.4     <u>Distributions</u>. The Board shall determine, subject to the approval of a Majority Interest of the Members, the amount of profits of the Company available for distribution to Members in compliance with the Act and the amount, if any, to be distributed to Members ("<u>Distributions</u>"), and shall authorize and distribute Distributions

regularly to the Members pro rata in proportion to their respective Unit Percentages, the determined amount when, as and if declared by the Board.

(a)     Notwithstanding the preceding sentence, the Board shall authorize and make Distributions in amounts not less than the amounts required to enable the Members (or the shareholders of the Members) to timely satisfy their respective federal and state income tax liabilities related to such Member's pro rata profits of the Company.

6.5     Withholding.  The Company is authorized to withhold from distributions to a Member, or with respect to allocations to a Member, and to pay over to a Federal, foreign, state or local government, any amounts required to be withheld pursuant to the Code, or any provisions of any other Federal, foreign, state or local law. Any amounts so withheld shall be treated as having been distributed to such Member pursuant to this Article VI for all purposes of this Agreement, and shall be offset against the current or next amounts otherwise distributable to such Member.

ARTICLE VII

ACCOUNTS

7.1     Books and Records.  The Company shall keep or cause to be kept at the office of the Company (or at such other place as the Board in its discretion shall determine) full and accurate books and records regarding the status of the business and financial condition of the Company and shall make the same available to the Members upon request, subject to the provisions of the Act.

7.2     Form K-1.  After the end of each fiscal year of the Company (the "Fiscal Year"), the Board shall cause to be prepared and transmitted, as promptly as possible, and in any event within 90 days of the close of the Fiscal Year, a Federal income tax Form K-1 and any required similar state income tax form for each Member.

7.3     Tax Allocations.  Items of Company taxable income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall be allocated among the Members in accordance with the Code Section 704(c) and the traditional method of Treasury Regulation Section 1.704-3(b).

7.4     Tax Matters Partner.  Carl Doane is hereby designated as the Company's "Tax Matters Partner" under Section 6231(a) (7) of the Code, and shall have all the powers and responsibilities of such position as provided in the Code.

The Tax Matters Partner is specifically directed and authorized to take whatever steps are necessary or desirable to perfect such designation, including filing any forms or documents with the Internal Revenue Service and taking such other action as may from time to time be required under the Regulations issued under the Code. The Tax Matters Partner shall cause to be prepared and shall sign all tax returns of the Company, make any tax elections for the Company allowed under the Code or the tax

laws of any state or other jurisdiction having taxing jurisdiction over the Company and monitor any governmental tax authority in any audit that such authority may conduct of the company's books and records or other documents.

## ARTICLE VIII

## TRANSFER OF UNITS

8.1     Limitation on Transfer.  Except as expressly provided for in this Agreement, a Member shall not Transfer Units.  A holder of Common Units shall not transfer, sell, assign or otherwise Transfer any equity or Unit Interest in the Company without the consent of the affirmative vote of Members owning Units representing at least a Majority Interest. The Members will cause their respective Board representatives to reject any Transfer not permitted by this Article VIII.

8.2     Permitted Transfers.  Except as otherwise provided below, the provisions of this Article VIII shall not apply to: (a) any Transfer by a Member, directly or indirectly, to an Affiliate of such transferring Member; (b) an immediate family member or trust for the purpose of estate planning (provided that the Transferring equity holder maintains voting control of such equity) or (c) any Transfer pursuant to Section 8.4 or 8.5 (each, a "Permitted Transfer"); provided, however, that all Permitted Transfers shall comply with the provisions of Section 8.3.  In the event of any Transfer by a Member to an Affiliate pursuant to this Section 8.2, such Member shall remain liable for the performance of its obligations hereunder, to the extent not performed by such Transferee.

