1                IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

3

4

   SMASH TECHNOLOGY, a Nevada     )
5  limited liability company,     )
   et al.,                        )
6                                 )
             Plaintiffs,          )
7                                 )
        vs.                       )   Case No:   2:19cv00105
8                                 )
   SMASH SOLUTIONS, a             )
9  Delaware limited liability     )
   company, et al.,               )
10                                )
             Defendants,          )
11 _____

12

13

14

15

16

17            BEFORE THE HONORABLE TENA CAMPBELL

18                   August 14, 2019

19                    MOTION HEARING

20

21

22

23

                        Reported by:
24            KELLY BROWN HICKEN, RPR, RMR
                      801-521-7238

25

```
1                          APPEARANCES OF COUNSEL
2     FOR THE PLAINTIFF:                HOLLAND & HART LLP
3                                       BY:  DARREN G. REID
4                                           Attorney at Law
5                                       222 S MAIN ST, STE 2200
6                                       SALT LAKE CITY, UTAH 84101
7
8     FOR THE DEFENDANT:                RICHARDS BRANDT MILLER NELSON
9                                       BY:  MATTHEW C BARNECK
10                                          KRISTINA H. RUEDAS
11                                          Attorney at Law
12                                      299 S MAIN ST, 15TH FLOOR
13                                      SALT LAKE CITY, UTAH  84110
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1              SALT LAKE CITY, UTAH, WEDNESDAY, AUGUST 14, 2019

 2                            *   *   *   *   *

 3              THE COURT:  Okay.  We're here in Smash Technology

 4    and others vs. Smash Solutions here today on various motions.

 5    Representing the plaintiff is Mr. Reid.

 6              MR. REID:  Yes, Your Honor.

 7              THE COURT:  And Mr. Maxfield.

 8              MR. MAXFIELD:  Yes, Your Honor.

 9              THE COURT:  And behind we have Ms. Larsen.

10              MS. LARSEN:  Yes.

11              MR. REID:  Yes, Your Honor.  And I'd also like to

12    introduce my cousin Asia Reid.  She's a high school senior

13    interested in practicing law.

14              THE COURT:  Thank you.  Nice to meet you.  After

15    you've watched a little bit, you might decide to go into an

16    honest profession.

17              And for the defense we have Mr. Barneck.

18              MR. BARNECK:  Yes.

19              THE COURT:  And Ms. Ruedas.

20              MS. RUEDAS:  Yes, Your Honor.

21              THE COURT:  Okay.  Let's take care of what I

22    believe to be, and I've read your materials quite carefully,

23    lots of them though there be, voluminous though they are.

24    Let's look at the motion to amend filed by the plaintiff, that

25    is granted without argument.  I know there was an opposition,
```

10:03:44 (line 5)
10:03:56 (line 10)
10:04:07 (line 15)
10:04:18 (line 20)
10:04:41 (line 25)

3

1    and I read it very carefully.  But considering all the

2    pleadings and the stage where we are in the litigation I am

3    going to grant it.

4            Next let's move to the motion for partial summary

10:05:06  5    judgment filed by the defense, and the issue being that

6    Solutions owns all rights to the technology.  Have I

7    characterized that correctly?

8            MR. BARNECK:  I believe that's correct, Your Honor.

9            THE COURT:  All right.  The first question I'm

10:05:38  10    going to ask you as I will the plaintiffs is to define the

11    technology for me that we are discussing ownership of.  Are we

12    discussing the, quote, infant technology or the now developed

13    marketable technology that you are saying you own it all and

14    Technology has no right?  Okay?

10:06:12  15            MR. BARNECK:  That is correct, Your Honor.  I guess

16    I don't agree with the distinctions that the plaintiffs try to

17    make between infant and developed, but we believe the

18    technology includes the intellectual property, the underlying

19    idea and the software that has been developed based upon it.

10:06:34  20            THE COURT:  The marketable software.

21            MR. BARNECK:  And even software that's not yet in a

22    marketable stage, if that is the case.  My understanding is

23    it's still in the final stages of development.

24            THE COURT:  By FeraCode.

10:06:48  25            MR. BARNECK:  FeraCode is doing some of the coding

```
 1   work, but I think I would characterize Solutions as the one

 2   who is the developer.

 3               THE COURT:  And so it is, you just say that

 4   there's -- and correct me because I'm just kind of finding my

 5   way along here.  When the partnership that didn't go anywhere

 6   began, you were talking about what is called infant

 7   technology?

 8               MR. BARNECK:  That's not my term.  That's a term

 9   the plaintiffs have used.

10               THE COURT:  And what do you understand that to

11   mean?

12               MR. BARNECK:  I'm not sure what that means.  I

13   think what the plaintiffs are trying to say is it wasn't very

14   much before they got involved and now it's more.

15               THE COURT:  But you would agree that it wasn't very

16   much and now it's more, because there has been work by

17   FeraCode and by you; right?  And when say "you" I mean

18   Solutions.

19               MR. BARNECK:  Solutions, yes.

20               THE COURT:  Am I right?

21               MR. BARNECK:  That is true.  Both FeraCode and

22   Solutions have continued to do work.  We think the idea was

23   fully developed beforehand.

24               THE COURT:  And "beforehand," what do you mean?

25               MR. BARNECK:  Before discussions with the
```

1      plaintiffs about some kind of joint business venture.

2              THE COURT:  All right.

3              MR. BARNECK:  And what hadn't been developed is the

4      translating of that idea into a final piece of marketable

10:08:19  5  software.

6              THE COURT:  Right.  So that's what as you

7      understand the term to be used by the plaintiffs, that initial

8      is what they call the infant technology.

9              MR. BARNECK:  I assume that's what they mean by it.

10:08:36  10  Again, I don't -- I think that casts it in the wrong light, so

11     I'm not inclined to sign onto that label.

12             THE COURT:  Right.  But now we're talking about

13     CRM Platform that has been developed, and to whatever extent

14     you say it's not quite ready, but it is -- it has changed

10:09:06  15  whether it's changed from the basic principle.  But it is

16     different, although you say it's really the same animal as

17     began with your idea.

18             MR. BARNECK:  I think that's correct.  And our

19     position is that Solutions has owned it all along regardless

10:09:29  20  of whether it's characterized as infant technology or more

21     developed technology.

22             THE COURT:  And what you are seeking with this

23     motion and also I think under the whole lawsuit, if I'm not

24     mistaken, you want a declaration that Solutions and Solutions

10:09:53  25  only possesses all the rights, the interests and the ownership

1     of that platform; am I correct?

2               MR. BARNECK:  That is correct, yes.

3               THE COURT:  Okay.  And, of course, and you'll deal

4     with it, plaintiff is saying not so fast.  Look at all the

10:10:13  5     money that we've poured in.

6               MR. BARNECK:  That is what they're saying.

7               THE COURT:  Okay.  So at least I have the outlines

8     of what we'll be talking about.  So you go ahead, please.

9               MR. BARNECK:  Okay.  Thank you, Your Honor.  I

10:10:26  10    think that's helpful.  You are correct that our motion as we

11    see it is rather narrow.  It seeks a ruling that Solutions

12    owns the intellectual property, both the idea and the software

13    that has been developed based upon that idea, and the

14    ownership of that intellectual property has never been

10:10:49  15    transferred.

16              THE COURT:  Would you say there was or was not an

17    agreement to transfer it?

18              MR. BARNECK:  There was no written agreement.

19    There were discussions.  I guess I hesitate to say whether

10:11:05  20    those discussions would meet the terms of an agreement under

21    contract law because we actually have some concerns about the

22    way plaintiffs characterize that agreement, that it isn't

23    enforceable.  But there were certainly discussions toward an

24    agreement and the intent to ultimately form a joint business

10:11:26  25    venture.  And for the reasons we've said that failed and other

1   reasons probably that we haven't even addressed.

2          Procedurally, and I think there is an important

3   procedural element to this --

4          THE COURT:  Okay.

10:11:42 5          MR. BARNECK:  -- we have a properly supported

6   motion for summary judgment under 56(c).  We have cited

7   documentary evidence and included declarations to support our

8   positions.  And I think the question is whether --

9          THE COURT:  What's your main documentary evidence

10:12:03 10  would you say?

11          MR. BARNECK:  Well, I think the primary evidence

12  is --

13          THE COURT:  Is it lack of evidence on their part?

14          MR. BARNECK:  I think that's the most important

10:12:20 15  point.  We do have documentary evidence, but that includes the

16  operating agreement for plaintiff's Smash Technology which,

17  you know, indicates it's a solely owned, one member, single

18  member entity, not a joint ownership entity as they allege it

19  was supposed to be.  We primarily have our declaration from

10:12:42 20  our client Jerry Ulrich, who was a manager of Solutions, who

21  says Solutions has always owned this intellectual property and

22  there's never been a transfer.  There is no document anywhere

23  that assigns rights, either limited rights or complete

24  ownership interest in the intellectual property.