8.3     Conditions to Transfers.  In addition to all other terms and conditions contained in this Agreement, no Transfer shall be completed or effective for any purpose unless prior thereto:

(a)     the Transferor shall have provided to the Board and each non-transferring Member (i) at least thirty (30) days' prior notice of such Transfer, (ii) a certificate of the Transferor, delivered with such notice, containing a statement that, upon receiving the affirmative vote of Members required pursuant to Section 8.1 hereof, such Transfer is permitted under this Article VIII, together with such information as is reasonably necessary for the Board to make such determination, and (iii) such other information and documents as may be reasonably requested by the Board in order for it to make such determination;

(b)     the Transferee shall agree in writing and in advance to be bound by the terms of this Agreement applicable to the Transferor and the Transferee shall furnish copies of all instruments effecting the Transfer and such other certificates, instruments and documents as the Board may reasonably request;

(c)     all necessary third party consents to the Transfer shall have been obtained;

(d)     if requested by the Board in its sole judgment, the Company receives the opinion of counsel to the Company, at the Transferor's expense, reasonably satisfactory in form and substance to the Board, to the effect that: (i) such Transfer, when added to all other Transfers within the preceding twelve (12) months, would not result in any Federal income tax consequences which may be materially adverse to the Company or the non-transferring Members, (ii) such Transfer shall not impose liability or reporting obligations on the Company or any Member thereof in any jurisdiction, whether domestic or foreign, or result in the Company or any Member thereof becoming subject to the jurisdiction of any court or governmental entity anywhere, other than the states, courts and governmental entities in which the Company is then subject to such liability, reporting obligation or jurisdiction, (iii) such Transfer would not cause the Company to be treated as a "publicly traded partnership" within the meaning of Section 7704 of the Code and the related Regulations and would not make the Company ineligible for "safe harbor" treatment under Section 7704 of the Code and the related Regulations, and (iv) such other matters as the Board may reasonably request; and

(e)     all reasonable expenses incurred by the Company (including any legal and accounting fees) in connection with such Transfer have been paid according to the agreement between the Transferor and Transferee.

8.4     <u>Buyout Rights.</u>

(a)     Proposed Transfer. In the event that any Member (a "Transferring Member") shall propose to Transfer, other than in connection with a Cessation of Employment governed by Section 8.6, in one or more transactions, any of its Units (a "Sale") to a third party or third parties not Affiliated with such Member (the "Proposed Purchaser") and has otherwise complied with the requirements of this Article VIII, the Transferring Member shall notify the Company and the Members holding at least a Five Percent (5%) interest (each, a "Non-Transferring Member") in writing of any proposed Sale at least thirty (30) days prior to the proposed effective date of such proposed Sale (a "Sale Notice"). Any such Sale Notice shall set forth: (i) the Units of the Company proposed to be Transferred, (ii) the proposed purchase price to be paid in such proposed Sale, (iii) the other material terms and conditions of such proposed Sale, (iv) the name and address of the Proposed Purchaser, (v) the proposed effective date of the proposed Sale and (vi) that the Proposed Purchaser has been informed of the rights set forth in this Section 8.4, and has agreed to purchase the Units held by each Non-Transferring Member in accordance with the terms hereof.

(b)     Company's Option. The Company shall have the first option to purchase from the Transferring Member any part or all of such Units. The Company's option shall be exercisable within, and shall expire after, the 15-day period commencing on date the Sale Notice is delivered. If the Company desires to exercise its option, it shall do so by delivering to the Transferring Member within the 15-day exercise period a notice specifying the number of Units to be purchased. A director of the Company who is a Transferring Member shall not be entitled to vote as a director with respect to such option. If any of the Units in the proposed Sale are not purchased by the

Company, the Non-Transferring Members shall have the option to purchase such Units from the Transferring Member pursuant to Section 8.4(c) below.

(c)     Non-Transferring Members' Options.  Upon receipt of a Sale Notice, the Non-Transferring Members may, by delivering a written notice to the Transferring Member after the Company's option described in Section 8.4(b) shall have expired but within thirty (45) days following receipt of the Sale Notice, exercise its right to purchase such Transferring Member's Units to be Transferred ("Buyout Rights"), in which event (A) the Non-Transferring Member(s) and the Transferring Member shall prior to the closing of any such purchase, execute any purchase agreement or other certificate, instrument or other agreement reasonably required to consummate the proposed purchase on the terms and subject to the conditions set forth in the Sale Notice and (B) at the closing of any such purchase, the Transferring Member shall deliver to the Non-Transferring Member(s) such instruments of transfer as shall be reasonably requested by the Non-Transferring Member(s) with respect to the Units to be Transferred, against receipt of the purchase price therefor.  In the event that the closing on any such purchase shall not occur within thirty (30) days after the date of the Sale Notice with respect thereto (or such other period as agreed to in writing by such Members) and such failure to close was not caused by the Transferring Member, the Transferring Member shall be free to transfer to the Proposed Purchaser the Units which was the subject of such Sale Notice, on terms and conditions no less favorable to the Transferring Member as set forth in the Sale Notice. If more than one Non-Transferring Member elects its Buyout Rights, the purchases by the Non-Transferring Members shall be in proportion to their respective Membership Interest holdings.  To the extent a Non-Transferring Member does not exercise his or her Buyout Rights, the Non-Transferring Member may exercise its right ("Tag-Along Rights") to participate in such Sale, at the same price (which shall take into account all consideration proposed to be paid to the Transferring Member in such Sale) and on the same terms and subject to the same conditions as the Sale proposed by the Transferring Member, by transferring in its discretion up to all of its Units.