10:13:07 25          THE COURT:  Could you give me that document number,

1      please?  I've got a lot of paper here.

2                 MR. BARNECK:  The declaration is document

3      Number 33.

4                 THE COURT:  Okay.

10:13:24  5       MR. BARNECK:  And he goes into some detail about

6      when this development began in 2012 and so on.

7                 THE COURT:  Let me just find it.

8                 MR. BARNECK:  Sure.

9                 THE COURT:  That's okay.  Thank you.  Go ahead,

10:14:01 10    please.

11                MR. BARNECK:  So Mr. Ulrich's declaration states

12     that the software really is a data collection platform that

13     has --

14                THE COURT:  Excuse me.

10:14:20 15               (Discussion off the record.)

16                THE COURT:  Okay.  Thank you.

17                MR. BARNECK:  You've got it?

18                THE COURT:  Yes, I do.

19                MR. BARNECK:  Okay.  So he explains the software as

10:14:34 20    a data collection platform, I'm look at Paragraph 6 --

21                THE COURT:  Yep.

22                MR. BARNECK:  -- that has CRM capabilities,

23     customer relationship management.  He wouldn't characterize it

24     as primarily a CRM type of software.  There's lots of CRM

10:14:53 25    software out there.  And Solutions owns it and has owned it.

1    Solutions began developing it in 2012, long before

2    Mr. Alexander or Splash Technology ever entered the scene.

3    And the bill plan is something he put together, Solutions,

4    did, of 6,000 pages.  And it was provided to Farracode, and

10:15:19    5    FeraCode has been doing coding work.

6              THE COURT:  Let me ask you.  When you say, looking

7    at Paragraph 11, you say:  This agreement has never been

8    canceled and remains in force.

9              What agreement are you speaking of?

10:15:41    10              MR. BARNECK:  I'm speaking of the agreement between

11   Solutions and FeraCode.  And, I'm sorry, there's -- that may

12   just be out of order or there's something missing there.  But

13   FeraCode and Solutions signed a contract in January of 2018,

14   and it's that contract that the declaration is referring to.

10:16:10    15   It's never been canceled.

16              THE COURT:  Okay.  So this is -- this agreement is

17   the FeraCode.  But as I understand it and do you understand

18   the assertion there's also an agreement between either

19   Mr. Alexander and FeraCode or Technology and FeraCode?

10:16:31    20              MR. BARNECK:  Technology and FeraCode.  There is --

21              THE COURT:  So there are two agreements with

22   FeraCode.  Do they both center on the same intellectual

23   property?  The same software?

24              MR. BARNECK:  It's my understanding that that was

10:16:50    25   the intent.

10

1          THE COURT:  So you have one -- what is FeraCode?

2     Kind of a coding business?

3          MR. BARNECK:  That's my understanding, yeah.  They

4     write the code.  And I'm sounding like a computer scientist

10:17:03  5     and I'm not.  But they write the code, as I understand, that

6     makes the software function and implement the idea.

7          THE COURT:  So you have one software or whatever

8     and one company writing the code to implement this software.

9     I presume FeraCode will undertake the same efforts.  But two

10:17:42 10    agreements.

11         MR. BARNECK:  Well, it's important to remember that

12    the second one, that FeraCode canceled the second one.

13         THE COURT:  Right.

14         MR. BARNECK:  So in our view, the second one no

10:17:50 15    longer exists.

16         THE COURT:  In your view why did FeraCode cancel

17    it?

18         MR. BARNECK:  Well, what it says, and that's the

19    only view I have, the notice of termination says for serious

10:18:03 20    delinquency in payments --

21         THE COURT:  Right.

22         MR. BARNECK:  -- and because of the failure of the

23    transfer of the intellectual property to technology.

24         THE COURT:  And that was how long after the

10:18:19 25    FeraCode technology agreement was signed?

1          MR. BARNECK:  I think about 10 months.

2          THE COURT:  10 months.

3          MR. BARNECK:  So March of '18 to January of '19.

4          THE COURT:  And your agreement or Solutions'

10:18:36  5    agreement is still ongoing.

6          MR. BARNECK:  Still ongoing.

7          THE COURT:  Okay.  Go ahead, please.

8          MR. BARNECK:  And so Mr. Ulrich declares in his

9     declaration that ownership or any other interests in the

10:18:58 10    intellectual property have never been transferred to

11    Technology.  And we agree that there were discussions toward

12    that as an ultimate end.  It just never happened.  Things fell

13    apart.  There are going to be different versions on both

14    sides, but we've laid out some of the reasons why it didn't

10:19:18 15    happen.  Mr. Ulrich, his position is as he's -- as we've said

16    in the filings that Mr. Alexander did not fund the coding

17    work, the development of the software in the way it was needed

18    and the way he agreed to.

19          THE COURT:  But was there some funding by

10:19:42 20    Mr. Alexander?

21          MR. BARNECK:  There was some funding, yes.  There

22    is a wide disparity.  Our records show $132,000.  His

23    declaration says it was over 2 million, and we don't have

24    documentation to back that up.

10:20:00 25          THE COURT:  So there's a big -- there's a disputed

1    fact about how much Mr. Alexander put toward the development.

2              MR. BARNECK:  There is; although I would add

3    quickly that we don't believe that has anything to do with the

4    ownership.

10:20:21  5              THE COURT:  Okay.  Well, why would that be?

6              MR. BARNECK:  Well, because the agreement was

7    for --

8              THE COURT:  Okay.  Now when you say "agreement,"

9    which agreement?

10:20:32  10              MR. BARNECK:  Sorry.  The agreement that plaintiffs

11   allege, an unwritten verbal agreement toward this joint

12   business venture.  What they say is Mr. Alexander was to fund

13   Technology, his own company, and there simply was never any

14   transfer of ownership.  It didn't happen.

10:20:52  15              Now, I'm probably getting a little bit ahead of

16   myself.

17              THE COURT:  Okay.  Go back to where you're

18   comfortable.

19              MR. BARNECK:  So what I want to start from is the

10:21:06  20   procedural posture that I believe we have a properly supported

21   motion for summary judgment under Rule 56(c) with evidence to

22   support the position not just relying upon the allegations of

23   pleadings.

24              THE COURT:  And your main evidence, correct me if

10:21:23  25   I'm wrong, is document Number 33, Mr. Ulrich's affidavit;

1    correct?

2              MR. BARNECK:  I think that is an important part of

3    it.

4              THE COURT:  What else did you think supports your

5    position?

6              MR. BARNECK:  I believe that the two FeraCode

7    agreements and the cancellation of the second one.

8              THE COURT:  So the cancellation by FeraCode of the

9    agreement with --

10             MR. BARNECK:  With Technology.

11             THE COURT:  -- with Technology.

12             MR. BARNECK:  And the stated reasons for it.

13             THE COURT:  Yeah.  Which said you never got it.

14   And then the still existing agreement I guess between

15   Solutions and FeraCode; right?

16             MR. BARNECK:  Yes.  Yes.

17             THE COURT:  Okay.

18             MR. BARNECK:  That's correct.  Also I believe an

19   important part of the record is, and I think it's attached to

20   our reply, but is the operating agreement for Smash

21   Technology, LLC, which indicates, it's in the pleadings on the

22   plaintiff's side, but it's a single member LLC.

23             THE COURT:  Okay.  It's attached -- tell me that

24   again.  It's the --

25             MR. BARNECK:  So the verbal agreement that the

14

1    plaintiffs allege included the formation of an entity, and I

2    think they say that Ulrich and Alexander discussed ultimately

3    becoming joint owners of that entity.  That joint ownership

4    never did happen.  Smash Technology, LLC, was formed in

10:23:43  5    February of 2018, so the last day of February.  It's a single

6    member LLC, and even by the most recent, the now approved

7    amended complaint, the plaintiffs still say that Mr. Alexander

8    is the sole member of Technology.

9           THE COURT:  Make sure that I've got -- I'm seeing

10:24:06 10  Document 46-1, maybe I'm wrong, an LLC.

11           MR. BARNECK:  That's it.

12           THE COURT:  And you're saying that it supports your

13    position why?

14           MR. BARNECK:  Because it's solely owned by

10:24:25 15  Mr. Alexander.  It's not as directly supportive of who owns

16    it.  But the agreement, the verbal agreement that the

17    plaintiffs allege supposedly required the transfer of the

18    intellectual property to Technology and that Ulrich and

19    Alexander would be joint owners of that entity.  Well, we say

10:24:56 20  the intellectual property was never transferred, and there's

21    no document anywhere that says it was.  And moreover, the

22    entity that was supposed to then become the owner is solely

23    owned by Mr. Alexander.  So why would Solutions --

24           THE COURT:  Wait.  I'm getting mixed up.  As I'm

10:25:18 25  looking at the signature page, Smash Solutions, LLC.