8.5     Drag-Along Rights.

(a)     In the event that Members, whose combined Fully Diluted Unit Percentage exceeds seventy percent (70%) (collectively, "Transferring Holders") shall propose to Transfer, in one or more related transactions, Units in connection with a sale of the Company (whether by merger, sale of Membership Units, sale of all or substantially all of the assets of the Company or other means), or Units representing a Majority Interest, or pursuant to Section 8.4 and the Non-Transferring Members shall not elect to exercise Buyout Rights or Tag-Along Rights for all of their respective Units in connection with such proposed Sale, as applicable, such Transferring Holders shall, subject to Section 8.5(b), have the right and option ("Drag-Along Rights"), but not the obligation, to require the other Members to participate in such Sale for all of their respective Units, at the same price (which shall take into account all consideration proposed to be paid by the Proposed Purchaser in such proposed Sale) and on the same terms and subject to the same conditions and the same Proposed Purchaser as the Sale proposed by the Transferring Holders.

(b)     If the Transferring Holders desire to exercise Drag-Along Rights, it shall give the Company and the Non-Transferring Members written notice of its intention to exercise its Drag-Along Rights (the "<u>Drag-Along Notice</u>") within thirty (30) days after delivery of the Sale Notice, and the Non-Transferring Members shall sell its Units pursuant to the proposed.

8.6     <u>Cessation of Employment.</u>

(a)     If a Cessation of Employment of an Employee Member occurs for any reason other than in connection with a termination specified in Section 8.6(d), the unvested portion of such Member's Membership Interest shall be forfeited.  If a Cessation of Employment of an Employee Member occurs for any reason other than in connection with a termination specified in Section 8.6(d), Section 8.6(e), or Section 8.7, each other Member shall have the right to purchase such portion of the Employee Member's vested Membership Interest as the number of Membership Interests owned by such Member as of the date of the Cessation of Employment bears to the total number of shares owned by all other Members, and in the event any non-selling Members does not purchase its full proportionate share of such Employee Member's Membership Interest, the remaining balance thereof may be purchased by the other non-selling Members in proportion to their respective Membership Interest holdings with the non-selling Member having a 30-day period in which to exercise the option in the manner set forth in Section 8.4(c), except that the price shall be set in accordance with Section 8.6(b).  If after the expiration of such 30-day period all or a portion of the Employee Member's Membership Interest remain available for purchase, then the Company shall have the option to purchase such remaining Units for a 60-day period following the expiration of the non-departing Members' option to purchase.

(b)     The purchase price for the Employee Member's Membership Interest purchased pursuant to Section 8.6(a) shall be (i) the fair market value of such Membership Interests as determined by the Company's Board of Directors as of the most recent date of vesting related to such Membership Interests, if such vesting date occurred within six months of the Cessation of Employment, with consultation of advisors, or (ii) if no such determination by the Board was made within such time period, the valuation reflected in the most recent sale of the Company's equity securities to third party investors for at least $250,000 in the aggregate during such time period, if applicable, or (iii) if clauses (i) and (ii) are inapplicable, the fair market value of the Employee Member's Membership Interest shall be determined by an independent appraiser appointed by the Board who is a member in good standing of the American Society of Appraisers and who has at least five years of full-time experience in the appraisal of closely-held businesses reasonably similar to the Company or is comparably qualified.  Should the departing Member disagree with the valuation pursuant to clause (iii) of this Section 8.6(b), the departing Member shall have fifteen days to appoint a separate, independent appraiser who is a member in good standing of the American Society of Appraisers and who has at least five years of full-time experience in the appraisal of closely-held businesses reasonably similar to the Company or is comparably qualified.  If the two appraisers agree on a fair market value, that valuation shall stand as the purchase price.  If the two appraisers disagree and the lower valuation is greater than

80% of the higher valuation, the purchase price shall be the average of the two valuations. Otherwise, if the two appraisers are unable to agree on the fair market value within 30 days after the second appraiser's appointment, the two appraisers shall select a third appraiser, who shall have no pre-existing relationship with either party.  Each of the three appraisers would then submit his or her determination of the fair market value, and the average of the three determinations shall be the purchase price for purposes of this Section 8.6(b).