1          MR. BARNECK:  Okay.

2          THE COURT:  And I see it signed by Mr. Ulrich.

3          MR. BARNECK:  No.  You're right.  I'm sorry.

4     That's the Smash Solutions operating agreement.

10:25:36  5          THE COURT:  And it's owned -- the manager and CEO

6     is designated as Mr. Ulrich.

7          MR. BARNECK:  Yes.  I apologize for that confusion.

8          THE COURT:  That's okay.

9          MR. BARNECK:  Our reply memorandum does refer to

10:25:50 10     the Technology operating agreement, and I believe it is filed,

11     but I assume that it was that one.  I didn't look close

12     enough, and I apologize.

13          THE COURT:  So do you think in the record there's

14     somewhere --

10:26:05 15          MR. BARNECK:  Yes.

16          THE COURT:  -- a document that is an operating

17     agreement of what entity signed by whom?

18          MR. BARNECK:  Smash Technology, LLC, signed by

19     Michael Alexander.  And it is document Number 32-4.  I've just

10:26:24 20     found the citation to it.

21          THE COURT:  Okay.  Let's see if we've got it.  I

22     have 32-4.

23          MR. BARNECK:  So it's actually attached to our

24     motion as opposed to our reply memorandum.  That's where my

10:26:45 25     confusion came from.

16

1          THE COURT:  The operating agreement of Smash

2     Technology, and then it is dated whatever and signed by

3     Mr. Alexander.  And you say that it shows what, sir?

4          MR. BARNECK:  What it shows is that only

10:27:08  5     Mr. Alexander is the owner of that entity.

6          THE COURT:  Smash Technology.

7          MR. BARNECK:  Yes.

8          THE COURT:  And because Mr. Alexander represents

9     himself in this document as the sole owner how does that

10:27:26  10     support your argument?

11          MR. BARNECK:  It's secondary support.  And it's

12     support because it is contrary to the verbal agreement that

13     the plaintiffs say was reached between Mr. Ulrich and

14     Mr. Alexander, that the two would jointly own an entity that

10:27:44  15     would own the software.  And this is not a jointly owned

16     entity.

17          THE COURT:  Okay.  I see what you're saying.

18          MR. BARNECK:  Yes.

19          THE COURT:  That makes it clear.  Thank you.

10:27:53  20          MR. BARNECK:  You bet.  And so what we think the

21     Court should consider is, has the plaintiffs presented any

22     admissible evidence that would demonstrate a genuine issue of

23     fact as required under Rule 56?

24          THE COURT:  A genuine issue of fact --

10:28:15  25          MR. BARNECK:  As to the ownership.

17

1           THE COURT:  -- of the software.

2           MR. BARNECK:  Yes.  The intellectual property and

3      the software that it's based on.  And in our view is they

4      haven't done it, and I'll mention a few reasons why.

10:28:30  5           THE COURT:  Okay.

6           MR. BARNECK:  One important reason is that there is

7      no writing transferring any ownership rights, whether the

8      trademark only or the entire bundle of rights that full

9      ownership would include.

10:28:46 10           THE COURT:  Would you say that under the law such

11     is required?

12           MR. BARNECK:  Yes.

13           THE COURT:  Okay.

14           MR. BARNECK:  And let me add to that.

10:28:53 15           THE COURT:  Tell me why.  Is it because it's

16     copyright or something or what?

17           MR. BARNECK:  There's a registered trademark.

18           THE COURT:  Okay.  A registered trademark.

19           MR. BARNECK:  And I have a copy of that I can hand

10:29:07 20     to the Court, and I think I would like to file something to

21     supplement the record to include it.  But this is a record of

22     the trademark registration in the name of Splash Solutions,

23     LLC, from 2014.

24           THE COURT:  And what is it registered?

10:29:26 25           MR. BARNECK:  Well, it's the name Smash Solutions,

18

1    LLC, and then there's a mark which is not shown on this

2    registration, but it's part of the symbol.

3            THE COURT:  Okay.

4            MR. BARNECK:  And then the goods and services that

10:29:41  5    go along with the word mark include software program.

6            THE COURT:  So you believe that under the trademark

7    law any agreement about a joint transfer of the software would

8    have to be in writing.

9            MR. BARNECK:  Yes.  In fact, there's a statute

10:30:07  10    entitled 15 that we've cited in our brief.  It's Title 15

11    Section 1060 that says:  Assignments shall be by instruments

12    in writing duly executed.

13            THE COURT:  And it would be the assignment of the

14    software.

10:30:25  15            MR. BARNECK:  Of a trademark.

16            THE COURT:  Of a trademark.

17            MR. BARNECK:  Yes.

18            THE COURT:  And the trademark would be Smash

19    Solutions.

10:30:33  20            MR. BARNECK:  Yes.

21            THE COURT:  Okay.

22            MR. BARNECK:  So there is also some case law that

23    we've cite --

24            THE COURT:  But I thought that the alleged

10:30:45  25    agreement was Smash Solutions would vanish, be dissolved, and

1    then another entity or whatever would continue in the

2    development.  Is that not so?

3              MR. BARNECK:  The intent of these discussions

4    toward a joint venture together was that ultimately Splash

10:31:18  5    Solutions would be dissolved after a new joint entity was

6    formed and the intellectual property was transferred to it.

7    So that was the intent.

8              THE COURT:  So why would there have to be a

9    transfer of Smash Solutions to somebody or something else if

10:31:36  10   it's going to be dissolved?

11             MR. BARNECK:  Not of the entity itself, but of the

12   trademark --

13             THE COURT:  Of Smash Solutions.

14             MR. BARNECK:  -- in the name of Smash Solutions.

10:31:48  15             THE COURT:  Why would the trademark have to be

16   transferred if the development, marketing, et cetera, would be

17   done by a new entity?  Why would that trademark have to be

18   transferred?

19             MR. BARNECK:  Let me back up a half step.  There

10:32:02  20   wouldn't have to be a transfer of solely the trademark, but if

21   the entire ownership, the entire bundle of rights of ownership

22   which would include the trademark right were transferred, then

23   the new entity would own it; right?  But this statute says

24   that there has to be a written assignment duly executed.  And,

10:32:25  25   in fact, the statute directs the USPTO to maintain a record of

1    information on assignments.  So the writing requirement is

2    pretty strict.

3              THE COURT:  Okay.

4              MR. BARNECK:  And there is some case law that we

10:32:42  5    cited which we think is important for the Court from the

6    Second Circuit, a case titled SPI Spirits.  It was litigation

7    over the trademark for a brand of Russian vodka.  And the case

8    talks about this statute and the writing requirement and says

9    some important things here.  It says, you know, this may seem

10:33:15  10   like that it's unduly technical or overly formal.  I'll quote

11   it:  Although it may seem formalistic the writing requirement

12   is written in policy concerns.

13             And those policy concerns, some of them at least

14   fit our case very well, to ensure that the owner of

10:33:40  15   intellectual property does not assign it inadvertently and to

16   enhance the predictability and certainty of ownership.

17             THE COURT:  Right.

18             MR. BARNECK:  Which goes directly to our issue.

19   And then the Court goes on to say:  A clear writing affecting

10:33:56  20   an assignment signals to the parties and the world that the

21   assigned is the party that owns the mark and is authorized to

22   exclude others from use.

23             So the state of the law requires a written

24   instrument duly executed to transfer a registered trademark.

10:34:18  25   That does not exist here.  And we've asserted that none

1    exists.  The plaintiffs have not produced one, neither in

2    discovery behind the debriefing or outside of the briefing.

3    They certainly haven't attached one to it.  And neither does

4    the declaration say that there is one.

5            There's a part of the record that we've cited that

6    we think is rather telling, and that was in an e-mail exchange

7    between Mr. Alexander and Mr. Ulrich from December of 2018,

8    just one month before the plaintiffs filed this suit,

9    Mr. Alexander saying that the lawyer he had been working with

10   in Las Vegas, Sterling Kerr, has the agreement and needs more

11   information from you to finalize it.

12           We think that's a pretty significant admission that

13   it was not finalized then, and it never has been finalized

14   since.  So that's a significant hurdle for the plaintiffs that

15   frankly we think they can't get over.  There is no -- there

16   just is no right that satisfies the writing requirement.

17           Now, let me address some of the other arguments

18   they do make because they do talk about funding a lot, as Your

19   Honor has referenced.  We are not asking the Court to resolve

20   that issue about how much Mr. Alexander provided by the way of

21   funding and what he is entitled to in exchange for that

22   funding.  It may be that he's entitled to an ownership

23   interest in Solutions, Smash Solutions, LLC.  It may be that

24   he is entitled to -- that his claim for unjust enrichment will

25   succeed or it may be that his breach of contract claim will

1    succeed, and he's entitled to damages.  We don't concede any

2    of that, we're just saying those are issues for another day.

3    And the declarations about payments having been made are

4    separate and unrelated to the question of whether ownership of

10:36:28  5    this intellectual property was ever transferred.