(c)     If the Employee Member and the other Members agree in writing (i) as to the purchase price of the Employee Member's Membership Interest, and (ii) to purchase such Employee Member's Membership Interest at such purchase price, then no appraisers shall be appointed pursuant to Section 8.6(b) above, or, if an appraiser has been appointed, such appraiser shall be dismissed and the agreed purchase price shall be deemed to be the Employee Member's Membership Interest for purposes of this Section 8.6.

(d)     Notwithstanding any other provision contained herein, the parties hereto agree that, should an Employee Member be terminated for Cause pursuant to clause (i) - (iv) of Section 1.9, then the Company shall have the right to recapture any equity interest granted to such service provider at no cost (such equity interest to be canceled or returned to treasury in the Company's discretion), regardless of whether such equity interest was vested or unvested at the time of cessation of employment.

(e)     Notwithstanding any other provision contained herein, the parties hereto agree that, in the event of a Disability of an Employee Member, the unvested portion of such Member's Membership Interest shall be forfeited, and the Employee Member may retain his or her vested Membership Interest, which shall not be subject to a repurchase right by the other Members or the Company as described in Section 8.6(a).   Notwithstanding the preceding sentence, nothing herein shall prohibit any Employee Member who may become Disabled and the Company or other Members from negotiating a repurchase by the Company or such other Members by mutual agreement.

8.7     Death

Notwithstanding any other provision contained herein, the parties hereto agree that, in the event of the death of a Member, there shall be a mandatory redemption of the deceased Member's vested Membership Interest by the Company, at a purchase price equal to fair market value, as determined pursuant to Section 8.6(b); provided, that regardless of the manner in which the Board determines fair market value, the heirs of the deceased Member shall have the right to appoint a separate independent appraiser in the manner provided in Section 8.6(b).  The Company shall be entitled, in its option, to purchase life insurance, "key man" insurance or similar policies with respect to any Member it chooses so as to facilitate payment under this mandatory redemption provision. Should the Company not have sufficient liquidity to make the mandatory redemption, including through use of any available insurance funds, the Company shall be authorized

to make the mandatory redemption though a combination of cash and promissory notes or other debt instrument acceptable to the heirs of the deceased.

8.8     Divorce

If a Member and his or her spouse should divorce, the Membership Interest of the divorcing Member shall not be set aside or awarded to the Member's spouse, nor encumbered in any way in his or her favor, but the value of the Membership Interest shall be satisfied from other assets of the divorcing Member and all interest in the Membership Interest shall be awarded to the divorcing Member.  If the assets other than the Membership Interest are adjudged insufficient by the court having jurisdiction of the divorce proceedings, or if for any reason the Court shall award an interest in the Membership Interest to the divorcing Member's spouse, then the Company and the Members other than the divorcing Member shall have the option to purchase all, but not less than all, of the Membership Interest of such divorcing Member in the manner provided in Sections 8.6(a) and (b), with the exercise period beginning on either (i) the date the assets other than the Membership Interest are adjudged insufficient, or (ii) the date the Court awarded an interest in the Membership Interest to the spouse of the divorcing Member.

## ARTICLE IX

## EVENTS OF DISSOLUTION

9.1     Event of Dissolution. The Company shall be dissolved upon the occurrence of any of the following events (each, an "Event of Dissolution"):

(a)     The Members holding at least eighty percent (80%) of the Membership Interests vote for dissolution; or

(b)     A judicial dissolution of the Company under the Act.

No other event, including the retirement, withdrawal, insolvency, liquidation, dissolution, insanity, resignation, expulsion, bankruptcy, death, incapacity or adjudication of incompetency of a Member, shall cause the existence of the Company to terminate.

## ARTICLE X

## TERMINATION

10.1     Liquidation.  In the event that an Event of Dissolution shall occur, then the Company shall be liquidated and its affairs shall be wound up.  All proceeds from such liquidation shall be distributed in accordance with the provisions of the Act to creditors, including Members who are creditors to the extent permitted by law, in satisfaction of the Company's liabilities; and then to holders of Units pro rata in proportion to their respective Unit Percentages.