6         So those -- that is really -- as I understand the

7    plaintiff's position, they make two arguments over and over,

8    and that's one, we gave a lot of money in funding; and, two,

9    that the parties talked about forming a partnership or some

10:36:50 10    kind of joint business venture.  And we agree they talked

11    about it.  But the facts show that it just never materialized

12    for reasons that will probably be disputed.  But that again is

13    a separate question from whether the ownership of the

14    intellectual property was transferred.

10:37:10 15         Now, let me address this from a different

16    standpoint.  Going back to I think the procedural framework

17    that is before the Court, the plaintiffs bear the burden of

18    proof on these facts, these legal claims, the claims of

19    ownership.  They are the plaintiffs.  They have alleged claims

10:37:38 20    under the Lanham Act, three claims under the Lanham Act:

21    false advertising, false designation of origin and unfair

22    competition.  All of those are based upon 15 USC Section 1125.

23    We cited case law to the Court which shows that to pursue any

24    one of those claims you have to be the owner of the mark or

10:38:06 25    have the right to use it under a license of some kind.

1          THE COURT:  Right.

2          MR. BARNECK:  The plaintiffs do not respond at all

3     to the case law we were talking about a minute ago, the

4     statute that requires the writing and the Second Circuit case

10:38:22  5     about Russian vodka.  They don't even acknowledge that it

6     exists much less dispute that it applies.  I think this other

7     case law that I'm just referring to now that requires

8     ownership of at least the mark if not ownership of the

9     technology as a whole, that I think was included in our reply

10:38:45 10     memorandum.  But they still in their opposition have not

11     challenged the notion that it's their burden of proof.

12          And so we think it fails because -- the plaintiff's

13     position fails that is, because they simply cannot show a

14     genuine issue of fact as to ownership, and it is their burden

10:39:07 15     to prove.  It's not our burden ultimately, it's theirs.  And

16     so as I understand the shifting responsibilities under

17     Rule 56, if we file a properly supported motion and the other

18     side has the burden of proof at the end of the day, they carry

19     the burden to come forward with facts that present a genuine

10:39:33 20     dispute for the court.  And that we believe they have not done

21     and on the record simply cannot do.  Let me see if there is --

22          I guess another aspect of this that I want to

23     address here, we've addressed it quite a bit in our briefing,

24     and that is that we believe that much of what the plaintiff

10:40:03 25     relies upon in terms of record response.  Mr. Alexander's

1    declaration is quite lengthy, and several documents were

2    attached to their opposition.

3              THE COURT:  Oh, yes.

4              MR. BARNECK:  Much of it is not admissible

10:40:20  5    evidence.  Mr. Alexander's statements are conclusory in form.

6    He says --

7              THE COURT:  But aren't yours?  Aren't Mr. Ulrich's

8    somewhat conclusory?

9              MR. BARNECK:  I suppose any declaration of

10:40:37 10    ownership ultimately is a conclusion.

11             THE COURT:  Right.

12             MR. BARNECK:  But I believe Mr. Ulrich has got some

13    background facts to support that conclusion, whereas

14    Mr. Alexander's, his declaration and the opposition continues

10:40:54 15    to say it's a mantra, rather, that says over and over that

16    they own rights, interests, and ownership in and/or control.

17    Very conclusory terms.  They don't say, here's the date on

18    when it was transferred.  Here's what's happened.  Here's the

19    document that effected that transfer.  Here's exactly what

10:41:19 20    Mr. Ulrich said to me.  I just transferred it.  There's

21    nothing like that.  The closest that it comes is a reference

22    in the declaration that says --

23             THE COURT:  Where are you?

24             MR. BARNECK:  I'll tell you exactly where that is.

10:41:33 25    So this is document Number 38-1.

1          THE COURT:  Right.  What paragraph?

2          MR. BARNECK:  Paragraph 7.  I think this is the

3     closest the plaintiffs come, and it still isn't enough.

4          THE COURT:  Here we go.  I understood that Ulrich

10:41:54  5     transferred Solutions infant intellectual property to

6     Technology and dissolved Solutions.

7          MR. BARNECK:  Yes.  Based upon his representations.

8     We don't know what those representations were, when they were

9     said, what exactly was said, what was the context.  But he's

10:42:12  10     making an assumption based upon some undefined, undisclosed

11     representations that there was a transfer.

12          THE COURT:  Well, couldn't it be read that the

13     representations that Mr. Alexander is talking about really are

14     found in Paragraphs 5 and 6 right above 7?  Could those be the

10:42:43  15     representations?  I understood that Ulrich transferred

16     Solutions' infant intellectual property to Technology and

17     dissolved Solutions.  And 5 he says, Ulrich agreed to dissolve

18     Solutions, and then talks about money a little bit.

19          MR. BARNECK:  I suppose that's right.  I mean, if

10:43:06  20     you and I have to guess at what this is, then it's pretty

21     shaky.  But even if we say okay, 5 and 6 are the

22     representations that he's talking about --

23          THE COURT:  Right.

24          MR. BARNECK:  -- then my question is, is that a

10:43:23  25     material fact given the law that requires a written instrument

1    duly executed to effect the transfer?

2              THE COURT:  Of the trademark.

3              MR. BARNECK:  Or the entire bundle of ownership

4    rights.

5              THE COURT:  See, I'm getting all confused.  The

6    ownership of -- the transfer of ownership rights, because if

7    Solutions was going to be dissolved then all that would be

8    transferred would be the software; right?  And do you think

9    that the statute Section 1060 requires a writing to transfer

10   the ownership of just the software if the name Smash Solutions

11   wasn't going to be part of the bundle?

12             MR. BARNECK:  I don't think Section 1060 requires a

13   writing to transfer the entire thing.  But think of it this

14   way --

15             THE COURT:  Okay.

16             MR. BARNECK:  -- if you transfer the entire

17   ownership, the entire bundle of rights relating to that

18   software including the name, then that would include a

19   trademark right.  And the trademark right itself does have to

20   be transferred by a written instrument.

21             THE COURT:  Sure.  But, okay.  And this is

22   something I'll clear up with or try to clear up with

23   plaintiff.  And then, of course, you'll have an opportunity to

24   tell me what I need to know.  I really need to know what the

25   agreement was, unwritten as it was, about what was going to

1    happen to the trademark Smash Solutions.  Okay?

2              MR. BARNECK:  I can he tell you what they allege.

3              THE COURT:  Okay.

4              MR. BARNECK:  If you'd like.  I have their -- they

10:45:20   5    allege --

6              THE COURT:  From the complaint?

7              MR. BARNECK:  Yes.

8              THE COURT:  Oh, I've got that, too.

9              MR. BARNECK:  Okay.  So, I mean, they say there's

10:45:28  10   four terms to it.  But back to this point because I'm afraid

11   it's a little bit confusing.  I think the statute, the writing

12   requirement of the statute only applies to the trademark right

13   and to a registered trademark right, which this one is

14   registered.  By the way, I still have that.  I'm happy to hand

10:45:52  15   it to the Court.

16             THE COURT:  I agree.  I accept that.

17             MR. BARNECK:  I don't think the writing requirement

18   is strict when it's applied to the entire bundle of rights

19   that full ownership would transfer.  But that bundle of rights

10:46:11  20   includes the trademark.  So if you're only going to transfer

21   the entire ownership of intellectual property not separate

22   from the trademark, then you still have to have a writing at

23   least for it.

24             THE COURT:  What if it is separate from the

10:46:26  25   trademark?

1          MR. BARNECK:  If it is separate?  Then I don't

2     think the writing requirement is as strict.

3          THE COURT:  Right.

4          MR. BARNECK:  But we filed some other authority

10:46:37  5     yesterday to say it is still strongly encouraged.

6          THE COURT:  Sure.  Sure.

7          MR. BARNECK:  And I think the standard is there has

8     to be strong evidence.  That's the Seventh Circuit standard

9     that is the leading case on it.  In our situation that's a

10:46:51  10    nonissue because as I understand it the alleged agreement was

11    to transfer the entire ownership of intellectual property in

12    the software, which would include the trademark right.

13          THE COURT:  Okay.

14          MR. BARNECK:  And therefore the writing requirement

10:47:04  15    applies.

16          THE COURT:  All right.

17          MR. BARNECK:  Okay.

18          THE COURT:  What else should I be thinking about,

19    sir?

10:47:10  20          MR. BARNECK:  I think those are the main points.

21    And if I have a little chance for a rebuttal I'll see anything

22    else.

23          THE COURT:  You'll have a chance for rebuttal for

24    sure.

10:47:20  25          MR. BARNECK:  Okay.  Thank you very much.

1          THE COURT:  Okay.  Tell me, sir, my first question,

2     Mr. Maxfield --

3          MR. REID:  Mr. Reid.

4          THE COURT:  Mr. Reid.

10:47:33  5          MR. REID:  You're good, Your Honor.