Initials:

10.2 __Final Accounting__. In the event of the dissolution of the Company, prior to any liquidation, a proper accounting shall be made to the Members from the date of the last previous accounting to the date of dissolution.

10.3 __Cancellation of Certificate__. Upon the completion of the winding up of the Company's affairs and distribution of the Company's assets, the Company shall be terminated and the Members shall cause the Company to execute and file a Certificate of Cancellation in accordance with the Act.

## ARTICLE XI

## EXCULPATION AND INDEMNIFICATION

11.1 __Exculpation__. Notwithstanding any other provisions of this Agreement, whether express or implied, or obligation or duty at law or in equity, none of the Members, Directors, or any officers, directors, stockholders, partners, employees, representatives or agents of any of the foregoing, nor any officer, employee, representative or agent of the Company or any of its Affiliates (individually, a "Covered Person" and, collectively, the "Covered Persons") nor any former Covered Person shall be liable to the Company or any other person for any act or omission (in relation to the Company, this Agreement, any related document or any transaction or investment contemplated hereby or thereby) taken or omitted in good faith by a Covered Person and in the reasonable belief that such act or omission is in or is not contrary to the best interests of the Company and is within the scope of authority granted to such Covered Person by this Agreement, provided a court of competent jurisdiction shall not have determined that such act or omission constitutes fraud, willful misconduct, bad faith, or gross negligence.

11.2 __Indemnification__. To the fullest extent permitted by law, the Company shall indemnify and hold harmless each Covered Person and each former Covered Person from and against any and all losses, claims, demands, liabilities, expenses, judgments, fines, settlements and other amounts arising from any and all claims, demands, actions, suits or proceedings, civil, criminal, administrative or investigative ("Claims"), in which the Covered Person may be involved, or threatened to be involved, as a party or otherwise, by reason of its management of the affairs of the Company or which relates to or arises out of the Company or its property, business or affairs. A Covered Person or former Covered Person shall not be entitled to indemnification under this __Section 11.2__ with respect to (i) any Claim with respect to which a court of competent jurisdiction has determined that such Covered Person has engaged in fraud, willful misconduct, bad faith or gross negligence or (ii) any Claim initiated by such Covered Person unless such Claim (or part thereof) (A) was brought to enforce such Covered Person's rights to indemnification hereunder or (B) was authorized or consented to by the Board. Expenses incurred by a Covered Person in defending any Claim shall be paid by the Company in advance of the final disposition of such Claim upon receipt by the Company of an undertaking by or on behalf of such Covered Person to repay such amount if it shall be ultimately determined that such Covered Person is not entitled to be indemnified by the Company as authorized by this __Section 11.2__.

11.3   Amendments.  Any repeal or modification of this Article XI shall not adversely affect any rights of such Covered Person pursuant to this Article XI, including the right to indemnification and to the advancement of expenses of a Covered Person existing at the time of such repeal or modification with respect to any acts or omissions occurring prior to such repeal or modification.

ARTICLE XII

AMENDMENT TO AGREEMENT

12.1   Amendment to Agreement.

(a)   Amendments to this Agreement and to the Certificates shall be approved in writing by the affirmative vote of holders of Units issued and outstanding and entitled to vote representing at least a Majority Interest.

(b)   An amendment shall become effective as of the date specified in the Members' approval or, if none is specified, as of the date of such approval or as otherwise provided in the Act.  Notwithstanding the foregoing, the Board may amend this Agreement without the approval of any Members (i) to satisfy any law; (ii) to change the name of the Company; and (iii) to cure any ambiguity or correct or supplement any provision of this Agreement that may be incomplete or inconsistent with any other provision contained in this Agreement.

ARTICLE XIII

GENERAL PROVISIONS

13.1   Notices.  Unless otherwise specifically provided in this Agreement, all notices and other communications required or permitted to be given hereunder shall be in writing and shall be (i) delivered by hand, (ii) delivered by a nationally recognized commercial overnight delivery service, (iii) mailed postage prepaid by first-class mail in any such case directed or addressed to the respective addresses set forth in this Section 13.1 or in Schedule 1 attached hereto, or (iv) transmitted by facsimile transmitted to:

If to the Company, to:

SMASH solutions, LLC
Attention:  J.J. Ulrich
10757 South River Front Parkway
Suite 275
South Jordan, UT 84095

If to any Member, to the address of such Member specified on Schedule 1 hereto.