6          THE COURT:  You are Mr. Maxfield; you're Mr. Reid.

7     Tell me, Mr. Reid, what was the agreement?

8          MR. REID:  Your Honor, the agreement had several

9     components to it.

10:47:43 10          THE COURT:  Do you outline it in your complaint?

11          MR. REID:  I do.  And then, of course, the

12     agreement is then supported by the documentary evidence that

13     we put into the record, as well.

14          THE COURT:  Tell me first what the agreement is and

10:47:57 15     what the documentary -- well, the documentary evidence,

16     doesn't that mainly have to do, and correct me if I'm wrong,

17     with the discussions by e-mail or whatever between

18     Mr. Alexander and Mr. Ulrich about paying money?

19          MR. REID:  Yes; among other things.  I think what

10:48:22 20     will be helpful for the Court --

21          THE COURT:  I need some help.

22          MR. REID:  -- is we've had some allegations that

23     are deliberately confusing, and they're intended to obfuscate

24     the facts before the Court.  The defendants' entire summary

10:48:39 25     judgment is based on one statement in a declaration by Jerry

1    Ulrich, the defendant.  And he says that Smash Solutions owns

2    the software, the intellectual property at issue in this case.

3              THE COURT:  And he -- but how does it tie in or is

4    that the same his assertion that Smash Solutions never

10:49:05  5    transferred anything to do with that software?

6              MR. REID:  Right.  We have a disputed fact on that

7    issue, and here's why.

8              THE COURT:  Okay.

9              MR. REID:  In response to that statement, we have a

10:49:18 10    counter declaration from Mr. Alexander saying, no, actually my

11    company Smash Technology --

12              THE COURT:  Right.

13              MR. REID:  -- owns that CRM Platform, that

14    developed software technology.  And then in support of that we

10:49:38 15    have submitted numerous documents that demonstrate the

16    transfer indeed did happen and that Mr. Alexander's statement

17    does have merit, especially at the summary judgment stage.

18              THE COURT:  Okay.  So if you can help me break that

19    down, and it is quite a lengthy little affidavit.

10:50:04 20              MR. REID:  What I would like to do is I would like

21    to put in front of the Court a few of the key documents.

22              THE COURT:  Please do.  Are they in the record?

23              MR. REID:  They are in the record.  They're part of

24    our appendix of evidence, and I will put them on the monitor

10:50:16 25    in front of the Court.  But before I do that, let me just say

1    something that's critical.  This is not a trademark

2    infringement case.  The word "trademark" or "infringement" do

3    not appear in our complaint or our first amended complaint,

4    which the Court has just granted leave to file.

10:50:37   5            THE COURT:  I don't think there's an allegation so

6    much in the argument, if I'm understanding the defense's

7    argument.  What it is is that if you transfer a trademark

8    which according to the defense was contemplated, the trademark

9    being Smash Solutions, then according to the trademark statute

10:51:06  10   there has to be a right.

11           MR. REID:  Right.  And this case has nothing to do

12   with the transfer of a trademark.  We don't care about it.  We

13   don't care if it was transferred.  And, in fact, as the Court

14   already identified, we have a new company with a different

10:51:21  15   name.  We have no interest in a trademark, and that's why it's

16   not an issue in this case.

17           THE COURT:  And a new company is what, Technology?

18           MR. REID:  Smash Technology.  Yes.  So Technology

19   received its rights in the ownership of software.  Here's a

10:51:42  20   way to think about it, Your Honor.

21           THE COURT:  Okay.  Please, I need help.

22           MR. REID:  Microsoft has software, Microsoft Word.

23   Over here it has trademarks, symbols that it uses and other

24   things to help advertise and sell its good.  They're two

10:52:01  25   vastly different assets.

1          This case is only about the software.  It has

2   nothing to do with trademarks or the way that you advertise

3   the name of a company, a brand, et cetera.  So what is --

4   candidly I'm flabbergasted that counsel in their reply raised

10:52:26  5   all of these procedurally improper arguments related to

6   trademarks.  It's deliberately confusing.  The cases are not

7   on point.  And, in fact, what they say is they cite the

8   Lanham Act and say that the Lanham Act has this requirement

9   that assignments of registered trademarks shall be by

10:52:53  10   instruments in writing duly executed.

11          But this case isn't about trademarks.  And, in

12   fact, the Lanham Act covers a whole range of goods or services

13   that are protected from unfair competition and false

14   advertising.  That's why we raised those Lanham Act claims,

10:53:15  15   because what we're saying is, hey, bad guys, you're telling

16   the word -- the world that you own our software.  You don't.

17   And here's why they don't.  Because the agreement between my

18   client Mr. Alexander and their client Mr. Ulrich actually did

19   materialize.  And the parties went considerably down the road

10:53:45  20   of performing their partnership in the new Smash Technology

21   company.

22          THE COURT:  How about the fact, and now I'm getting

23   mixed up, about the document that the operating agreement

24   which Mr. Barneck gave me the number to is for Technology is

10:54:13  25   just signed by Mr. Alexander and there's absolutely nothing to

1    do with Mr. Ulrich?

2            MR. REID:  That's one document among many.  That's

3    one piece of evidence among many that the Court as the

4    factfinder at a trial will have to determine its weight.  But

10:54:34  5    for purposes of summary judgment, and counsel said that at the

6    Rule 56 stage we have to prove ownership.  We have the burden

7    of proving ownership.  Well, that's completely false.

8            THE COURT:  Well, I don't know that it's false.

9            MR. REID:  It is false, Your Honor.  All we have to

10:54:51 10    do is demonstrate that there's a disputed issue of fact, a

11    genuine material fact relating to ownership.  And we've done

12    that in spades.

13            THE COURT:  Okay.  Calm down just a second.  What

14    you have to do is, the defense to establish its point that it

10:55:13 15    never transferred anything to either Mr. Alexander or to

16    Technology has pointed to documents.  Among them one of the

17    things they point to is, and then it's up to you to rebut it,

18    it's up to you to put up enough to show that they -- that

19    there's a fact that defeats summary judgment.

10:55:45 20            MR. REID:  Right.

21            THE COURT:  And what the defense is arguing is,

22    hey, your arguments show only the transfer of money.  And you

23    were speaking with Mr. Ulrich about a partnership, but it

24    never came to be.  You got zip.  In fact, FeraCode canceled.

10:56:13 25    We were the ones who paid FeraCode in our initial idea to

1   where it is now belongs to us only because we didn't transfer

2   it.

3          MR. REID:  Your Honor, what I'm telling you is we

4   met our burden and our obligation by putting forward not only

10:56:31  5   Mr. Alexander's declaration, but the voluminous documents that

6   specifically detail the transactions that occurred.  And let

7   me put the first one in front of you.

8          THE COURT:  Please do.  That will help.

9          MR. REID:  Exhibit A, Exhibit A to our appendix of

10:56:47  10   evidence.

11          THE COURT:  All right.  That will show up.  Do you

12   all have that on your -- okay.  Do you have that defense?

13   Miss Rice?

14          THE LAW CLERK:  I'm sure I do.

10:57:01  15          MR. REID:  This is the master services agreement

16   entered into between my client Smash Technology and FeraCode

17   for purposes of developing the CRM Platform edition.

18          THE COURT:  Okay.

19          MR. REID:  If you go to the next callout you see

10:57:19  20   that the signatories are Wladimir Ribeiro, Junior, the CEO of

21   Farracode; and Michael Alexander on behalf of Smash

22   Technology.  And it's dated March of 2018.

23          THE COURT:  Now, let me make sure I've got my dates

24   right.  According to the defense 10 months later, FeraCode

10:57:40  25   terminated this agreement because of nonpayment and also

1    because there was no transfer; right?

2              MR. REID:  Yes.  According to them conveniently

3    that appeared for the first time after we filed our complaint

4    in this matter in January 2019.

10:57:57  5              THE COURT:  Okay.

6              MR. REID:  Okay.  So if you go to the next

7    pertinent page this is the work order form for the master

8    services agreement.

9              THE COURT:  Right.

10:58:10 10              MR. REID:  And you will see that the project

11   representatives for FeraCode is its CEO and for the client

12   interestingly it's Jerry Ulrich on behalf of Smash Technology,

13   the new partnership enterprise.

14              THE COURT:  Okay.  I see client Jerry Ulrich, but

10:58:33 15   if I go down a bit I'll see Smash Technology; right?

16              MR. REID:  Correct; because he's representing the

17   client, which is Smash Technology.

18              If you go down to the next callout you will see

19   that as we've alleged that the project was divided into

10:58:52 20   12 milestones with payments that would accompany each

21   milestone, $1.7 million.  And FeraCode will only start a

22   milestone after Smash Technology executives have approved

23   previous milestones and paid the invoices.

24              THE COURT:  So what you're saying is that Smash

10:59:13 25   Technology signed on on behalf of -- Mr. Ulrich signed on on

1    behalf of Splash Technology with FeraCode to develop the new

2    software.