Such notices shall be effective:  (a) in the case of hand deliveries, when received; (b) in the case of an overnight delivery service, on the next Business Day after being placed in the possession of such delivery service, with delivery charges prepaid; (c) in the case of mail, five (5) days after deposit in the postal system, first-class mail, postage prepaid; and (d) in the case of facsimile notices, when electronic indication of receipt is received.  Any party may change its address and telecopy number by written notice to the other parties given in accordance with this <u>Section 13.1</u>.

13.2   <u>Entire Agreement, Etc</u>.  This Agreement and the Purchase Agreement constitute the entire agreement between the parties hereto relating to the subject matter hereof and supersedes all prior contracts, agreements, discussions and understandings between them.  No course of prior dealings between the parties shall be relevant to supplement or explain any term used in this Agreement.  Acceptance or acquiescence in a course of performance rendered under this Agreement shall not be relevant to determine the meaning of this Agreement even though the accepting or the acquiescing party has knowledge of the nature of the performance and an opportunity for objection.  No provisions of this Agreement may be waived, amended or modified orally, but only by an instrument in writing executed by a duly authorized officer.  No waiver of any terms or conditions of this Agreement in one instance shall operate as a waiver of any other term or condition or as a waiver in any other instance.

13.3   <u>Construction Principles</u>.  As used in this Agreement words in any gender shall be deemed to include all other genders.  The singular shall be deemed to include the plural and vice versa.  The captions and article and Section headings in this Agreement are inserted for convenience of reference only and are not intended to have significance for the interpretation of or construction of the provisions of this Agreement.

13.4   <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts by the parties hereto, each of which when so executed will be an original, but all of which together will constitute one and the same instrument.

13.5   <u>Severability</u>.  If any provision of this Agreement is held to be invalid or unenforceable for any reason, such provision shall be ineffective to the extent of such invalidity or unenforceability; <u>provided</u>, <u>however</u>, that the remaining provisions will continue in full force without being impaired or invalidated in any way unless such invalid or unenforceable provision or clause shall be so significant as to materially affect the Members' expectations regarding this Agreement.  Otherwise, the Members agree to replace any invalid or unenforceable provision with a valid provision, which most closely approximates the intent and economic effect of the invalid or unenforceable provision.

13.6   <u>Governing Law; Venue</u>.  This Agreement, the legal relations between the parties hereto and the adjudication and the enforcement thereof, shall be governed by and interpreted and construed in accordance with the substantive laws of the State of Delaware without regard to applicable choice of law provisions thereof.

13.7   <u>Submission to Jurisdiction; Consent to Service of Process</u>.

(a)    The state and federal courts located in Salt Lake City, Utah shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and any and all proceedings related to the foregoing shall be filed and maintained only in such courts, and the parties hereby consent to and submit to the jurisdiction and venue thereof and shall receive notices at such locations as indicated in Section 13.7 hereof and any appellate court thereof, for the resolution of any such claim or dispute.  The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b)    Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 13.7.

13.8    <u>Waiver of Right to Trial by Jury</u>.  Each party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

13.9    <u>Binding Effect</u>.  This Agreement shall be binding upon, and inure to the benefit of, the Members.

13.10    <u>Further Agreements</u>.

(a)    Nothing contained in this Agreement shall modify the terms of the Purchase Agreement.

(b)    Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and of the transactions contemplated hereby.

13.11    <u>No Third-Party Beneficiary</u>. This Agreement is made solely for the benefit of the parties hereto and no other person shall have any rights, interest, or claims hereunder or otherwise be entitled to any benefits under or on account of this Agreement as a third-party beneficiary or otherwise.

13.12    <u>Limited Liability Company</u>.  The parties to this Agreement agree to form a limited liability company and do not intend to form a partnership under the laws of the State of Delaware or any other laws; <u>provided</u>, <u>however</u>, that, to the extent permitted by U.S. law, the Company will be treated as a partnership for U.S. Federal, state and local income tax purposes.   The Members agree not to take any action inconsistent with the Company's classification as a partnership for U.S. Federal income tax purposes.

IN WITNESS WHEREOF, each party hereto has duly executed this Agreement as of the day and year first above written.

Smash Solutions, LLC

By: _____

Name: J.J. Ulrich

Title: Manager, Chairman and CEO

IN WITNESS WHEREOF, each party hereto has duly executed this Agreement as of the day and year first above written.