3              MR. REID:  Yes.  Mr. Ulrich and my client as a

4    partnership in the new enterprise, Smash Technology, have now

10:59:39  5    entered into a contract with FeraCode, the coding provider, to

6    help continue to develop the intellectual property asset, the

7    software at issue in this case.

8              So what's interesting, you'll take a look, I've

9    highlighted it in red there.

10:59:58 10              THE COURT:  Sure.

11              MR. REID:  This is just a provision that says:

12    Should FeraCode conclude that it cannot perform this project,

13    FeraCode will draw out a written statement that it cannot

14    continue and deliver all works to Smash Technology.

11:00:13 15              This is one of the reasons we've added FeraCode

16    among many as a defendant in this case because they breached

17    this provision.  They have not returned the software, whatever

18    state it's in, back to us.  They haven't returned it back to

19    us as they're required to do.

11:00:29 20              If you'll go to the next callout, right here at the

21    bottom.  FeraCode will deliver source code to my client, Smash

22    Technology, after completion of all 12 milestones.

23              So the Court might ask the question, why in the

24    world is FeraCode and Smash Technology entering into this

11:00:52 25    agreement to develop the source code if that source code, if

37

1    that infant intellectual property has not been transferred to

2    FeraCode for the benefit of my client?  Because that's what

3    actually happened, and I'm going to walk you through that now.

4         If you go to the next document, which is Exhibit B

11:01:14  5    to our appendix of evidence.

6         THE COURT:  Is that 33?

7         MR. REID:  Yep.  So now we're going back in time

8    just a little bit.  This is at the start of this earnest

9    partnership between my client and Mr. Ulrich.  Jerry Ulrich

11:01:30  10    sends this e-mail in November 2017.  And if you, just calling

11    out a few things, the Court can review this carefully and I'm

12    sure it has.  He says to my client:

13         I needed to do some soul searching because I know

14    with your business experience we can bring this home.

11:01:49  15    However, it will require a huge commitment for both of us.

16    Hey, we're going to be billionaires.

17         That's his statement to my client.  If you go down

18    to the next callout.  Now he's talking about Smash

19    Technology's development of the software.

11:02:06  20         We would be nine months in development and the

21    software company is ready to go if we can supply the monthly

22    revenue requirement to keep them paid.  As we saw, it's going

23    to cost $1.7 million to do this.  He says:  That means in less

24    than two years we would be sitting on a billion dollar

11:02:25  25    company.  I know we have had a million challenges, and I know

1    any of those mistakes are my own, and I take complete

2    accountability for all them.  I know with your business

3    experience and connections combined with the plan that we have

4    developed we can accomplish this extraordinary ambitious

11:02:41  5    software.

6             That's what they set out to do.  You'll see at the

7    bottom here, again reiterating their partnership.

8             I am willing to work into a full partnership with

9    you meaning you would own, I believe he meant to say, the same

11:02:57 10    equity as I own.

11             And that's how they proceeded down the path.

12             THE COURT:  "The same equity as I own" in what?

13             MR. REID:  It's Smash Technology.

14             THE COURT:  Okay.

11:03:06 15             MR. REID:  This is the new company, the new

16    enterprise, the new partnership that they're going to be part

17    of.

18             THE COURT:  All right.  And when it says:  We need

19    to clean up the shares and the company infrastructure, we're

11:03:17 20    talking about Smash Technology's interest.

21             MR. REID:  He's talking about the old entity.  The

22    old entity.  We're going to take that infant technology out of

23    the old entity.  It's got lots of problems, and we're going to

24    bring it over to our new partnership, our new entity.

11:03:35 25             THE COURT:  The old company?

1          MR. REID:  Yeah.  The old Smash Solutions, the

2     defendant.  One of the defendants.

3          THE COURT:  But doesn't that then tie into the

4     defendant's argument that any transfer -- the old company

11:03:46 5    would include the old company's trademark, wouldn't it?

6          MR. REID:  No.  We don't want the trademark.  We

7     don't care about the trademark.  That's just a legal argument.

8     That's not what happened.  That's not even our allegations.

9          THE COURT:  Okay.

11:03:59 10         MR. REID:  This isn't a trademark case, Your Honor.

11    We don't care about it.  It's not even mentioned one time in

12    our complaint.

13          So if you go to the next part of this long e-mail,

14    Mr. Ulrich again, these again are, Your Honor, documentary

11:04:20 15   admissions from the defendant.

16          You and I combined can find the funding.  I know

17    this product market and have a belief deeper than anything

18    I've ever believed in or been involved in.

19          If you go to the next callout.

11:04:33 20         THE COURT:  What about the argument, we're not

21    denying that there were plans, but the plans never came to

22    fruition.  And because they never came to fruition we never

23    transferred our infant software.  And the development that was

24    done was of our basic idea, and we own it.  We own the basic

11:05:07 25   idea and what has become of it.  You might have a complaint

1    for a claim against Solutions because we didn't do it, but as

2    far as transferring the software never happened?

3                MR. REID:  That's the right question, Your Honor.

4    And the response is we put forward evidence to dispute that

11:05:27 5    fact.  And what I'm going to do is I'm going to walk you on

6    this journey that my client and defendant took together.

7    That's what I'm doing here.

8                THE COURT:  Okay.  What I see here and I don't

9    think there was a dispute from the defense that it was

11:05:42 10    contemplated.

11                MR. REID:  Okay.  And what you're going to see as I

12    move through the documents --

13                THE COURT:  Okay.

14                MR. REID:  -- is that not only was it contemplated,

11:05:50 15    but it actually happened.

16                THE COURT:  That's the key.

17                MR. REID:  That's the key.  Did it happen?  Did it

18    happen?  And we're going to walk through the documents to show

19    that it did.

11:06:00 20                If you go to Exhibit F, this is a wire transfer

21    receipt for 60,000 US dollars.  It's from my client to

22    Mr. Ulrich sent on February 2018, about a month before

23    FeraCode and Smash Technology entered into their agreement.

24    You'll see on the next page that this wire was sent from a

11:06:36 25    Jakarta, Indonesia, bank account.  My client spent some of his

1      time in nearby Bali.  You'll see it was sent to a America

2      First Credit Union account, which the documents have shown we

3      believe belongs to Mr. Ulrich.  So you have this evidence of a

4      realtime wire transfer from my client for $60,000.  Now let's

11:06:58  5      trace this through because it is critical.

6                THE COURT:  Clarify this for me.  I don't think

7      there's any dispute that money was wired and that it was in

8      contemplation of the development of the software.

9                MR. REID:  Right.

11:07:17  10                THE COURT:  However, what does that show other than

11      performance by Mr. Alexander and a possible breach by Smash

12      Solutions or Mr. Ulrich?  And they say, okay, you thought we

13      were going ahead.  You put up the money.  You performed.

14      Guess what, we didn't.

11:07:41  15                MR. REID:  You're asking the right questions again,

16      Your Honor.

17                THE COURT:  I so often do.

18                MR. REID:  And the answer is, where did the money

19      go?  What happened?  Did it -- again, did it materialize?  And

11:07:54  20      so again, let's work our way through these documents here,

21      because this is critical.  That's why I'm sharing it with you.

22      This is right here what precludes summary judgment.  If you go

23      to the next Exhibit G, which is again in the appendix of

24      evidence, you will see that this is an e-mail from Mr. Ulrich

11:08:12  25      a few weeks later in February 2018 to my client.  And you will

1    see he starts talking about:

2         Once I have the documentation we have the funding

3    to submit the $10,000 to him and be underway in activating the

4    new corporation.

11:08:29  5         THE COURT:  Who's Sterling?  The corporate

6    attorney?

7         MR. REID:  Sterling Kerr is the attorney that did

8    work in forming the Smash Technology entity.  And my client's

9    declaration states that that $10,000 was another part of his

11:08:45 10   investment into Smash Technology.  He paid Mr. Kerr that

11   money.

12        So then if you continue to Exhibit H.  This is an

13   e-mail.  Subject titled Smash Technology Contract.  It's from

14   Mr. Ulrich, defendant, to my client and Mr. Kerr.  Here's the

11:09:13 15   agreement from FeraCode.  I'm working on price with them for

16   the first two months.

17        So he sends them the agreement.  He's right in the

18   middle of this transaction.  You go to the next exhibit, which

19   is Exhibit I.  Again, a couple weeks later, subject line, made

11:09:31 20   corrections.  Mr. Ulrich says to my client:  Michael, here's

21   the agreement.  Please sign and return and let me know how we

22   move forward with budget and check to these guys.

23        In other words, hey, you tell me how we're going to

24   pay these guys because we're going to actually do this.  Not

11:09:50 25   just contemplate it, but do it.  Okay.

1          So then we go to Exhibit K all right in our

2    appendix.  Here's my client's response on the same date of

3    that e-mail:  JJ, I signed the contract and have attached.