VIP Smash Solutions, LLC

By: _____
Name: J.J. Ulrich
Title: Sole Member

Think Quicker, LLC

By: _____
Name: Joe Q. Read
Title: Sole Member

Maromel, LLC

By: _____
Name: David L. Russell
Title: Sole Member

Treadwell Group, LLC

By: _____
Name: Carl Doane
Title: Member Manager

By: _____
Name: Samuel Potter

By: _____
Name: Jaime Westmoreland

Lance A. McKinlay, PC

By: _____
Name: Lance A. McKinlay
Title: President

[SIGNATURE PAGE TO LLC AGREEMENT]

## Schedule 1

### MEMBERSHIP TABLE

**OUTSTANDING COMMON UNITS**

| Name & Address of Member | Total Initial Capital Contribution | Common Units Outstanding | Outstanding Common Unit % | Fully Diluted Pro Forma % |
|---|---|---|---|---|
| VIP Smash Solutions, LLC<br>Attn: J.J. Ulrich | $50,000.00 | 18,265,457 | 38.66% | 35.76% |
| Think Quicker, LLC<br>Attn: Joe Q. Read | $50,000.00 | 16,733,139 | 35.40% | 32.76% |
| Maromel, LLC<br>Attn: David L. Russell<br>42727 Mountain Shadow Rd.<br>Murrieta, CA 92562 | Services rendered | 5,107,795 | 10.81% | 10.00% |
| Treadwell Group, LLC<br>Attn: Carl L. Doane | Services rendered | 2,553,898 | 5.40% | 5.00% |
| Samuel Potter | Services rendered | 1,532,339 | 3.24% | 3.00% |
| Jamie Westmoreland | Services rendered | 1,532,339 | 3.24% | 3.00% |
| Lance A. McKinlay, PC | Services rendered | 510,780 | 1.08% | 1.00% |
| Lynn Carrillo | Services rendered | 510,780 | 1.08% | 1.00%[1] |
| Reserved for Issuance to staff employees | Services rendered | 510,780 | 1.08% | 1.00% |
| **TOTAL** | | **47,257,324** | **100.00%** | **92.52%** |

---

[1] Subject to Section 8.6 and other applicable provisions in the Operating Agreement: the Units vest over a period of five years, in annual increments of 20% of the total award per year, with the first 20% vesting on the first anniversary of the grant date.

**OUTSTANDING PREFERRED UNITS**

| Name and Address of Member | Preferred Units Outstanding | Outstanding Preferred Unit Percentage | Fully Diluted Pro Forma Percentage |
|---|---|---|---|
| BTL Global (Shawn Brady) | 1,509,278 | 39.50% | 2.94% |
| Jenson IRA and Jenson Family Trust | 2,276,353 | 59.58% | 4.42%[2] |
| Ralph Carlson | 25,000 | 0.65% | 0.05% |
| Stephen Ross | 35,000 | 0.91% | 0.07% |
| **Total Preferred** | **3,845,631** | **100.00%** | **7.48%** |

**PRO FORMA CAPITALIZATION BY CLASS**

| | Common Units Outstanding | Preferred Units Outstanding | Total Units | Fully Diluted Pro Forma Percentage |
|---|---|---|---|---|
| Outstanding Common Units | 47,257,324 | -- | 47,257,324 | 92.52% |
| Outstanding Preferred Units | -- | 3,845,631 | 3,845,631 | 7.48% |
| **TOTAL PRO FORMA** | **47,257,324** | **3,845,631** | **51,102,955** | **100.00%** |

---

[2] Jenson IRA and Jenson Family Trust have signed a Purchase Agreement dated November 22, 2013 providing for the purchase of 2.0% of the Company on a fully diluted basis, with the option to purchase an additional 2.5%. As of March 31, 2014, only the first 2.0% had been subscribed for and purchased.

EXHIBIT "A"

<u>CONSENT OF SPOUSE</u>

The undersigned, who is the spouse of _David L. Russell_, hereby consents to his or her spouse's execution of the foregoing Agreement, agrees to be bound by the terms of this Operating Agreement and hereby irrevocably appoints his or her respective spouse as her agent for purposes of performing any actions directly or indirectly relating to the foregoing Operating Agreement, including, but not limited to, sales of Membership Interests of the Company under the Agreement, without further signature, consent or notice to the undersigned.

DATED: _5/5/14_

_Vivienne Russell_
[Spouse signs here]

_Vivienne Russell_
[Print name of spouse]