4    Second paragraph.

11:10:10  5          THE COURT:  And again, you're talking about the

6    FeraCode contract.

7          MR. REID:  Absolutely.  I hereby authorize per our

8    verbal agreement you have my permission to use $50,000 I wired

9    to you to buy BitCoin for me to pay this first payment to the

11:10:28  10   development team together with the our shared funds from

11   Uberfund to cover the $76,000 first installment.

12         THE COURT:  When he says:  I hereby authorize per

13   our verbal agreement.  Is he speaking about the agreement to

14   develop the software for the benefit of technology?

11:10:49  15         MR. REID:  Exactly.

16         THE COURT:  Okay.

17         MR. REID:  So then he even says:  Hey, call me when

18   you're up.  We'll put our heads together on how we cover the

19   next payment.

11:10:59  20         So we're going to pay these guys again to develop

21   Smash Technology's software.  So then, and this e-mail alone,

22   Your Honor, it precludes summary judgment among the many

23   other.  And I'm not going to walk through all of the

24   documents, but this one right here.  The next e-mail from

11:11:19  25   Mr. Ulrich, to my client, he says:

1    This is to show a receipt of transfer from Uberfund

2    to PaidEasy.  When we paid the invoice to FeraCode $50,000 was

3    used from the $60,000 you sent.  The difference was used by

4    pulling all cash and commissions out of our accounts to cover

11:11:43    5    the $26,000 difference.

6    And what he's referring to there is their shared

7    BitCoin account.  So in other words, my client paid almost the

8    entirety of the first $76,000 development payment to FeraCode.

9    And there's more.

11:12:00    10    THE COURT:  When "we" paid.  Who paid?  Who's the

11    "we?"

12    MR. REID:  Him.  Him and my client Mr. Ulrich and

13    Mr. Alexander.  We did it, because we have a partnership in

14    Smash Technology.

11:12:16    15    THE COURT:  Okay.

16    MR. REID:  So now if you take a look at Exhibit 4

17    of the appendix, these are a series of invoices that were sent

18    from FeraCode to Smash Technology for the development of the

19    software at issue in this case.

11:12:35    20    THE COURT:  Right.

21    MR. REID:  And if you'll notice at the top

22    right-hand corner this one says paid.  And if you'll notice,

23    as well, it's for the $76,000 that you just referenced.  So

24    this is evidence, not a contemplation.  This is evidence of

11:12:52    25    performance.  We did this together, and this is my client's

1    money.

2              Now, what you'll also notice in these invoices is

3    Invoice 2, 3, 4, 5 were all paid by Smash Technology, all the

4    way through the end of 2018.  And then what you'll find is,

11:13:15   5    yes, some straggling invoices towards the end of the year were

6    not paid, and that's because the parties dispute crystallized.

7    And we ended up having to file a complaint in January to

8    demonstrate that we own this property among other allegations

9    that we made.

11:13:36  10              Now what's interesting and conveniently, it was

11    only then, Your Honor, that for the first time this idea that

12    there was some notice of termination by FeraCode, that came

13    after we filed our complaint.

14              THE COURT:  Well, are you saying that FeraCode did

11:13:55  15    not terminate?

16              MR. REID:  Yeah.  We dispute that they terminated.

17    In my client's declaration, he says, I never got that.  But

18    even if they did terminate, it was 10 months into my client

19    and Smash Technology systemically paid for the development of

11:14:13  20    the property at issue in this case.  How can -- how can this

21    case not move forward past summary judgment with those facts

22    in the record?  There's clearly a dispute as to who owns this

23    software.  That's what trials are for, to figure it out.

24              THE COURT:  What about, is the only evidence of

11:14:36  25    termination by FeraCode Mr. Ulrich's declaration?

1          MR. REID:  Correct.

2          THE COURT:  There is nothing independent such as a

3  document from FeraCode or --

4          MR. REID:  There is a document from FeraCode that

11:14:50  5  my clients had never seen and was only produced to us months

6  later after January during the course of this dispute.  So

7  there is a document.  And it has the issues that come with it.

8          THE COURT:  So it is a document from FeraCode

9  saying, you haven't paid.  You don't have the software.

11:15:09 10  You're out of here.

11          MR. REID:  That's right.

12          THE COURT:  Okay.

13          MR. REID:  So then, of course, we argue that's one

14  piece among many things.  That's certainly not determinative

11:15:18 15  of our rights and what we paid for.

16          THE COURT:  Right.

17          MR. REID:  Finally -- well, yeah, let's throw it

18  out.  Exhibit 5.  This is Sam Potter.  He's mentioned in the

19  allegations.  He's a buddy of JJ Ulrich's.  And he was hired

11:15:40 20  and engaged by Smash Technology to sort of be their point

21  person with FeraCode.  Hey, we need a guy with some expertise

22  to sort of help monitor their development of Smash Technology

23  software.

24          And what I've provided to the Court is a series of

11:15:57 25  documents demonstrating that Smash Technology paid Mr. Potter

1    the entire length of 2018 from April all the way to November.

2    We paid for his services because we were developing the code.

3    And he accepted our money.  And where did that money come

4    from?  My client states that it came from his coffers.  It

5    came from his resources.

6         And here's the strange procedural posture we are

7    in, Your Honor, is this summary judgment motion was filed so

8    early in the case we don't even have the benefit of all

9    defendant's documents.  We had to submit our record evidence

10   without any discovery.  We haven't deposed anyone yet.  And so

11   not withstanding that premature nature of their motion the

12   record evidence demonstrates a substantial and significant

13   genuine dispute of fact.

14        So this case needs to move forward.  And when we

15   come back here down the road you can bet there's going to be a

16   whole host of other documents.  We don't even have any of

17   Mr. Ulrich's financial records.  All of the payments that my

18   client made to him, all of the BitCoin that he pulled out of

19   my client's accounts to help fund this development, we haven't

20   seen any of those records yet.  And when we get them, it's

21   going to create a very compelling story that they moved well

22   beyond contemplation, and they proceeded down this path and

23   they developed this software.  And that bundle of right in

24   that software, not a trademark, we don't care.  That bundle of

25   right is what this case is about.

1    And so I would submit that evidence I just walked

2    you through compared to one single statement from Mr. Ulrich

3    that Solutions owns the property, that's the stuff that

4    summary judgment denials are made of.

5    Now, I think it's important to talk about this idea

6    that intellectual property and specifically the question of

7    ownership, the case law, and we've cited cases for you, it is

8    a question of fact.  And that's why at the summary judgment

9    stage, you know, we cited the Luckette case stating that which

10   party owned the intellectual property was a material question

11   of fact precluding summary judgment.  We cited the Bodum USA

12   case* that says:  Whether intellectual property were validly

13   assigned was a question of fact that precluded summary

14   judgment.  And that's because this registered trademark

15   concept from the Lanham Act has literally zero application to

16   this case.

17   And so in short, Your Honor, if the Court has any

18   additional questions, but I think that our evidence is

19   compelling.  I think my client deserves to have his

20   opportunity to proceed with discovery in this case and to

21   truly vindicate his rights, especially when he according to

22   him has spent $2 million developing this software.

23   THE COURT:  When he and it.  You represent both

24   Mr. Alexander and Smash Technology?

25   MR. REID:  That's right.  That's right.

1           THE COURT:  Okay.

2           MR. REID:  Thank you, Your Honor.

3           THE COURT:  Let's take about a 10-minute break, and

4    then I'll certainly hear from you defense.

11:19:28  5           MR. BARNECK:  Thank you.

6           (Recess.)

7           THE COURT:  Okay.  Go ahead, please, defense.

8           MR. BARNECK:  Thank you, Your Honor.  I'd like to

9    begin by refocusing us on I think a key point, which is that

11:33:34 10   it's undisputed that Solutions owned this intellectual

11   property in the beginning, and we say they still own it.  And

12   the question --

13           THE COURT:  What was that second thing you say?

14           MR. BARNECK:  We say they still own it.

11:33:47 15           THE COURT:  Okay.

16           MR. BARNECK:  And the question is whether it's been

17   transferred.  But counsel said something to the effect that

18   all this hinges on one little statement in Mr. Ulrich's

19   declaration.  Well, it happens to be a statement that they

11:34:00 20   agree with.  Their pleadings, both their original complaint

21   and their amended complaint refer to it as Solutions'

22   intellectual property.

23           THE COURT:  Well, it's not anymore.

24           MR. BARNECK:  They say it's been transferred.  But

11:34:16 25   I'm saying the starting point is an undisputed point.

1    Everyone agrees that this began as intellectual property owned

2    by Smash Solutions.  And the question for the Court is, has it

3    transferred?

4            THE COURT:  Right.

11:34:32   5            MR. BARNECK:  We say no; they say yes.

6            THE COURT:  Yes.

7            MR. BARNECK:  So I want to refocus that because I

8    think they tried to minimize the fact that that's undisputed.

9    It's even alleged in their pleadings.

11:34:42   10            THE COURT:  That at the beginning of the process

11   nobody disputes that it was initially the property of

12   Solutions.

13            MR. BARNECK:  That's correct.

14            THE COURT:  Okay.

11:34:57   15            MR. BARNECK:  That's correct.  So then the question

16   is whether it's been transferred.

17            THE COURT:  Yep.

18            MR. BARNECK:  And, of course, we cited the writing

19   requirement that we think is critical here.

11:35:13   20            THE COURT:  But according to plaintiff they don't

21   care what you do with your trademark.  They just want the

22   property because they wanted Smash Solutions and everything

23   that goes with it to be dissolved.

24            MR. BARNECK:  They say that, but it doesn't make

11:35:34   25   sense --

1          THE COURT:  Okay.

2          MR. BARNECK:  -- Your Honor, for a couple of

3      reasons.

4          THE COURT:  Okay.

11:35:38  5          MR. BARNECK:  One is that they allege trademark

6      claims in this case.  They allege Lanham Act claims.  They

7      allege three of them and two causes of action.  And each of

8      those claims requires proof of ownership of the trademark to

9      pursue it.  We cited case law to say that.  And I'd be happy

11:36:00 10     to walk through it.

11          THE COURT:  No.  You need not.

12          MR. BARNECK:  But that's something that they gloss

13      over.  Their Sixth and Seventh causes of action in the new

14      complaint that the Court just approved allege false

11:36:13 15     advertising and false designation of origin and unfair

16      competition all under 15 USC Section 1125.

17          THE COURT:  But they say what it is is they own the

18      intellectual property.  And if there's a violation of a mark,

19      although I don't think they say they've allege it, it's that

11:36:40 20     Ulrich and --

21          MR. BARNECK:  Alexander.

22          THE COURT:  -- Solutions, you're breaching it.

23      You're breaching their new ownership, but you're not breaching

24      Solutions' trademark.  They say they don't care about

11:37:00 25     Solutions' trademark.

1          MR. BARNECK:  Well, that's the other reason why

2     their position doesn't make sense because they say, we own all

3     of it.  And all of it would include the trademark right.

4          THE COURT:  Okay.

11:37:14   5          MR. BARNECK:  And that's why we started looking at

6     this writing requirement in the first place because they're

7     alleging these Lanham Act claims, and we find the statute in

8     the case law that says you've got to have a written instrument

9     duly executed to transfer a mark, even if it's just a mark,

11:37:36  10     but certainly if it's the mark as part of the overall bundle

11     of rights that complete ownership would convey.  They still

12     have to comply with that writing requirement.  And so to say,

13     we don't -- I wrote down some quotes.  We have no interest in

14     a trademark.  We don't care about it.  It's not even mentioned

11:37:56  15     one time in our complaint.  Well, it is by way of allegation

16     of Lanham Act claims.

17          And so our point to the Court is, if you're

18     pursuing Lanham Act claims you're bound by the writing

19     requirement.  That's what the case law says.  We've cited each

11:38:16  20     one of for each one of those three claims.  It says you've got

21     to prove ownership of the mark or right in the mark, and we

22     cited that in our briefing.

23          So the question then still comes back to whether it

24     was transferred.  They just want to say, oh, we own it.  But

11:38:35  25     they don't say how that ownership transferred.  I looked at

1    all of these exhibits that counsel showed the Court, and they

2    talk about funding.  That's a wire transfer from Indonesia.

3    There's e-mails talking about $10,000 to Mr. Kerr.

4              THE COURT:  But there are also documents that

11:39:00   5    exhibit I think they've argued that Mr. Ulrich and

6    Mr. Alexander were working together to get the software

7    developed.

8              MR. BARNECK:  We do not dispute that.  As we said

9    at the beginning, there were discussions and there were steps

11:39:19  10    taken on both sides to work toward that end.  It just didn't

11    get completed.  Neither did the funding get completed on his

12    side, certainly the transfer of ownership didn't get completed

13    on our side.  If they have a claim for breach of contract

14    based on that or a claim to an ownership interest in Solutions

11:39:40  15    because of the funding, those are issues for another day.  We

16    do not concede.  We simply say they are distinct from the

17    question of ownership.

18              THE COURT:  Okay.

19              MR. BARNECK:  And I think it's important to -- I

11:39:57  20    just lost my train of thought.  But let me point out a couple

21    of other things.  One is you asked about whether there is a

22    document reflecting the FeraCode termination, and there is and

23    we attached it to our motion.

24              THE COURT:  Right.  And I've looked at that.

11:40:20  25              MR. BARNECK:  You looked at that.

1          THE COURT:  Yes.

2          MR. BARNECK:  32-6 is the document number for the

3     record.  And it says:  The reasons are the seriousness

4     delinquency of the payments and final transfer of the

11:40:32  5     intellectual property not being completed from Jerry Ulrich

6     and Smash Solutions gave us no other option but to exit and

7     terminate this agreement effective immediately.

8          So I think the question mainly hinges I think first

9     on whether there is a writing, a written instrument duly

11:40:56 10     executed.  I think the Court needs to decide, does that

11     writing requirement apply here?  We think it does, because

12     whether they care about the trademark or not, what they wanted

13     is a bundle of rights that included the trademark.

14          And it's also important to remember that these

11:41:15 15     parties were contemplating a written document that would have

16     effected the transfer.  And it never got finalized by

17     Mr. Alexander's own admission.  And if the Court determines

18     that the writing requirement doesn't apply then I think what

19     the Court has to look at is are claims about funding, claims

11:41:39 20     about wanting to form a partnership or joint business venture,

21     whatever you call it, does that evidence by itself reflect a

22     transfer of ownership?  I think that's the second question if

23     you decide that the writing requirement doesn't apply.

24     Honestly I think it's hard to get around that because you've

11:42:02 25     got a federal statute and case law that seems undisputed, and

1    the plaintiffs frankly have not even tried to dispute that

2    principle of law.

3           Also here's the point I forgot just a moment ago.

4    The verbal agreement that they allege which is laid out in

11:42:28   5    their complaint, for the record I'll just say that it's in

6    Paragraphs 12 and 13 of the amended complaint, does not

7    include Solutions, it is by their own allegations a verbal

8    agreement only between Alexander and Ulrich.  And in our

9    separate briefing on the motion to dismiss, we had some

11:42:59  10    argument about that, and they said quite emphatically

11    Solutions is not a party to this agreement.  It's only

12    Alexander; it's only Ulrich.  And that's why their breach of

13    contract claim is only alleged against Ulrich.

14           But the parties agree that Ulrich didn't own this

11:43:18  15    software.  They don't have, even by -- if we take their

16    allegations at face value, they don't have an agreement that

17    involves Solutions and would require Solutions to transfer

18    ownership of the intellectual property.

19           I guess the last thing I'll say is that counsel has

11:43:36  20    said that they ought to have the right to conduct discovery on

21    these issues.  And we don't dispute that they ought to have

22    the right to conduct discovery on all of the other issues that

23    they've addressed.  They just haven't addressed the ownership.

24    There's been plenty of opportunity for them to come up with a

11:43:57  25    document that shows there was a transfer of ownership.  We've

1    asked for it.  It hasn't been produced.  We've asserted it in

2    our motion, and it doesn't exist.  And they have not produced

3    one in response.  I don't know what further discovery could

4    help with with regard to a written instrument.  But certainly

11:44:16  5    with regard to all the other issues in the case that we are

6    not seeking adjudication of here, the parties are going to

7    have whatever discovery the Court deems is appropriate.

8            THE COURT:  Thank you, counsel.

9            MR. BARNECK:  Thank you.

11:44:28  10           THE COURT:  Here's what -- I've already granted the

11    motion to amend.  But again in listening to your arguments

12    which clarified issues that weren't as clear to me after

13    reading the materials as they are now I'm still firm in my

14    belief that there are disputed issues of fact about who owns

11:44:57  15    what.  And for that reason I'm going to deny the motion for

16    partial summary judgment with prejudice.

17           We'll be in recess.

18       (Whereupon, the court proceedings were concluded.)

19                    *   *   *   *   *

20

21

22

23

24

25

1    STATE OF UTAH          )

2                           ) ss.

3    COUNTY OF SALT LAKE  )

4           I, KELLY BROWN HICKEN, do hereby certify that I am

5    a certified court reporter for the State of Utah;

6           That as such reporter, I attended the hearing of

7    the foregoing matter on August 14, 2019, and thereat reported

8    in Stenotype all of the testimony and proceedings had, and

9    caused said notes to be transcribed into typewriting; and the

10   foregoing pages number from 3 through 57 constitute a full,

11   true and correct report of the same.

12          That I am not of kin to any of the parties and have

13   no interest in the outcome of the matter;

14          And hereby set my hand and seal, this ____ day of

15   _____ 2019.

16

17

18

19

20          _____
                         KELLY BROWN HICKEN, CSR, RPR, RMR
21

22

23

24

25